# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Brandon Deutsch, *individually and on*
*behalf of all others similarly situated*,

      Plaintiffs,

  v.

My Pillow, Inc.,

      Defendant.

Case No. 20-cv-318 (SRN/ECW)

**ORDER**

---

In this action, Plaintiff Brandon Deutsch, on behalf of himself and others similarly situated (collectively, "Plaintiffs"), alleges that Defendant My Pillow, Inc. ("Defendant" or "My Pillow") violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*,[1] by failing to pay him overtime.  (Dkt. 31 ¶¶ 61-74.)  This matter is before the Court on Plaintiffs' Motion for Conditional Certification and Notification to All Putative Class Members Under 29 U.S.C. § 216(b) ("Motion").  (Dkt. 35.)  Plaintiffs filed the Motion and supporting materials, including the declaration of opt-in Plaintiff Craig Lyons ("Lyons"), on August 5, 2020.  (Dkts. 35-40.)  My Pillow filed its opposition and supporting materials on August 26, 2020.  (Dkts. 48-50.)  Plaintiffs requested and were granted permission to file a reply brief, which was filed on September 4, 2020.  (Dkts.

---

[1] The Complaint also alleges violations of the Minnesota Payment of Wages Act and the Minnesota Fair Labor Standards Act (Dkt. 31 ¶¶ 75-91); those claims are not at issue in this Motion.

51-53.)[2]  For the reasons stated below, the Motion is granted, although the definition of

the class is modified as set forth in Section IV.

## I.       <u>BACKGROUND</u>

### A.    **My Pillow's Call Center**

My Pillow is a Minnesota corporation that sells pillows and other goods in its

retail stores and via its website.  (Dkt. 31 ¶ 2; Dkt. 50 ¶ 2.)  My Pillow operates a call

center in Chaska, Minnesota.  (Dkt. 50 ¶ 2.)  During the relevant period, the call center

employed "as many as 100 individuals," operating in four shifts.  (*Id.* ¶ 3.)[3]  During most

of the shifts, My Pillow employs Customer Service Representatives and Sales Agents,

while during the overnight shift, those two positions are combined into a Customer

Service/Sales Representative position.  (*Id.*)  For convenience in addressing the present

---

[2]      My Pillow argued at the hearing that the reply should not be considered because it
relies on screen shots of a video that is not part of the record.  Counsel for Plaintiffs was
unaware of how to file a video and stated he would provide the video to the Court and
opposing counsel after the hearing if the Court requested him to do so.  The Court will
consider the reply because it addressed the topic of "detailing the actual boot up and log
in procedure" as seen in a video taken by Craig Lyons, which is the issue that Plaintiffs
sought and were granted permission to address.  My Pillow also did not identify any
reason for doubting the accuracy of the screen shots.  Further, even if the Court did not
consider the reply, it would not change the outcome here.  The Lyons declaration states
that on August 7, 2019, approximately eight minutes passed from when Lyons turned on
his computer to when he was able to log in to the ADP system and clock in, and that this
process regularly took him between five and ten minutes.  (Dkt. 38-2, Ex. 2 ¶ 7.)
Although My Pillow claims this statement is contradicted by record evidence and is not
credible (Dkt. 48 at 2, 11-12), as explained in Section III.A, the evidence My Pillow
relies on for this point does not undermine the Lyons declaration such that the Court
would find the Lyons declaration not credible for purposes of this Motion.

[3]      At the hearing, My Pillow's counsel clarified that "100 individuals" referred to
100 employees at any given time and that counsel believed the potential class to consist
of at least 200 employees.

Motion, the Court refers to all of these positions as a Customer Service Representative

("CSR") position.[4]  "My Pillow employs approximately ten employees in the overnight

shift."  (*Id.*)

**B.      Allegations of Named Plaintiff Deutsch**

Plaintiff Brandon Deutsch ("Deutsch") worked at the call center as an hourly CSR

from December 2017 to October 2019.  (Dkt. 31 ¶¶ 14, 16; *see also* Dkt. 50 ¶ 4

(specifying that Deutsch worked the overnight shift).)  Deutsch alleges that his primary

duties as a CSR included "answering customer calls and placing orders for various My

Pillow products, up-selling various products and programs, answering questions about the

products, and responding to and handling customer complaints."  (Dkt. 31 ¶ 17; *see also*

Dkt. 50 ¶¶ 3-4.)  According to Deutsch, he worked more than forty hours per week.  (Dkt.

31 ¶ 18.)

Deutsch alleges that he "was regularly required to work a substantial amount of

time off-the-clock as part of his job as a [CSR]," performing various tasks, for which he

was never compensated.  (*Id.* ¶ 19.)  This off-the-clock time included pre-shift work:

"Defendant required Plaintiff and other similarly situated . . . employees to allot time to

come into the office before their scheduled shifts to get to their work stations, boot up

---

[4]      Although My Pillow submitted evidence that the Customer Service
Representative, Sales Agent, and Customer Service/Sales Representative positions are
not precisely identical (Dkt. 50 ¶ 3), My Pillow did not argue that there were differences
relevant to the issue of conditional certification or that Plaintiffs' proposed class
definition included employees with varied job responsibilities.  As described in Section
I.D, the parties agreed on the job responsibilities of Deutsch and other CSRs, and the
declaration of Sherry Miles, a supervisor at My Pillow, states that the process to clock in
is the same for all of these employees (Dkt. 50 ¶ 12).

their computers, launch and log into all necessary programs and clock-in on Defendant's time keeping system, or before, their scheduled shifts." (*Id.* ¶ 22.) "Defendant suffered or permitted Plaintiff and other similarly situated former and/or current employees to routinely perform off-the-clock pre-shift work by not recognizing its employees as 'clocked-in' until *after* the pre-shift procedure was complete." (*Id.* ¶ 24 (emphasis in original).) Deutsch alleges that "[t]his pre-shift procedure would take approximately eight to fifteen minutes per shift" and that the work "was integral and indispensable to Defendant's business and integral and indispensable to the performance of a [CSR's] principal job duties." (*Id.* ¶¶ 22-23.) Deutsch alleges that My Pillow "willfully engaged in the policy and practice of calculating [employees' compensable hours] beginning at the scheduled start time of its employees' shifts and not the time [employees] actually began working despite knowing, and in fact, directing, its employees to arrive" early to complete the boot-up and sign-in processes by the employee's scheduled start time. (*Id.* ¶ 25.) My Pillow's "policy and plan" of requiring but not compensating pre-shift work "resulted in Plaintiff and other similarly situated former and/or current employees not being paid for all time worked, and for all of their overtime hours worked, in violation of the FLSA." (*Id.* ¶ 30.)

Similarly, Deutsch alleges that he was not paid for work time following breaks because "[e]ach time Plaintiff and Class members clocked back in after taking a break, they were made to wait for Defendant's timekeeping program to load before they could clock in and begin to be paid," which "oftentimes" took one to two minutes. (*Id.* ¶ 33.) Since employees took multiple breaks during a workday, this post-break waiting time

4

"resulted in, at minimum, an additional 3-6 minutes per workday—on top of the several minutes [employees waited at the start of a shift]—for which Plaintiff and Class members were not paid." (*Id.* ¶ 34.) My Pillow "adopted and then adhered to its policy and plan of employing Plaintiff to perform work without compensation," which "resulted in Plaintiff and other similarly situated former and/or current employees not being paid for all time worked, and for all of their overtime hours worked, in violation of the FLSA." (*Id.* ¶ 40.)

With respect to similarly situated individuals for the purposes of a FLSA collective action, Deutsch alleged,

> Upon information and belief, there are numerous other similarly situated current and/or former Customer Service Agents or other job titles performing similar job duties who performed off-the-clock work during their preliminary 'boot up' time and/or postliminary time who were not compensated at the proper legal rate for each hour worked and would benefit from the issuance of a court-supervised notice of this action and the opportunity to join it.

(*Id.* ¶ 49.) In addition to named plaintiff Deutsch, opt-in Plaintiffs Lyons and Shandrea Jenkins have filed consents to sue. (Dkts. 5, 5-1, 30, 30-1.)

## C.    Assertions of Opt-In Plaintiff Lyons

Lyons declared under penalty of perjury that he worked at My Pillow's call center as an hourly employee from February 2018 to September 2019. (Dkt. 38-2, Ex. 2 ¶ 3.) He believes his job title was CSR, but whatever his job title, he asserts that his duties included "answering customer calls and placing orders for various My Pillow products, up-selling various products and programs, answering questions about the products, and responding to and handling customer complaints and shipping." (*Id.* ¶¶ 4-5.) Lyons asserts that he regularly worked at least 40 hours per week. (*Id.* ¶ 11.) Lyons further asserts that he "regularly worked a significant amount of pre-shift time that [he] was not

5

paid for" and was told by his supervisor "to show up to work at least 15 minutes prior to

my shift start so [he] could boot up and log into [his] necessary programs and be ready to

begin taking calls at the start of [his] shift." (*Id.* ¶ 6.) Lyons described this boot-up and

log-in process as follows:

> I had to turn on and wait for the computer to load. Once the computer was
> fully loaded, I would log into my account and wait for the Desktop to load.
> Once this additional loading was completed, I would open Google Chrome
> and wait for ADP to load. Once ADP was fully loaded, I would be able to
> enter my credentials. Once I waited for ADP to load my credentials and
> present the clock in screen, I would clock in to begin being paid. During this
> time, my email and phone system will automatically load as well. I
> personally documented the amount of time it took for my computer to load
> after arriving for a scheduled shift on Wednesday, August 7, 2019. From
> turning on the computer until I was able to log in to ADP took approximately
> 8 minutes. At the time of documenting this particular login process, I stated
> that: 'This is pretty quick this time.' It regularly took between 5-10 minutes,
> or more, to turn on my computer and wait for all necessary programs to load
> before I could clock in. To carry out my job duties, I needed to repeat this
> same log-in process after returning from breaks.

(*Id.* ¶ 7.) Plaintiffs' reply brief, as ordered by the Court, "detail[ed] the actual boot up

and log in procedure." (Dkt. 52; *see also* Dkt. 53 at 3-9.[5]) The brief includes screenshots

from Lyons' video of the process on August 7, 2019 (Dkt. 53 at 3 (citing Dkt. 38-2, Ex. 2

¶ 7)), and the screenshots show the time elapsed in the video, with the last time in the

screenshots at seven minutes and fifty-eight seconds (*id.* at 4-8).

Lyons asserts, "I was not paid for my time I spent working before my shift began.

If I did not arrive early to boot up my computer and actually arrived at my scheduled

time, I would be considered late." (Dkt. 38-2, Ex. 2 ¶ 9; *see also id.* ¶ 12 ("Defendant did

not pay me overtime . . . for my pre-shift time I worked when booting up and logging in

---

[5]     Unless otherwise noted, all page numbers refer to the CM/ECF pagination.

to Defendant's computer.  Defendant refused to pay me anything for my pre-shift work performed.").)  Lyons asserts that all CSRs worked under the same conditions: they "had to be ready to take their first phone call and provide customer service at the start of their shift" and so had to wait for the log-in process to complete before clocking in on My Pillow's system, and thus "they were not paid for their time spent working before their shifts began."  (*Id.* ¶¶ 8, 10.)

Lyons further states that he is "aware of and [has] personal knowledge of [other CSRs] who were subjected to Defendant's same practices regarding pre-shift hours worked and were subjected to Defendant's same compensation practices that resulted in not being paid . . . for the preshift overtime we worked."  (*Id.* ¶ 14.)  He says, "I took part in conversations about this happening with other call center coworkers, and this practice happened to me and they treated us all the same."  (*Id.*)

**D.     My Pillow's Evidence: Undisputed and Disputed Matters**

In support of its opposition, My Pillow submitted materials consisting of a declaration by Sherry Miles, who supervised Deutsch and Lyons at the call center (Dkt. 50 ¶ 2), and two documents reflecting partial time records of Deutsch and Lyons (*id.* ¶¶ 6-8).

The parties generally agree on some factual matters, including the job responsibilities of Deutsch, Lyons, and other CSRs.  (Dkt. 31 ¶ 17; Dkt. 38-2, Ex. 2 ¶¶ 4-5; Dkt. 50 ¶¶ 3-4.)  The parties also largely agree on the process for CSRs to be able to clock in to work—the point at which an employee starts being paid—at the beginning of a shift, in which employees enter the call center; go to their workstation; log in to their

computer; open a web browser, which launches browser tabs, including one for My

Pillow's timekeeping system; and then log in and clock in via the timekeeping system.

(Dkt. 31 ¶¶ 22-23; Dkt. 38-2, Ex. 2 ¶¶ 6-10; Dkt. 50 ¶¶ 10, 12-13; Dkt. 53 at 3-9.)

However, Plaintiffs' descriptions of the process for starting a shift include turning on the

computer and waiting for it to boot up prior to logging in.  (Dkt. 31 ¶¶ 22-23; Dkt. 38-2,

Ex. 2 ¶ 7; Dkt. 53 at 5.)  Miles, on the other hand, states that "employees are told to

punch-out and sign out, but to leave their computers on at the end of their shift," so that at

the start of the next shift, "they do not need to boot up their entire computer prior to

punching in."[6]  (Dkt. 50 ¶ 10; *see also id.* ¶¶ 12-13.)  Similarly, the parties agree that the

process for clocking in after a break involved at least logging back in to the computer and

clocking in again to the timekeeping system, though Lyons seems to suggest that an

employee had to go through the same process as at the beginning of a shift, including

turning on and logging in to the computer, while Miles says employees were trained to

only lock, not log off or turn off, their computers.  (Dkt. 31 ¶¶ 33-34; Dkt. 38-2, Ex. 2

¶ 7; Dkt. 50 ¶ 14; Dkt. 53 at 9.)

The parties also dispute how long the clock-in process takes.  Deutsch alleges the

pre-shift procedure took "approximately eight to fifteen minutes per shift" (Dkt. 31 ¶ 22)

and that the clock-in process after a break involved waiting one to two minutes each time,

adding up to an additional three to six post-break minutes per workday (*id.* ¶¶ 32-33);

Lyons documented one instance that took approximately eight minutes and states that

---

[6]    The Court understands "punch in" and "punch out" to have the same meaning as
"clock in" and "clock out" through the timekeeping system accessed via ADP.

"[i]t regularly took between 5-10 minutes, or more" and that he "repeat[ed] this same log-in process after returning from breaks" (Dkt. 38-2, Ex. 2 ¶ 7).  In contrast, Miles states that the process "takes very little time," "no more than twenty seconds."  (Dkt. 50 ¶ 13.)

Attached to Miles' declaration, My Pillow submitted a table of Deutsch's badge-swipe records, which shows what time Deutsch entered the call center in August and September of 2019, and his punch-in times from the timekeeping system for the same period, with calculations of time elapsed between badge-swipe and punch-in.  (Dkt. 50-1, Ex. A; *see also* Dkt. 48 at 3-4, 10-11; Dkt. 50 ¶¶ 6-7.)  My Pillow contends that this data shows that "***Deutsch never spent more than two minutes and forty-nine seconds (2:49)—let alone the eight to fifteen minutes that he alleges—in the building prior to clocking in for his shift.***"  (Dkt. 48 at 10 (emphasis in original).)  My Pillow's analysis of this data is that "Deutsch punched in on average one minute and fourteen seconds (1:14) after first entering the call center for the day" and that "[a]fter leaving the call center during his breaks, Deutsch—on average—punched in and began receiving compensation sixteen seconds (:16) after reentering the call center," and both of these average times included non-compensable walking time.  (*Id.* at 11.)  At the hearing, My Pillow's counsel admitted that there was no evidence that the badge-swipe and clock-in systems ran off the same clock.

My Pillow also submitted evidence purporting to show that Deutsch and Lyons each had job performance problems.  Miles stated that although Deutsch was hired to be a full-time employee, "he rarely worked more than forty hours a week." (Dkt. 50 ¶ 5.)  She also states that he frequently arrived late, skipped shifts without notice, took frequent

breaks, was found sleeping on the job, and was the subject of customer complaints. (*Id.*) "Deutsch was ultimately terminated on September 27, 2019, for violating My Pillow's attendance policy." (*Id.*) As to Lyons, My Pillow submitted his time records from February 2018 to September 2019 (Dkt. 50-2, Ex. B; Dkt. 50 ¶ 8), which My Pillow contends show that "Lyons frequently punched in after his 9:00 AM or 11:00 PM shift was scheduled to start" (Dkt. 48 at 12).

My Pillow also disputes that employees are not paid for all time worked. According to Miles, "[i]t is My Pillow's policy to pay its employees for all time worked, and My Pillow abides by this policy." (Dkt. 50 ¶ 9.) Miles also asserts that employees have an opportunity to review their timecards for accuracy and that employees can email her to have an inaccurate timecard fixed. (*Id.*) Miles further states, "There is no requirement that call center employees arrive to work a certain amount of time or complete certain tasks prior to the start of their shift." (*Id.* ¶ 11.)

## E.    Class Definition and Proposed Notice

Along with seeking conditional certification of this matter as a collective action under the FLSA, Plaintiffs move for Court-authorized notice to putative class members. (Dkt. 35.) Plaintiffs propose to define the class for the collective action as follows:

> All current and former Customer Service/Sales Representative employees, or other job titles performing the same or similar job duties, who worked more than forty hours per week for My Pillow at any time in the last three years and were not paid overtime for every hour worked over 40 in a workweek.

(*Id.*; Dkt. 38-3, Ex. 3 at 3.) Plaintiffs further request that the Court approve the proposed Court-Authorized Notice and Consent to Sue form (Dkt. 38-3, Ex. 3), compel My Pillow to produce a list of putative class members, permit notice to be disseminated via U.S.

Mail and email, permit opt-in plaintiffs to file their consents using an electronic signature service, set the opt-in period at 90 days from dissemination of the notice, and permit a reminder notice at 45 days.  (Dkt. 35; Dkt. 37 at 12-21.)

## II.  <u>LEGAL STANDARD</u>

Under the FLSA, "any one or more employees" may bring a collective action against an employer for unpaid overtime.  29 U.S.C. § 216(b).  Unlike a class action under Federal Rule of Civil Procedure 23, no person becomes party to a collective action unless "he gives his consent in writing to become such a party and such consent is filed in the court in which [the] action is brought."  *Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1149 (D. Minn. 2005) (quoting § 216(b)).  "Courts have discretion, in appropriate cases, to facilitate the opt-in process by conditionally certifying a class and authorizing court-supervised notice to potential opt-in plaintiffs."  *Chin v. Tile Shop, LLC*, 57 F. Supp. 3d 1075, 1082 (D. Minn. 2014) (cleaned up).

To proceed with a collective action, plaintiffs must demonstrate that they are similarly situated to the proposed FLSA class in a two-step inquiry.  *Id.* (citing *Brennan v. Qwest Commc'ns Int'l, Inc.*, No. 07-cv-2024 (ADM/JSM), 2008 WL 819773, at *3 (D. Minn. Mar. 25, 2008); *Burch v. Qwest Commc'ns Int'l, Inc.*, 500 F. Supp. 2d 1181, 1186 (D. Minn. 2007)).  "First, the court determines whether the class should be conditionally certified for notification and discovery purposes."  *Id.* (citing *Burch*, 500 F. Supp. 2d at 1186).  "Determination of class status at the notice stage is granted liberally because the court has minimal evidence for analyzing the class."  *Id.* (citing *Ray v. Motel 6 Operating, Ltd. P'ship*, No. 3-95-828(RHK), 1996 WL 938231, at *2 (D. Minn. Mar. 18,

1996)).  "The plaintiffs need only establish at that time a colorable basis for their claim that the putative class members were the victims of a single decision, policy, or plan." *Id.* (citing *Burch*, 500 F. Supp. 2d at 1186).  If there is contrary evidence presented by the parties, the Court does not make credibility determinations or find facts at this stage.  *Id.* at 1083 (citing *Brennan*, 2008 WL 819773, at *3).  "[C]ourts usually rely on the pleadings and any affidavits submitted by the plaintiff to determine whether to grant conditional certification."  *Id.* at 1082-83 (citing *Parker v. Rowland Express, Inc.*, 492 F. Supp. 2d 1159, 1164 (D. Minn. 2007)).  The plaintiffs bear the burden of showing class members are similarly situated, but the "burden at the first stage is a light one."  *Vallone v. CJS Sols. Grp., LLC*, 437 F. Supp. 3d 687, 689 (D. Minn. 2020) (citing *Smith*, 404 F. Supp. 2d at 1149).

In addition to showing class members are similarly situated, "this Court has consistently held that a plaintiff must demonstrate some interest from others who are similarly situated."  *Chin*, 57 F. Supp. 3d at 1090.  "[I]n order for a case to be appropriate for collective-action status under the FLSA, the Court must be satisfied that there are other employees who desire to opt in."  *Id.* (quoting *Lyons v. Ameriprise Fin., Inc.*, No. 10-cv-503 (RHK/JJK), 2010 WL 3733565, at *4 (D. Minn. Sept. 20, 2010)).  "[A]n FLSA plaintiff is not entitled to conditional certification simply to seek out others who might wish to join the action."  *Parker*, 492 F. Supp. 2d at 1166.  Still, a "plaintiff's burden to demonstrate interest is not particularly onerous."  *Chin*, 57 F. Supp. 3d at 1091.

"After discovery is completed, the court conducts an inquiry into several factors if there is a motion to decertify the class."  *Chin*, 57 F. Supp. 3d at 1082 (citing *Burch*, 500

F. Supp. 2d at 1186).  Since the parties here have not completed discovery, this case is at the first step of the two-step inquiry.

### III.   <u>ANALYSIS</u>

Plaintiffs argue they have sufficiently established that My Pillow call center CSRs are similarly situated to conditionally certify a class (Dkt. 37 at 11) and that their proposed court-authorized notice plan is appropriate (*id.* at 12).  My Pillow argues that conditional certification should not be granted because Plaintiffs have not presented adequate evidence of opt-in interest nor of a colorable basis for a FLSA violation claim (Dkt. 48 at 17), and because class adjudication would be unmanageable (*id.* at 28).

### A.   **Similarly Situated Putative Class Members**

"The term 'similarly situated' is not defined by the FLSA, but it typically requires a showing that an employer's commonly applied decision, policy, or plan similarly affects the potential class members, and inflicts a common injury on plaintiffs and the putative class."  *Chin*, 57 F. Supp. 3d at 1083 (cleaned up).  "[P]laintiffs need only establish . . . a colorable basis for their claim that the putative class members were the victims of a single decision, policy, or plan."  *Id.* at 1082 (citing *Burch*, 500 F. Supp. 2d at 1186).  "A colorable basis means that plaintiffs must come forward with something more than the mere averments in their complaint in support of [their] claim."  *Lyons*, 2010 WL 3733565, at *3 (cleaned up).  "Determining whether Plaintiff's showing meets this standard lies within the Court's sound discretion."  *Chin*, 57 F. Supp. 3d at 1083 (cleaned up).

13

Plaintiffs argue that "the *Deutsch Compl.* and *Lyons Dec.* readily establish that Plaintiffs and the other CSRs are 'similarly situated'" because they "all performed similar jobs," "were regularly scheduled to work 40 hours," and "were required to perform uncompensated pre-shift work; namely, that Defendant required them to boot up and log in to their computers prior to being paid." (Dkt. 37 at 11.) According to Plaintiffs, "[t]aken collectively, this establishes that Defendant treated all CSRs the same, subjecting them to the same illegal pay practices by failing to pay them overtime for certain pre-shift and post-break work," and "[t]he Amended Complaint and Declaration readily satisfies the low showing required at stage one conditional certification." (*Id.* at 11-12.) My Pillow argues that the single declaration submitted by Plaintiffs is not sufficient to establish a colorable basis for a claim of company-wide FLSA violations and that, even if it were, "the evidence submitted in this case is inaccurate and cannot carry Plaintiffs' burden." (Dkt. 48 at 21, 23-24.)

The Court concludes that Plaintiffs have met their burden of showing that Plaintiffs and the putative class members are similarly situated for the purpose of conditional certification. To begin with, they are generally similarly situated employees with respect to the work they performed. Deutsch and Lyons describe the same job duties for themselves as CSRs (Dkt. 31 ¶ 17; Dkt. 38-2, Ex. 2 ¶¶ 4-5), and My Pillow does not dispute that Deutsch and Lyons were CSRs or that their responsibilities were as they described, nor does My Pillow contend that Deutsch's or Lyons' responsibilities differed from other CSRs or similar positions. Indeed, My Pillow's evidence confirms

Deutsch and Lyons' allegations that the call center employed CSRs, including Deutsch and Lyons, who had the job responsibilities Plaintiffs described.  (Dkt. 50 ¶¶ 2-4.)

More critically for the claim in this case, Deutsch and Lyons describe the same process that they and other CSRs at the call center must go through after arriving at work before clocking in and being compensated.  (Dkt. 31 ¶¶ 22-23; Dkt. 38-2, Ex. 2 ¶¶ 7-10, 14; Dkt. 53 at 3-9.)  Their estimations of how much time this process takes are similar: Deutsch says the pre-shift process took 8 to 15 minutes (Dkt. 31 ¶ 22), and Lyons says it took 5 to 10 minutes and documented one instance where it took about 8 minutes and describes that instance as "pretty quick" (Dkt. 38-2, Ex. 2 ¶ 7).  And once again, My Pillow's own evidence confirms that CSRs are similarly situated with respect to the process they go through, after arriving at their workstations, to clock in.  Indeed, Miles describes one, uniform process for CSRs to clock in, and the process she describes is the same as, albeit shorter than, the one Plaintiffs describe.  (Dkt. 50 ¶¶ 10, 12-14.)  Deutsch, Lyons, and Miles likewise all describe a similar process for clocking in after a break— again, with My Pillow's version including fewer or shorter steps than Plaintiffs'—and all state the process is the same for all CSRs.  (Dkt. ¶¶ 33-34; Dkt. 38-2, Ex. 2 ¶¶ 7-8, 10, 14; Dkt. 50 ¶ 14; Dkt. 53 at 9.)

Plaintiffs' FLSA claim is that all CSRs were subject to My Pillow's policy and practice of requiring CSRs to work uncompensated for some period of time at the beginning of each shift and after returning from a break before clocking in.  (Dkt. 31 ¶¶ 4, 25, 30, 40, 49.)  Lyons specifically says, with respect to My Pillow's compensation practices, "[T]hey treated us all the same" (Dkt. 38-2, Ex. 2 ¶ 14), and Miles says, "I go

through the same process to punch in as the CSRs" (Dkt. 50 ¶ 12).  Accordingly, the

parties agree that there is no variation in how CSRs clock in or whether they get paid for

the time spent going through the log-in and punch-in process.  Deutsch's and Lyons'

descriptions of this policy and practice provide a colorable basis for this claim, and My

Pillow's evidence, rather than undermining that basis, mostly confirms those descriptions

and entirely confirms that there is some period of time a CSR must spend at her

workstation before beginning to be paid.  Plaintiffs' assertions differ from Miles' as to

how much time the uncompensated process takes (*see* Dkt. 31 ¶ 22; Dkt. 38-2, Ex. 2 ¶ 7;

Dkt. 50 ¶ 13), and whether some steps, like turning the computer on, are appropriately

included in calculating that amount of time (*see* Dkt. 31 ¶¶ 22-23; Dkt. 38-2, Ex. 2 ¶ 7;

Dkt. 50 ¶¶ 10, 12-13), but those are factual and credibility questions the Court should not

decide at this stage.  *See Chin*, 57 F. Supp. 3d at 1083 (citing *Brennan*, 2008 WL 819773,

at *3).

My Pillow contends that Plaintiffs' evidence amounts to a single declaration that is

not sufficient to establish a colorable basis for a claim "because it does not—and

cannot—provide personal knowledge of the experiences of other putative class

members."  (Dkt. 48 at 21-22.)  My Pillow first argues, "After eliminating the averments

which are not based on personal knowledge, the Lyons declaration alleges that one

supervisor required one individual to work off-the-clock . . . .  Such a limited averment

does not support Plaintiffs' assertion of widespread wage and hour violations resulting

from a company-wide policy or plan."  (*Id.* at 22.)  My Pillow misses the mark with this

argument, which focuses on one part of one paragraph of Lyons' declaration.  Although

Lyons states that a supervisor told him to arrive at least fifteen minutes early so that he could go through the process at his workstation in time to be taking calls at the scheduled start of his shift (Dkt. 38-2, Ex. 2 ¶ 6), the "policy and practice" alleged in the Amended Complaint is that all CSR call center employees could not clock in and start getting paid until after a lengthy boot-up and log-in process and that the time elapsed should have been compensated (Dkt. 31 ¶¶ 4, 25, 30, 40, 49).[7]  As discussed above, Lyons' declaration contains several statements about My Pillow's alleged practice of not compensating certain pre-shift and post-break work that are consistent with both the allegations in the Amended Complaint and, in certain important respects, My Pillow's evidence, and, moreover, Deutsch, Lyons, and Miles all stated that all CSRs performed the same process.

This District has concluded that the evidence was sufficient to establish a colorable basis in cases with similar facts where plaintiffs alleged that they worked but were not compensated while booting up and logging in to computer programs and, further, that all employees in the putative class used the same boot-up and log-in process

---

[7]     One allegation in the Amended Complaint does say that My Pillow "direct[ed ] its employees to arrive to work early for the purposes of completing lengthy computer boot-up and sign-in processes by the employee's scheduled shift start time."  (Dkt. 31 ¶ 25.) But the paragraph's full allegation, and the Amended Complaint as a whole, is directed at the practice of not compensating employees for all work time, specifically the time spent waiting for a computer and programs to load, regardless of whether anyone told an employee to arrive early to complete that uncompensated time by the scheduled shift start.  (*See, e.g.*, *id.* ("Defendant willfully engaged in the policy and practice of calculating Plaintiff's compensable hours . . . beginning at the scheduled start time of its employees' shifts and not the time Plaintiff and all other similarly situated employees, actually began working despite knowing, and in fact, directing, its employees to arrive to work early . . . .").)

and/or the same timekeeping system. *See, e.g.*, *Jennings v. Cellco P'ship*, No. CIV. 12-00293 SRN/TNL, 2012 WL 2568146, at *5 (D. Minn. July 2, 2012) ("[T]he class here is limited to only one call center where they all used the same timekeeping program, phone system, have a common director, and were compensated in the same way."); *Lyons*, 2010 WL 3733565, at *3 ("Lyons and the opt-in plaintiffs have asserted that they were the victims of a common practice not to compensate employees for overtime hours spent logging into and out of computer and phone systems."); *Burch*, 500 F. Supp. 2d at 1187 ("Qwest's phone log-in system serves as the time clock for Plaintiffs and putative class members; Plaintiffs and putative class members all have to log onto the computer, boot up several computer programs, and perform other duties before accepting calls . . . ."); *cf. Thompson v. Speedway SuperAmerica LLC*, No. 08-CV-1107(PJS/RLE), 2009 WL 130069, at *12 (D. Minn. Jan. 20, 2009) ("We find this distinguishable from the sorts of cases, which have been found to be best managed as a collective action—namely, cases in which the employees allege that they are not paid for mandatory, identical, preparatory tasks, such as . . . booting up their computers . . . at the beginning of a work shift.").  The Court reaches the same conclusion here.

To the extent My Pillow contends that Plaintiffs' evidence is quantitively not enough because it is limited to the allegations in the Amended Complaint and Lyons' declaration, the Court disagrees.  (Dkt. 48 at 23 ("Plaintiffs cite no cases conditionally certifying a class based solely on the averments of an unsworn complaint and one declaration.").)  First, the Court finds no authority for any categorical rule about the quantity of declarations required or disregarding the allegations in the complaint, and My

18

Pillow agreed at the hearing that the Court can consider the allegations in the complaint. Second, My Pillow relies on *Wang v. Jessy Corp.*, where the court "determined that one declaration was not sufficient to support conditional certification." (*Id.* (citing Civil No. 17-5069 (JRT/HB), 2018 WL 5617567, at *4 (D. Minn. Oct. 30, 2018).) But in *Wang*, it was not simply the quantity of evidence that was not sufficient; it was that the two affidavits (one from the named plaintiff) did not sufficiently show that the practice of not paying overtime extended beyond those two employees. 2018 WL 5617567, at *4 ("Wang is still only able to make the general allegation that China Buffet denied other employees overtime pay. Without some additional factual assurances that other employees at China Buffet were denied overtime, the Court is unwilling to hold, at this time, that his case is appropriate for collective action.") In contrast to the "general allegation" in *Wang*, here there are "additional factual assurances"—including evidence from My Pillow itself—about a specific boot-up and clock-in process, uniform among the relevant employees, that is uncompensated. *See also Burch*, 500 F. Supp. 2d at 1189 ("[A]lthough the percentage of potential class members submitting affidavits is smaller than in *West* [*v. Border Foods, Inc.*, Civil No. 05-2525 (DWF/RLE), 2006 WL 1892527 (D. Minn. July 10, 2006)], Plaintiffs have submitted evidence of a common scheme in which all workers are monitored by a nationwide monitoring system rather than only by individual managers. Also, although Plaintiffs have not submitted affidavits covering every call center . . . , the record contains . . . evidence of a common nationwide monitoring system, and evidence that job duties do not significantly vary from call center to call center.").

19

My Pillow also argues that Plaintiffs' evidence is not credible and inaccurate. (Dkt. 48 at 23-24.)  My Pillow submitted evidence, in the form of a table combining his badge-swipe and timecard records, it contends shows that Deutsch was not, as he claimed, in the call center and working before clocking in.  Essentially, My Pillow argues that these records show that Deutsch spent far less time than he describes in his allegations doing pre-shift work because the records allegedly show much shorter periods of time elapsing between when Deutsch entered the building and when he clocked in. (*Id.* at 10-11.)  Similarly, My Pillow contends that Lyons is not credible because his "time records [showing that he frequently punched in after his shift was scheduled to start] directly contradict Lyon's allegation that he was required to be, and in fact was, clocked-in and call-ready at the beginning of his scheduled shift."  (*Id.* at 12.)

As an initial matter, on a motion for conditional certification, "the Court does not make any credibility determinations or findings of fact with respect to contrary evidence presented by the parties."  *Chin*, 57 F. Supp. 3d at 1083 (cleaned up).  Further, to the extent the Court considers this contrary evidence, there are several issues that preclude the Court from concluding it weighs against Plaintiffs' showing of a colorable basis.

First, the records of Deutsch's badge-swipe times include many blank entries, rendering a not-insignificant portion of the data completely unhelpful to the Court's task here.  (*See* Dkt. 50-1, Ex. A.)  Second, the data as to Deutsch is only a two-month sample of Deutsch's records.  (*Compare* Dkt. 30 ¶ 16 (employed from December 2017 to October 2019), *with* Dkt. 50-1, Ex. A (records from August 2019 to September 2019).) Third, at the hearing, My Pillow stated that the systems logging the time of building entry

20

and clocking in are not the same, are not necessarily synchronized,[8] and round minutes differently.  The Court therefore cannot rely on this evidence at this stage to find how much time elapsed between Deutsch's arrival and clock in or to infer how much time he spent waiting for computer programs and browser pages to load.

As to the evidence regarding Lyons, the evidence consists only of his timecards and thus sheds no light on how much time elapsed at his workstation before he clocked in.  (*See* Dkt. 50-2, Ex. B.)  My Pillow focuses on the assertion that these records show that Lyons was regularly late to work (Dkt. 48 at 11), but the Court does not see what bearing that has on whether Lyons worked time without pay that he should have been compensated for while waiting to be able to clock in.  Indeed, these time records could conceivably even support the story Lyons tells: if, as he says, he arrived on time and was at his workstation before or at the time of his scheduled shift and then had to wait for several minutes for the computer to allow him to clock in, his timecard would show a clock-in time some minutes past his scheduled time and that he was "late."  In short, My Pillow's evidence does not call into question the first basic allegation in this case—that My Pillow does not pay call center employees for time spent booting up and logging in— and does not in any conclusive way undermine Plaintiffs' version of the facts about the second basic allegation—that the uncompensated time was more than *de minimis* and resulted in unpaid overtime.

---

[8]     In other words, the Court cannot conclude that it only took Deutsch two minutes to clock in on a particular date by subtracting Deutsch's badge-swipe time from his clock-in time because no evidence suggests that 11:00 p.m. as recorded by the badge-swipe system occurs at the same time as 11:00 p.m. as recorded by the clock-in system.

The Court therefore concludes that Plaintiffs have established a colorable basis for their claim that they and the putative class members were the victims of a single decision, policy, or plan by My Pillow to not compensate time that should have properly been considered work time and are thus similarly situated.

## B.   Interested Opt-In Plaintiffs

"In order for a case to be appropriate for collective-action status under the FLSA, the Court must be satisfied that there are other employees who desire to opt in." *Lyons*, 2010 WL 3733565, at *4 (cleaned up); *see also Chin*, 57 F. Supp. 3d at 1090.

Plaintiffs did not address interest in the lawsuit in their briefs; at the hearing, they argued that named plaintiff Deutsch and the two opt-in plaintiffs, Lyons and Jenkins, are sufficient.  They also represented that they have not so far made affirmative efforts to gather additional plaintiffs.  My Pillow argues that the interest shown in this case—three people—fails to make the requisite showing.  (Dkt. 48 at 18.)

With three total interested persons, the Court views this as a close case on this issue.  Reviewing the case law in this District, one or two interested persons usually seems not to be enough, though there is not a bright-line rule against conditional certification in such circumstances.  *See Wang v. Jessy Corp.*, No. CV 17-5069 (JRT/HB), 2019 WL 3574553, at *5 (D. Minn. Aug. 6, 2019) (denying second motion for conditional certification and observing that "[t]he Court has found no cases in which conditional certification was granted based on so little identified interest" of one named plaintiff and one opt-in plaintiff); *Knutson v. Blue Cross & Blue Shield of Minn.*, No. CIV. 08-584 RHK/JSM, 2008 WL 4371382, at *3 (D. Minn. Sept. 23, 2008) (denying

22

conditional certification where there was one named plaintiff and one opt-in plaintiff);
*Parker*, 492 F. Supp. 2d at 1165-66 (denying conditional certification where there were
two named plaintiffs and no evidence of others potentially interested); *cf. Chin*, 57 F.
Supp. 3d at 1091 (quoting *Lyons*, 2010 WL 3733565, at *4) ("In *Lyons*, this Court
explained that '[t]he existence of more than one or two plaintiffs in a FLSA case at the
time of the conditional-certification inquiry has been found sufficient to warrant
collective-action treatment, even without a showing that other individuals wish to opt-
in.'"); *Judkins v. Southerncare, Inc.*, No. 4:12-CV-00293, 2013 WL 12099652, at *3
(S.D. Iowa June 24, 2013) ("[A] named plaintiff (or plaintiffs) would comply with *Parker*
upon the submission of evidence that at least one of the putative class members desires to
join the lawsuit. Therefore, since Plaintiff has presented evidence that Holborow—*who
is not a named plaintiff in this litigation*—desires to opt in to this litigation, Plaintiff has
satisfied her burden of establishing that at least one member of the proposed collective
class is interested in joining the suit.") (emphasis in original). In at least one
circumstance, five persons was found to be sufficient. *See Chin*, 57 F. Supp. 3d at 1091
(granting conditional certification where there was one named plaintiff and four opt-in
plaintiffs). And "the plaintiff's burden to demonstrate interest is not particularly
onerous." *Id.*

At the hearing, the parties also discussed whether the Court should consider the
percentage of known interest among the whole potential class. While the Court views the
percentage as one potentially helpful factor, "courts in this District and the Eighth Circuit
have not required a threshold percentage of opt-ins for conditional certification." *Id.*

(citing *Bilskey v. Bluff City Ice, Inc.*, No. 1:13–cv–62 (SNLJ), 2014 WL 320568, at *3

(E.D. Mo. Jan. 29, 2014)).  In the end, "there is no numerical baseline that plaintiffs must

meet," and "whether a plaintiff has shown sufficient opt-in interest is necessarily a case-

specific inquiry that will turn on case-specific facts." *Wang*, 2019 WL 3574553, at *5.

The facts of this case and Plaintiffs' "not particularly onerous" burden lead the

Court to conclude that, in this case, a single named plaintiff combined with two opt-in

plaintiffs demonstrates sufficient interest in the litigation from others who are similarly

situated.  First, simply considering the numbers, these three people likely amount to

somewhere between 1% and 3% of the total potential class, based on My Pillow's

representations about the size of the class.  (*See supra* note 3.)  Though the percentage of

the total potential class is not determinative, here, the percentage is higher than some and

similar to some other cases that have been conditionally certified.  *See Chin*, 57 F. Supp.

3d at 1091 (5 interested persons of 2,700 putative class members, or about 0.002%);

*Lyons*, 2010 WL 3733565, at *4 n.5, *5 (10 interested persons of 200 to 400 putative

class members, or 2.5% to 5%); *Ahle v. Veracity Rsch. Co.*, No. 09-cv-00042

(ADM/RLE), 2009 WL 3103852, at *5 (D. Minn. Sept. 23, 2009) (22 interested persons

of 500 putative class members, or 4.4%), *cited with approval in Chin*, 57 F. Supp. 3d at

1091.

Second, the additional circumstances of this case support the conclusion that three

people, with two opt-ins, is enough interest.[9]  Courts may consider the particular

---

[9]     The Court notes that this District has granted conditional certification in cases,
even after *Parker*, where there appear to be only two interested persons, though the issue
of interest in the lawsuit was not addressed in these cases.  *See Vallone*, 437 F. Supp. 3d

circumstances of a named plaintiff's employment to decide whether a plaintiff has gathered enough interest.  *See Knutson*, 2008 WL 4371382, at *4 (D. Minn. Sept. 23, 2008) (quoting *Parker*, 492 F. Supp. 2d at 1167) ("[T]he length of Knutson's tenure with Blue Cross—7 years—'suggests that [she] likely knows the identity of several other [Blue Cross customer-service representatives].'"); *Parker*, 492 F. Supp. 2d at 1166-67 ("Parker worked for Rowland Express for five years.  Given this fact, it is not unreasonable to require Plaintiffs to submit evidence of additional drivers who desire to join this litigation before conditional certification is granted.  Indeed, the length of Parker's tenure with the company suggests that he likely knows the identity of several other Rowland Express drivers.  Accordingly, it should not be an insurmountable hurdle for him to contact those drivers about opting in to this litigation.").  Deutsch worked at the call center for less than two years and worked the overnight shift, which only employed approximately ten employees.  (Dkt. 31 ¶ 16; Dkt. 50 ¶¶ 3-4.)  It is not unreasonable under these circumstances that Deutsch may not know the identity of many other My Pillow call center employees.

Third, My Pillow's authority on this issue is distinguishable in important respects. (*See* Dkt. 48 at 19.)  In *Parker*, there was no interest in the lawsuit other than the two named plaintiffs.  492 F. Supp. 2d at 1165.  As just noted, here there are two opt-in plaintiffs, suggesting there is interest in this lawsuit beyond a single named plaintiff.  *See*

---

at 688, 692; *Dominquez ex rel. v. Minn. Beef Indus., Inc.*, No. CIV.06-1002RHKAJB, 2007 WL 2422837, at *3 (D. Minn. Aug. 21, 2007); *see also Ortiz-Alvarado v. Gomez*, No. CIV. 14-209 MJD/SER, 2014 WL 3952434, at *5 (D. Minn. Aug. 13, 2014) (three interested persons).

*Judkins*, 2013 WL 12099652, at *3 ("[A] named plaintiff (or plaintiffs) would comply with *Parker* upon the submission of evidence that at least one of the putative class members desires to join the lawsuit.").  My Pillow argues that this case is similar to *Knutson*, where "only two employees indicated their" interest, which was "simply not enough."  (Dkt. 48 at 19 (quoting *Knutson*, 2008 WL 4371382, at *3).)  But the two employees in *Knutson* were the named plaintiff and another whose declaration "suggest[ed] that [she] would opt in to this lawsuit if given the opportunity."  2008 WL 4371382, at *3.  Here, there are two opt-in plaintiffs already, so interest in this case is better supported than in *Knutson*, and, further, in *Knutson*, the named plaintiff "contacted at least twelve of her former co-workers to ascertain whether they were interested in opting in to this case," and only the one "agreed to do so, while at least three *expressly disavowed* joining this case."  *Id.* (emphasis in original).  No such facts exist here.

In sum, while the case is a close one, Plaintiffs have demonstrated sufficient interest in the case to render it appropriate for collective-action status.

## C.    Manageability of a Collective Action

My Pillow additionally argues that class adjudication of this case would be unmanageable because "the definition of the class Plaintiffs seek to certify necessitates individual determinations of liability prior to distributing notice, thereby defeating the efficiency furthered by class certification."  (Dkt. 48 at 28-29.)  Specifically, My Pillow contends, "Conditional class certification would require the parties to inquire into matters such as how many breaks did each putative class member take, how long did it take them to log into ADP and clock in, why did it take one putative class member longer to log

into ADP and clock in than it did another, how many hours did each putative class member work each week, and others, prior to distributing notice." (*Id.* at 29.)

It is not entirely clear that the Court need consider manageability at this stage. "Although the Eighth Circuit is silent as to whether consideration of manageability is proper at the conditional certification stage, numerous courts have observed that disparate factual and employment settings of the individual plaintiffs should be considered at the second stage of analysis, rather than at the first stage." *Lindsay v. Clear Wireless LLC*, No. CIV. 13-834 DSD/FLN, 2014 WL 813875, at *5 (D. Minn. Mar. 3, 2014) (cleaned up). *But see Saleen v. Waste Mgmt., Inc.*, No. CIV 08-4959(PJS/JJK), 2009 WL 1664451, at *4 (D. Minn. June 15, 2009) (quoting *West*, 2006 WL 1892527, at *9-10) ("In addition to showing a colorable basis that the putative collective plaintiffs were together the victims of a single decision, policy, or plan, '[a]t this stage [plaintiffs must show] that factual similarities or differences among the putative [p]laintiffs are such that the case may be properly managed as a collective action.'") (alterations in original), *aff'd*, 649 F. Supp. 2d 937 (D. Minn. 2009); *id.* at *8 ("It is also appropriate for the Court to take case management into account at this stage because a collective action is simply a procedural device aimed at facilitating, in an efficient and cost effective way, the adjudication of numerous claims in one action. The focus here must be on the procedural advantages, or disadvantages, of conditional certification.").

At the hearing, Plaintiffs argued that these are questions more appropriate to the second stage inquiry for class certification and that the issue at this stage is whether there

is unpaid time, that should have been paid, that everyone in the putative class worked when they went through the log-in process.

The Court concludes that its discussion in Section III.A as to whether Plaintiffs and the putative class are similarly situated resolves this question to the extent needed here: Plaintiffs have adequately demonstrated at this stage that My Pillow has a "policy and practice of employing [CSRs] to work off-the-clock time without compensation" (Dkt. 31 at ¶ 4), and that all putative class members would have spent uncompensated time performing the same process, so there are procedural advantages to proceeding, for now, as a collective action. The questions that My Pillow believes need answering now are better addressed at the second stage of class certification, after discovery is complete, or potentially even later, at a final determination on the merits or damages.

The Court notes that one of the cases on which My Pillow relies is a second stage certification case analyzing the factors specific to that stage and thus is inapposite. (*See* Dkt. 48 at 29 (citing *Norris v. Bluestem Brands, Inc.*, No. 16CV03954ECTTNL, 2019 WL 1767408, at *5 (D. Minn. Apr. 22, 2019)).) The other cases My Pillow cites (*id.* at 28-30) involved facts markedly different from this case.[10]  *See Saleen*, 2009 WL 1664451, at *9 ("Because the evidence before the Court shows considerable variation in

---

[10]   The Court notes that these cases also concluded that plaintiffs had not met their burden with respect to similarly situated employees subject to a common policy or plan resulting in FLSA violations, and so the denials of conditional certification were not based only on a manageability issue. *See Saleen*, 2009 WL 1664451, at *7 (no "colorable basis that the Plaintiffs and putative collective members are similarly situated with respect to a single decision, policy, or plan that caused them to be deprived of overtime compensation"); *West*, 2006 WL 1892527, at *6 ("Such a limited sampling of employees does not support the Plaintiffs' assertion of widespread violations resulting from a common policy or plan.").

the reasons Plaintiffs and the putative collective action members were not compensated for working through meal breaks, the Court is left with the clear impression that this case would not be more orderly and sensibly managed as a nationwide collective action."); *West*, 2006 WL 1892527, at *9 ("Plaintiffs were employed at different store locations, where different individual restaurant managers allegedly used varying means to deprive the Plaintiffs of proper compensation for his or her overtime hours.  Furthermore, the nature of the asserted violation differ among the Plaintiffs; the number of uncompensated overtime hours that are being claimed range from two (2) to twelve hours (12) hours weekly, [and] the alleged violations are contrary to the Defendants' official written policy.") (citations omitted).  Here, there is one location; one process for all employees to start work, which My Pillow confirms employees had to perform per its own policies and/or training, even if it disputes the steps or time elapsed; no variation in the reasons putative plaintiffs were not compensated for off-the-clock work; and no variation in whether or how employees were uncompensated due to individual managers.  My Pillow has not demonstrated that there is anything particularly unmanageable about proceeding in this case with a conditionally certified class.

**D.    Notice**

Having determined that Plaintiffs have met their burden of showing this case is appropriate for conditional certification, the only remaining issue is the proposed notice. Plaintiffs request that the Court conditionally certify a collective action defined as follows:

> *All current and former Customer Service/Sales Representative employees, or other job titles performing the same or similar job duties, who worked more*

> *than forty hours per week for My Pillow at any time in the last three years*
> *and were not paid overtime for every hour worked over 40 in a workweek.*

(Dkt. 35 at 1.)  Plaintiffs further request that the Court approve the Court-Authorized

Notice (Dkt. 38-3, Ex. 3 at 2-5) and Consent to Sue form (*id.* at 6-7).  (Dkt. 35 at 1.)

Plaintiffs propose to send the Notice and Consent to Sue form via U.S. Mail and email to

putative class members and allow 90 days for class members to return their form to

Plaintiffs' counsel for filing with the Court, with a reminder notice sent via U.S. Mail

and/or email at the 45th day of the notice period and with opt-in plaintiffs being

permitted to file their form using an electronic signature service.  (Dkt. 35 at 2.)

Plaintiffs also request that the Court order My Pillow to produce "the full name, last

known address, and last known email address (work email address if a current employee

of My Pillow, personal email address if a former employee of My Pillow) to Plaintiffs'

Counsel" of potential class members within 14 days of the order granting the Motion.

(*Id.* at 1.)  Plaintiffs addressed all of these requests in their brief.  (Dkt. 37 at 12-21.)

My Pillow did not object to any aspect of Plaintiffs' proposed class definition,

scheme for notice, or request for an order compelling production of information about

My Pillow employees.  (*See generally* Dkt. 48.)

"District courts have discretion in appropriate cases to implement 29 U.S.C.

§ 216(b) by facilitating notice to potential plaintiffs."  *Chin*, 57 F. Supp. 3d at 1094

(citing *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989)) (reviewing

benefits of court involvement with notice).  The Court exercises its discretion to facilitate

notice in this case and approves the plan proposed by Plaintiffs in all respects, with one

exception.

At the hearing, the Court raised a concern that the proposed class definition in the Motion (Dkt. 35 at 1) and proposed Notice (Dkt. 38-3, Ex. 3 at 3) does not accurately reflect the specific allegations in the case.  The proposed definition refers broadly to employees who worked more than 40 hours per week for My Pillow and were not paid overtime for hours over 40.  (Dkt. 35 at 1; Dkt. 38-3, Ex. 3 at 3 (in "Eligibility to Participate in the Lawsuit").)  The allegations in the Amended Complaint, however, are specific to pre-shift and/or post-break time spent performing a computer boot-up and log-in process.  (Dkt. 31 ¶¶ 22-25, 31-35; Dkt. 38-3, Ex. 3 at 3 (Under "Description of the Lawsuit": "Plaintiffs allege unpaid wages . . . for pre-shift and/or post-break off-the-clock time worked.").)  At the hearing, Plaintiffs' counsel stated that the class definition could be narrowed to these specific circumstances.

The Court therefore modifies the class definition in the proposed Notice to read as follows:

> All current and former Customer Service/Sales Representative employees, or other job titles performing the same or similar job duties, who worked more than forty hours per week for My Pillow at any time in the last three years and were not paid overtime for every hour worked over 40 in a workweek where the workweek included unpaid time for pre-shift and/or post-break time spent booting up and/or logging in to computers and computer applications before being able to clock in and begin being paid.

The Court modifies the language in the "To" paragraph at the beginning of the Notice to match the language here.  (*See* Dkt. 38-3, Ex. 3 at 1.)  The Court also modifies the second paragraph of the "Description of the Lawsuit" section to read as follows:

> Plaintiffs represent all current and former Customer Service/Sales Representatives ("CSRs") employed by Defendant who worked off-the-clock during their pre-shift and/or post-break time spent booting up and/or logging in to computers and computer applications.  Plaintiffs allege unpaid

wages, including unpaid premium overtime wages for pre-shift and/or post-break off-the-clock time spent booting up and/or logging in to computers and computer applications.

Plaintiffs shall use the Notice attached hereto as Attachment A, which incorporates the Court's modifications.

The Court also grants Plaintiffs' request for production of a list of employees within 14 days of this Order.

## IV.   ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.   Plaintiffs' Motion for Conditional Certification and Notification to All Putative Class Members Under 29 U.S.C. § 216(b) (Dkt. 35) is **GRANTED**, and this matter is conditionally certified as a collective action defined as follows:

> All current and former Customer Service/Sales Representative employees, or other job titles performing the same or similar job duties, who worked more than forty hours per week for My Pillow at any time in the last three years and were not paid overtime for every hour worked over 40 in a workweek where the workweek included unpaid time for pre-shift and/or post-break time spent booting up and/or logging in to computers and computer applications before being able to clock in and begin being paid.

2.   Defendant shall produce, within 14 days of this Order, the full name, last known address, last known personal and work email addresses, and telephone numbers of the potential class members;

3.   Plaintiffs' proposed Notice form (Dkt. 38-3, Ex. 3 at 2-5) is **MODIFIED** and Plaintiffs shall send the Notice attached as Attachment A to this Order to each putative plaintiff;

4.   Plaintiffs' proposed Consent to Sue form (Dkt. 38-3, Ex. 4 at 6-7) is **APPROVED**;

5.   Putative class members may sign their Consent to Sue form using an electronic signature service;

6.    Putative class members shall have 90 days to return their Consent to Sue form to Plaintiffs' counsel for filing with the Court;

7.    Plaintiffs' counsel shall send the Notice, in the form attached as Attachment A to this Order, to each putative plaintiff by U.S. Mail and email within 14 days of receipt of Defendant's production of the list of potential class members; and

8.    Plaintiffs' counsel shall send a reminder of the Notice by U.S. Mail and email at the 45th day of the 90-day notice period.


DATED: December 15, 2020                    *s/Elizabeth Cowan Wright*
                                            ELIZABETH COWAN WRIGHT
                                            United States Magistrate Judge