# EXHIBIT 1

Page 1

1            UNITED STATES DISTRICT COURT
2               DISTRICT OF MINNESOTA
3    ------------------------------------------------
4    Brandon Deutsch, individually and on
5    behalf of all similarly situated individuals,
6                  Plaintiff,
7    vs.              Case No. 20-CV-00318-SRN-ECW
8    My Pillow, Inc.,
9                  Defendant.
10   ------------------------------------------------
11
12           REMOTE VIDEO ZOOM DEPOSITION OF
13                    THOMAS ARTH
14
15   DATE:  August 15, 2022
16   TIME:  9:26 a.m.
17   PLACE: Videoconference
18
19
20
21
22
23
24    REPORTED BY:  NANCY G. GISCH, RMR, CRR, CLR, CRC
25              (Via videoconference)

Page 2

1  The videoconference deposition via
2 Zoom of THOMAS ARTH, taken on August 15, 2022,
3 commencing at approximately 9:26 a.m., before
4 Nancy G. Gisch, Registered Merit Reporter,
5 Certified Realtime Reporter, Certified LiveNote
6 Reporter, Certified Realtime Captioner, a notary
7 public in and for the State of Wisconsin.
8
9           A P P E A R A N C E S
10    (All appearances via videoconference)
11
12 On Behalf of the Plaintiff:
13      ZACK KAYLOR, ESQ.
14      zkaylor@johnsonbecker.com
15      Johnson Becker, PLLC
16      444 Cedar Street
17      St. Paul, Minnesota 55101
18      612-436-1800
19
20
21
22
23 (Appearances continued on next page.)
24
25

Page 3

1 On Behalf of the Defendant:
2      JANET M. OLAWSKY, ESQ.
3      jolawsky@fredlaw.com
4      Fredrikson & Byron, P.A.
5      200 South Sixth Street
6      Suite 4000
7      Minneapolis, Minnesota 55402-1425
8      612-492-7000
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1           I N D E X
2 WITNESS:  THOMAS ARTH              PAGE
3
4 EXAMINATION BY MS. OLAWSKY..................   5
5 EXAMINATION BY MR. KAYLOR...................  34
6
7 EXHIBITS MARKED AND REFERRED TO:
8 EXHIBIT 1....................  15
9      Organization chart
10      MYPILLOW000155 0001
11 EXHIBIT 2....................  30
12      TIMECARD 2/1/2018 - 2/4/2018
13      MYPILLOW000009 - 0001 through
14      MYPILLOW000009 - 0236
15
16
17
18 (Original exhibits attached to original
19 transcript; copies to counsel.)
20
21
22
23
24
25

Page 5

1           P R O C E E D I N G S
2      COURT REPORTER:  Will all counsel
3 please stipulate to the swearing in of the
4 witness remotely.
5      MR. KAYLOR:  Yes.
6      MS. OLAWSKY:  Yes.
7           THOMAS ARTH,
8 duly sworn, was examined and testified as follows:
9           EXAMINATION
10 BY MS. OLAWSKY:
11    Q.  Good morning, Mr. Arth.
12        My name is Janet Olawsky.  And I represent
13 My Pillow in this lawsuit.
14        Have you ever had your deposition taken
15 before?
16    A.  No, I haven't.
17    Q.  So your counsel may have described the
18 ground rules for today, but just so you're aware,
19 it's very important that we not speak over
20 one -- speak over one another, because Nancy is
21 taking down everything that's being said.
22        So if you could just wait until after I'm
23 finished asking my question before you answer,
24 and I'll wait for you to finish answering before
25 I answer -- ask my next question.  And we'll just

Page 6

1  go back and forth, one at a time.
2      A.  Very good.
3      Q.  The only other requirement is that it's
4  very important that you answer verbally -- so yes
5  or no -- so that your answer can be accurately
6  transcribed.
7          So just be sure to answer yes or no,
8  rather than shaking your head or saying uh-huh.
9      A.  Okay.
10     Q.  You worked at My Pillow from January 2016
11 to November 2020.  Correct?
12     A.  That is correct.
13     Q.  You were initially hired into a customer
14 service role?
15     A.  Correct.
16     Q.  It looks like, on June 25 of 2018 you were
17 transferred from customer service to sales?
18     A.  That's correct.
19     Q.  This resulted in a new job title.  Didn't
20 it?
21     A.  Yes, it did.
22     Q.  And you also had different job duties?
23     A.  Yes, I did.
24     Q.  You remained in sales for the rest of your
25 employment.  Correct?

Page 7

1      A.  Correct.
2      Q.  And it looks like your employment ended on
3  November 23, 2020.
4      A.  Yes, it did.
5      Q.  Did you know about this lawsuit while you
6  were still working at My Pillow?
7      A.  Vaguely, I did.  A little bit.  I knew
8  people were contacted about getting in.
9      Q.  What did you understand about the lawsuit
10 while you were still working there?
11     A.  Just that people thought they were not
12 getting paid fairly for breaks and, you know, for
13 time when the computers were down and those type
14 things.
15     Q.  Once you learned about those allegations,
16 did you start tracking the time it took you to
17 log into your computer?
18     A.  I didn't track the time, no.  I just --
19 you know, I -- I know if -- approximately what it
20 was, but I did not keep a -- a -- actual physical
21 track of it, no.
22     Q.  While you were working there, did you
23 report any delay in your login time?
24     A.  When they were big delays, I certainly
25 did, you know.  When they were over ten minutes

Page 8

1  or more.
2          But when they were just -- normally they
3  were just, you know -- five minutes and under, I
4  didn't report those.
5          When they were larger delays, which didn't
6  happen a whole lot, but they happened enough,
7  when the systems were down -- I reported it to my
8  supervisor.
9      Q.  Who was your supervisor you reported that
10 to?
11     A.  Oh, boy, I can't think of her name.
12         I can't remember.  I'm -- I'm sorry, I
13 can't remember what her -- I can't remember her
14 name.  She was a blonde gal that sat right across
15 from me, though.  I can't remember.
16     Q.  Was it Abigail Martin?
17     A.  No.
18     Q.  When you reported those delays, did you
19 report them by email or verbally?
20     A.  Mostly verbally.  Once in a while email,
21 but the -- they were mostly verbally with her.
22         And there were several different people,
23 because I had a different supervisor --
24 supervisors during my tenure at My Pillow.  It
25 wasn't the same supervisor the whole time.

Page 9

1      Q.  Every time you experienced a delay logging
2  in, did you report it to someone at My Pillow?
3      A.  No.
4          Again, like I said, only the ones that
5  were, you know, I'd say 10, 15 minutes or longer.
6  Not the short ones.
7      Q.  Every --
8      A.  I think a lot of people had short delays.
9  I mean, every day, I mean, it was something.  We
10 just kind of took it, thought that was normal.
11         But, again, once in a while they were
12 long -- they sometimes were delays up to, I'm
13 saying, over an hour, so -- when we couldn't get
14 into the system.
15     Q.  It took over an hour to log into the
16 system?
17     A.  Once in awhile, when the computers went
18 down.
19         Especially what happened on the weekends,
20 when there was no tech service support there, you
21 know, we'd have to do it over the phone with
22 people.
23         And call them up.  And they'd do it
24 remotely, from home.  I assume that's where they
25 were.

Page 10

1     It didn't happen that -- those long ones
2  didn't happen very often, but they did happen.
3     Q.  Every time there was a delay longer than
4  ten minutes, did you report it to someone at My
5  Pillow?
6     A.  I'd say the majority of the time I did.  I
7  couldn't say 100 percent, but the majority of the
8  time I did.
9     Q.  Every time you reported a delay, were you
10 compensated for that time?
11    A.  I assume I was.  I didn't check
12 100 percent of the time, because, like they said,
13 they would change my clock punches.
14       And, to be very honest, I'm not very
15 computer savvy, so I have no -- didn't know how
16 to check that and that.  And I just assumed that
17 they did that for me.
18    Q.  As far as you're aware, you don't know of
19 any time where you experienced a delay more than
20 ten minutes, you reported it, and then they
21 didn't fix your time.
22       Correct?
23    A.  Correct.
24    Q.  While you were still working there, did
25 you hear about allegations that My Pillow was not

Page 11

1  keeping accurate employment records?
2     A.  I guess I really don't know that.  They
3  seemed kind of slipshod to me, to be honest with
4  you.  I didn't really have too much contact with
5  these people, but it seemed like when I did
6  contact --
7        COURT REPORTER:  If I could --
8     A.  (Continuing) -- that human resources --
9        COURT REPORTER:  Pardon me.  Pardon
10 me.
11       THE WITNESS:  Yeah.
12       COURT REPORTER:  Sorry for
13 interrupting.
14       You speak very quickly -- above 300 words
15 a minute.  And I am trying to capture everything.
16       So if you could slow down just a -- a
17 little bit, that would be very helpful.
18       THE WITNESS:  Okay.
19       COURT REPORTER:  Thank you.
20       "I guess I really don't know that.  They
21 seemed kind of slipshod to me, to be honest with
22 you.  I didn't really have too much --"
23       Please continue.
24    A.  (Continuing) Didn't have much to do with
25 the human resources people, but they seemed

Page 12

1  pretty lackadaisical about most things, I guess,
2  is what I could say.
3     Q.  While you worked there, are you aware of
4  any records that My Pillow wasn't keeping?
5     A.  No.  I didn't -- I didn't get involved
6  with any of that type of stuff.
7     Q.  You mentioned earlier that while you were
8  still working there, you heard there were
9  allegations about delays in login times.
10       Do you recall who you heard that from?
11    A.  Other employees who sat near me.
12    Q.  Who were those employees?
13    A.  Oh, boy.  They come and go, so I -- I -- I
14 can't remember their names off -- a couple of
15 them have even passed way, to be honest with you,
16 I know, but -- but I can't remember who they
17 were.
18    Q.  Do you know any of the other plaintiffs in
19 this lawsuit?
20    A.  I never asked who they were.  I never was
21 told.
22    Q.  Do you know anyone else who is
23 participating in this lawsuit?
24    A.  Not offhand, no.
25    Q.  It's your allegation that My Pillow should

Page 13

1  have paid you for time you spent logging into
2  your computer?
3     A.  Yes, I do think they -- they should have
4  paid for that.
5     Q.  At what point in the login process do you
6  believe My Pillow should start paying you?
7     A.  When you first get into the computer
8  and -- and try to log in.  I guess, you know,
9  when they get your information, your name and
10 whatever -- I can't remember how to log in
11 anymore, but when they got -- found out who it
12 was, I guess that's -- they should start paying
13 you then, I guess.
14    Q.  So when you wake up your computer and you
15 enter your user name and password to unlock your
16 computer?
17    A.  Right.  Exactly.  I think that's when you
18 should -- should be paid.
19    Q.  How much time do you believe My Pillow
20 failed to pay you for your time worked?
21    A.  Would you repeat that one more time?
22    Q.  How much time do you believe that
23 My Pillow failed to pay you for the time you
24 spent logging in?
25    A.  How much total time, do you think, when I

Page 14

1  worked there?  How --
2     Q.  Yes.
3     A.  Boy, is that -- that's a rough guess.  I
4  don't know.
5         I would say it probably averaged five to
6  eight minutes a day, I guess, for the days I
7  worked there.  So I don't know how many -- I
8  don't know the total hours or minutes that would
9  be.  But fairly substantial.
10    Q.  Because you reported delays more than ten
11 minutes, are you only saying that you weren't
12 compensated for delays less than ten minutes?
13    A.  Right.  Not that I know of.  And I'm sure
14 I wasn't.
15    Q.  Did you ever report delays that were less
16 than ten minutes long?
17    A.  No.  I mean, I -- I didn't report them;
18 but, you know, I made comments, you know, about,
19 "Boy, this is kind of ridiculous."
20        But it, actually -- you know, go face-to-
21 face with somebody, report them, like for the
22 longer ones.
23    Q.  When you would make comments about the
24 delay, who would you make those comments to?
25    A.  Again, to my -- they call them happy

Page 15

1  helpers.  I can see that girl's face, but I can't
2  think of her name.
3         And, again, there were several of them in
4  tenure.  I worked there -- what? -- about four
5  years or so.  Almost five years.  So...
6     Q.  I'm going to pull up an organizational
7  chart we have, if you can just bear with me for
8  one second.  And perhaps that will help, if we
9  can determine that supervisor's name.  Just give
10 me one moment.
11        Okay.  I'm going to mark this as
12 Exhibit 1.
13        (Deposition Exhibit No. 1 introduced.)
14    Q.  (By Ms. Olawsky, continuing) Can you see
15 this chart on your screen, Mr. Arth?
16    A.  Yes.
17    Q.  This is Exhibit 1.  And this is a list of
18 supervisors that My Pillow created.
19        Do you happen to see your supervisor's
20 name on this list?
21    A.  I do.  Lois, Lois Hansel.
22    Q.  Okay.
23    A.  She was -- she was the last one.
24        Now, there were others, too, but she was
25 the very last one, you know, at the very end.

Page 16

1     Q.  When we discussed earlier that you were
2  recording delays of over ten minutes to your
3  supervisor, were those reports made to Lois?
4     A.  The -- the latter ones, yeah.  The last
5  few years, when she was working there, yeah, I
6  reported everything to her.
7     Q.  Before Lois, do you recall who you
8  reported those delays to?
9     A.  I don't see a name on there.  No, I don't
10 see any name that I recognize.
11    Q.  If Lois started in 2017, is it your belief
12 that all of the reports you made after April 13th
13 of 2017 would have been made to Lois?
14    A.  Correct.
15    Q.  I'm going to stop sharing my screen,
16 unless there are any other names you're still
17 looking at.
18        You sat at the same desk every shift you
19 worked.  Correct?
20    A.  Correct, yep.  I never moved.
21    Q.  You also --
22    A.  I did -- excuse me.
23        I did move, maybe, once or twice, when we
24 couldn't get the computers working.  They -- they
25 put me on a different computer.

Page 17

1         But I'd say, in all those years, happened
2  maybe two, three times, at the most.  Because
3  we'd always wait to get mine up.
4     Q.  On those occasions where they moved you to
5  a different computer, did they compensate you for
6  that time spent trying to log into your computer?
7     A.  I do not know if they did or not, because,
8  you know, I wasn't logged in at all.  So I -- I
9  would -- I don't know.  I'm not going to say yes
10 or no.
11        Like I said, I don't -- I didn't check my
12 pay records just to -- you know, I don't -- I
13 mean, that type of stuff.
14    Q.  Earlier we talked about delays of over ten
15 minutes.
16        For delays of under ten minutes are you
17 aware of any times where you reported the delay
18 and you were not compensated for the delay?
19    A.  No, no.
20    Q.  When you arrived at your desk at the
21 beginning of your shift, it was already turned
22 on.
23        Correct?
24    A.  The computers were always off when I got
25 there.

Page 18

1  Q. Your computer was always turned off?
2  A. Yeah. We were told to shut down our
3  computers every day when we left to go home.
4  Q. Who told you --
5  A. Shut them --
6  Q. I'm sorry.
7  A. Shut them -- shut them completely down.
8  Q. Who told you that?
9  A. That was Sherry Miles. That's right when
10 I first started. Because some of the first days,
11 when I got done working, I just left.
12     And then she told me, "You have to shut
13 your computer off before you go home."
14 Q. Did she tell you the reasoning for that?
15 A. No. I assume just so nobody could get
16 onto your computer and pretend they were you, I
17 suppose. I don't know.
18 Q. And when you say "shut the computer
19 completely down," you mean that the computer was
20 completely turned off.
21     Correct?
22 A. Correct.
23 Q. And it's your understanding that when you
24 arrived at work you had to push the power button
25 to first turn your computer on?

Page 19

1  A. Correct.
2  Q. Did you completely shut off your computer
3  after every single shift you worked?
4  A. I had -- I know once -- left without doing
5  it. I --
6     COURT REPORTER: I'm sorry. Pardon
7  me.
8  A. (Continuing) -- forgotten --
9     COURT REPORTER: Pardon me. Pardon
10 me. I couldn't quite catch that. Could you
11 repeat your answer?
12 A. (Continuing) Once in a -- once in -- in a
13 blue moon, I said, I may have forgotten to turn
14 it off when I went home, but 99 percent of the
15 time I turned it off every time I went home.
16 Q. Throughout your employment did any other
17 supervisor tell you that you needed to keep your
18 computer on when you left at the end of the day?
19 A. No.
20 Q. Did you see other employees who left their
21 computers on when they weren't working?
22 A. No. I didn't -- didn't pay any attention
23 to anybody else.
24 Q. You're not familiar with the My Pillow
25 policy that you needed to keep your computer on,

Page 20

1  but logged out at the end of every shift?
2     MR. KAYLOR: Objection; assumes facts
3  not in evidence.
4  Q. (By Ms. Olawsky, continuing) You can go
5  ahead and answer.
6  A. Would that -- would you repeat that
7  question one more time?
8  Q. You weren't aware of a My Pillow policy
9  that you needed to leave your computer on at the
10 end of every shift?
11 A. No.
12     MR. KAYLOR: Same objection.
13 Q. (By Ms. Olawsky, continuing) You were
14 never trained to leave your computer logged out
15 when you left at the end of the day?
16 A. I was trained how to turn it off at the
17 end of the day, yes.
18 Q. How did you turn your computer off?
19 A. I logged out and turned everything off and
20 then turned the power off.
21 Q. I'd like to walk through the login process
22 that you allege you should have been compensated
23 for.
24     Earlier we discussed that you believe you
25 should have started being paid as soon as you

Page 21

1  entered your user name and your password in the
2  computer.
3     Correct?
4  A. Correct.
5  Q. Once that happened, your computer would
6  boot to its desktop. Correct?
7  A. Yep, I think that's what it was. Yep,
8  boot to the desktop.
9  Q. And to boot up from the login screen to
10 the desktop only took a matter of seconds.
11     Right?
12 A. Probably took a minute or so. Some -- if
13 everything worked properly. But sometimes --
14 that's sometimes -- that sometimes got hung up,
15 you know. Couldn't get on right away.
16 Q. How often would you say you couldn't get
17 on right away?
18 A. I would say 10 to 15 percent of the time.
19 Q. And in those instances, those were the
20 delays we were talking about earlier?
21 A. Correct.
22 Q. Once your computer reached the desktop
23 screen, the next thing you would do is open the
24 internet, to log into ADP.
25     Right?

6 (Pages 18 - 21)

Page 22

1  A. Correct.
2  Q. That only took a matter of seconds. 
3 Right?
4  A. Yep. Most every time it -- yep, if
5 everything worked right, correct.
6  Q. And then, once you logged into ADP, you
7 clicked a clock-in button. Right?
8  A. Boy, I -- I don't remember that. I -- I
9 thought that was automatic, once you logged in.
10 Maybe I did. It's -- it's been so long now. But
11 whatever -- whatever you're supposed to do, I
12 did.
13  Q. Fair to say that once you got to ADP, it
14 was a matter of seconds before you started being
15 paid?
16  A. Pretty much. Most -- you know, 90 percent
17 of the time. Once in a while, you know, it would
18 get hung up.
19  Q. And throughout the process we just
20 discussed, if you experienced delays, it was
21 going from the login to the desktop screen -- is
22 when you experienced the delays?
23  A. Correct, yep.
24  Q. You knew that you needed to clock in
25 before you started performing any work.

Page 23

1    Right?
2  A. Correct, yep.
3  Q. Did you ever work before you start --
4 before you were clocked in?
5  A. No. I did a couple times. And I was told
6 I couldn't. I had to clock in. And I couldn't
7 clock in until, I think it was, 6:50.
8    Because I used to get to work early. And
9 then once in a while I -- there weren't many
10 people. Then I would -- I would actually clock
11 in then. I -- I never worked without clocking
12 in.
13  Q. Did you ever use your computer -- your
14 My Pillow computer for personal purposes?
15  A. Well, I -- when times were slow, I --
16 I -- the Internet, I would. Other than that, no.
17  Q. Did you ever save documents to your
18 My Pillow computer?
19  A. No.
20  Q. Did you ever download any programs to your
21 My Pillow computer?
22  A. No. Wouldn't even know how to do it.
23  Q. Once you were clocked in, that's when you
24 would read emails and open Anaware. Correct?
25  A. Correct.

Page 24

1  Q. It was My Pillow's policy that you
2 shouldn't do any of those things before you were
3 clocked in.
4    Right?
5  A. That's correct.
6  Q. In looking at your timecards, it looked --
7 it looks like your shift typically started at
8 7:00 a.m.
9    Is that right?
10  A. Correct. Yeah, I usually started 10 to
11 7:00. Allowed me to start ten minutes early.
12  Q. In your timecards it appears you
13 consistently logged in at 6:50, on the dot.
14    Does that sound right?
15  A. Pretty much so, yep.
16  Q. So you would arrive at My Pillow sometime
17 before 6:50 and then ensure you were logged in at
18 6:50 exactly.
19    Right?
20  A. Correct.
21  Q. And that's because My Pillow allowed you
22 to start working ten minutes before your shift?
23  A. That's correct, that's what I was told.
24  Q. How did you ensure that you were clocking
25 in exactly at 6:50 every day?

Page 25

1  A. I don't know. I suppose the time was
2 on -- yeah, I think the time was on the screen.
3 Yeah.
4  Q. During the login process, did you start
5 some of that login before 6:50 and then...
6  A. No.
7  Q. You would -- would you just start the
8 login process around 6:50, and then clock in at
9 6:50?
10  A. I pretty much started right at 6:50.
11  Q. And, typically, when you got to that
12 computer, login screen would be at 6:50. And
13 then you would go through the process and also
14 clock in at 6:50?
15  A. Correct.
16  Q. If you arrived at My Pillow earlier than
17 that, would you -- what would you do at the
18 premises?
19  A. Well, I read the -- I brought the paper
20 in. I read the paper. Have a -- a -- a bottle
21 of pop or doughnut or something like that.
22  Q. You weren't working before the -- before
23 you clocked in?
24    MR. KAYLOR: Objection; calls for
25 legal conclusion.

7 (Pages 22 - 25)

Page 26

1  A. (Continuing) I wasn't working before I
2 clocked in, no.
3     Q. When My Pillow started using ADP, do you
4 recall being trained on how to use ADP?
5     A. Our training was very -- not the greatest.
6       Yes, we were trained somewhat, but not --
7 not the greatest. We pretty much learned on our
8 own or from asking other employees.
9     Q. Any time you had trouble with ADP, did you
10 report it to your supervisor?
11    A. Not -- not the minor times, but the major
12 times I did, yes, because -- yeah.
13    Q. If you had trouble with ADP that affected
14 your clock-in times, did you report those
15 instances to your supervisor?
16    A. I -- yep.
17    Q. Every time you asked for your time to be
18 corrected, you're not aware of any time it wasn't
19 corrected.
20      Right?
21    A. Correct. I -- I just assumed they did it.
22 I never, like I say, checked to make sure that
23 she -- do it for me.
24    Q. When you asked for your time to be
25 corrected, did you do that by email and verbally?

Page 27

1     A. Verbally.
2     Q. And, same as we just discussed, every time
3 you verbally asked for your time to be corrected,
4 it was.
5       Correct?
6     A. I assumed it was corrected, yes.
7     Q. You can't point to any instance where you
8 asked for it to be corrected and it wasn't?
9     A. No.
10    Q. Earlier you mentioned that IT wasn't
11 present at the My Pillow on the weekends.
12    A. They didn't come in early. I don't know
13 what hours they worked, but they weren't in
14 early.
15      In fact, even during the week -- of
16 course, I started early, so -- but -- but some
17 weekends they -- IT was not there at all.
18    Q. If you had a computer problem, would you
19 typically report that to IT?
20    A. Yeah. We had a phone number we'd call,
21 like I say. And those people were at home. They
22 would remotely do things from home.
23    Q. If you spent time trying to get your
24 computer fixed by IT, did you ensure you were
25 paid for that time?

Page 28

1     A. I assumed I wasn't being paid, because I
2 don't think I was logged in at that time, if the
3 computer was down.
4     Q. Were there any instances where you -- you
5 had to contact IT at the beginning of your shift
6 and you didn't ask for that time to be
7 compensated?
8     A. I guess I didn't talk to IT about being
9 compensated. I would always talk to the happy-
10 helper-type person to get compensated. Didn't
11 talk to IT about being compensated, though.
12    Q. But if there was a delay in your clocking
13 in due to technical issues, did you al -- always
14 tell your supervisor that?
15    A. Right.
16      The -- like I say, for the larger times.
17 Not for the little short ones, but for the larger
18 times, yeah.
19    Q. In looking at your time sheets, it -- did
20 you have an opportunity to review your time
21 sheets before your deposition today?
22    A. I looked through them. There were so many
23 that, you know -- yeah.
24    Q. In looking through your time sheets, it
25 appears that you only took one paid break on one

Page 29

1 occasion during your employment.
2       Does that sound right?
3     A. Yeah. Yep.
4       I didn't take a break at all, for the most
5 part. Like I say, I came in and I worked.
6       I had -- there was a refrigerator, I would
7 say, probably about 40 feet from where my cubicle
8 was. And I would -- once a day I would get up
9 and go to the refrigerator and get a bottle of
10 pop out of the refrigerator.
11      And I got reprimanded for not clocking out
12 for that period of time. And I told -- this was
13 Sherry.
14      I told her it would take me longer to
15 clock out and clock back in than it did for me to
16 walk over. Be less than a minute.
17      So I'll be honest with you, I never did
18 clock out for that time.
19    Q. I -- I can pull up the time sheet, if you
20 want. But I saw -- the only paid break I've seen
21 is in September of 2019 you took a three-minute
22 paid break.
23      Does that sound right?
24    A. Probably, because she was on my back so
25 much, I did it just to get her off my back.

Page 30

1  Q. And that break was paid. Right?
2  A. I don't know. I -- again, I don't know.
3  Q. Let me pull this up. One moment.
4     I'm going to mark this as Exhibit 2. Can
5  you see this time sheet on your screen?
6     (Deposition Exhibit No. 2 introduced.)
7  A. (Continuing) Yep.
8  Q. I don't know -- if you have the paper
9  documents in front of you and you would prefer it
10 that way, I can direct you to that page.
11    But I'm showing you page 151 from your
12 time sheets. And I will zoom in.
13    Did that help?
14 A. That helps, yep.
15 Q. It looks like on September 26 you took a
16 break from 11:52 a.m. to 11:55 a.m.
17    Do you see that?
18 A. Yes, I do.
19 Q. And then if we scroll down under the pay
20 code summary, it says, "Paid break .17 hours."
21    Do you see that?
22 A. I see that.
23 Q. According to this, the -- the only break
24 you took was -- was paid. Right?
25 A. It looks like it was. Yes, it is.

Page 31

1  Q. And so any delay you had logging back in
2  or clocking back in after your break -- that was
3  all paid time.
4     Right?
5  A. Correct.
6  Q. In looking at your time sheet -- in
7  looking at your time sheets, the only other times
8  I saw you clocking out in the middle of a
9  shift -- looks like a handful of occasions in the
10 spring of 2019, where you were clocking out for
11 maybe an hour and a half or two hours at a time.
12    Does that sound right to you?
13 A. Correct.
14    I had -- was diagnosed with cancer. And I
15 had to go in and get treatments. So I had to go
16 to the hospital in Waconia. And I clocked out
17 for that period of time.
18 Q. When you -- when you would leave the
19 worksite on those dates, did you log out of your
20 computer?
21 A. When I went -- when I went -- yes, I did
22 log out, yes.
23 Q. When you returned back to the worksite,
24 was your computer already on?
25 A. No.

Page 32

1  Q. You would turn --
2  A. Not that I can remember. Not that I can
3  remember, no.
4  Q. Would you turn your computer off before
5  you left, on those handful of occasions?
6  A. I'd say -- I'm not going to say
7  100 percent, because sometimes I left quickly.
8  But I'd say I was supposed to. And I think I
9  did.
10 Q. You believe that you then started your
11 computer from a -- power being off and -- when
12 you returned back to the worksite.
13    Right?
14 A. Correct.
15 Q. Do you allege that My Pillow failed to pay
16 you for time spent logging in on those occasions,
17 when you left in the middle of the workday?
18 A. It was probably just like clocking in the
19 in the morning, you know, I suppose. Those
20 couple minutes or so that it took to clock in,
21 power up.
22 Q. Other than the three-minute paid break we
23 discussed and those handful of times where you
24 left for treatment, are you aware of any other
25 breaks you took in your workday, that you weren't

Page 33

1  compensated for?
2  A. No.
3  Q. You can't point to any occasion in these
4  time records where your computer took five
5  minutes to log in or three minutes to log in.
6     Can you?
7  A. Any particular day, you mean?
8     No, no, no.
9  Q. To the best of your knowledge, you don't
10 have any ballpark for how much time you believe
11 you should be compensated for by My Pillow.
12    Correct?
13 A. Well, you know, if -- like I say, there
14 were a few times when it was a -- a fair amount
15 of time. But, on the average, every day was a
16 few minutes.
17    And, then again, there were probably ten
18 times or so where it was a fair amount longer,
19 anywheres from 15 minutes to -- sometimes it was
20 either, I'd say, close to an hour, once in a
21 while, when we couldn't get the systems up. But
22 that was very infrequent.
23    So --
24 Q. Those --
25 A. -- compensated?

9 (Pages 30 - 33)

Page 34

1  I have -- don't have a clue.
2  Q. Those times, though, where it took ten
3  minutes or more, you -- you reported that,
4  though.
5     Correct?
6  A. I'd say most of them I did. Yeah. I'm
7  not -- I -- I can't guaranty I did all of them,
8  but I'd say most of them, yeah.
9  Q. For the instances where it took
10 five -- five to ten minutes, would you report
11 those delays?
12 A. No. I mean, maybe made comments, but no,
13 I don't report them.
14     MS. OLAWSKY: That's all the
15 questions that I have. Thank you so much for
16 your time.
17     THE WITNESS: Thank you.
18     MR. KAYLOR: Okay. Tom, I've got a
19 few questions for you, so I'll take over here.
20         EXAMINATION
21 BY MR. KAYLOR:
22 Q. Ms. Olawsky referred -- strike that.
23    You recall that you clocked in pretty
24 consistently at 6:50 every morning. Right?
25 A. Correct.

Page 35

1  Q. And would you have to turn on your
2  computer before 6:50?
3  A. I -- I would try -- try to get it on
4  before 6:50, yeah.
5  Q. Then you would have to log in before 6:50.
6  Right?
7  A. I wouldn't log in until 6:50. I would
8  turn the computer itself on, but I wouldn't log
9  in.
10 Q. You would log into ADP at 6:50. Is that
11 fair?
12 A. That's correct, yeah.
13 Q. But before you could get to ADP, you would
14 need to log into the computer itself.
15    Correct?
16 A. Correct.
17 Q. And before you could log into the computer
18 itself, you would need to turn the computer on.
19    Right?
20 A. That's correct, yeah.
21    I mean, some days when I came in I'd
22 turned the computer on early and -- and, like I
23 told the young lady, I would go on the Internet
24 and read the news or something like that. Not
25 every day, but, you know, probably half the time.

Page 36

1  And the computer would be on, but I would
2  not be logged in to -- you know, getting paid for
3  it, obviously.
4  Q. Do you recall receiving training or an
5  orientation as a call center representative?
6  A. One more -- repeat that one more time,
7  Zack.
8  Q. Do you recall receiving training or an
9  orientation as a call center representative?
10 A. No. I don't remember any orientation or
11 anything, no.
12    We -- lot of employees talk about that.
13 Our training was very, very poor.
14 Q. Do you remember who your human resources
15 manager was?
16 A. Traci Shrimp.
17 Q. Did Traci Shrimp ever tell you that you'd
18 be paid to boot up your computer at the start of
19 your shift?
20 A. No. I had very little contact with her.
21 Very little.
22 Q. I think you referenced someone else at
23 My Pillow earlier, named Sherry Miles.
24    Do you remember that?
25 A. Yes.

Page 37

1  Q. Do you remember what her role was?
2  A. I think she was, like, the supervisor of
3  the employees that worked there. That's who I
4  interviewed with when I got my job. And she
5  seemed -- seemed to be the supervisor of
6  everybody at that call center. I don't know what
7  her exact title is.
8  Q. Did Ms. Miles ever tell you that you'd be
9  paid to boot up your computer in the morning?
10 A. No. We never talked about that at all.
11 Q. Did anyone at My Pillow ever tell you to
12 keep track of the time you spent booting up your
13 computer each day?
14 A. No. No, they didn't.
15    But Sherry did tell me -- like I said, is
16 when I -- when I first started coming in early,
17 in sales, I would get on line and -- actually, on
18 line early.
19    And she told me -- I did this, maybe, for
20 two or three times. Maybe couple more. Maybe
21 five at the very -- probably two or three.
22    And she told me I could not clock in or do
23 anything before 6:50, before my shift would
24 start. They'd allow me to start ten minutes
25 early.

10 (Pages 34 - 37)

Page 38

1  So that's when I started the 6:50 routine.
2      MR. KAYLOR:  That's all the questions
3  I have for you, Tom.
4      Janet, if you've got anything further?
5      MS. OLAWSKY:  I don't.  Thank you.
6      MR. KAYLOR:  And we can go off the
7  record.
8      MS. OLAWSKY:  Should we put the read
9  and sign on?
10     MR. KAYLOR:  I'll -- yeah, no
11 problem.
12     MS. OLAWSKY:  Mr. -- Mr. Arth, you
13 have an opportunity to receive a copy of this
14 transcript so you can review it for accuracy.  Or
15 you can waive that right.
16     Would you like a copy of your transcript
17 to look at?
18     THE WITNESS:  No, thanks.
19     MS. OLAWSKY:  Thank you so much for
20 your time.  Have a great day.
21     THE WITNESS:  Thank you.  You, too.
22 Thanks much.
23     (Discussion held off the record.)
24     COURT REPORTER:  Janet, you would
25 like a transcript made of this?

Page 39

1      MS. OLAWSKY:  Yes.  I believe we have
2  a standing order for our preferences.
3      COURT REPORTER:  Okay.  Sounds good.
4  And Zack?
5      MR. KAYLOR:  Yeah, we'll want a copy.
6  I'm going to drop my email for you in the
7  chat, if you don't have it already.
8      COURT REPORTER:  That would be great.
9  Thank you.
10     (Deposition concluded at 10:02 a.m.)

Page 40

1      REPORTER'S CERTIFICATE
2      STATE OF WISCONSIN
3
     I hereby certify that I reported the
4  videoconference deposition of THOMAS ARTH, who
   appeared remotely before me on August 15, 2022,
5  and that by stipulation and agreement of counsel
   to swear in the witness remotely, the witness was
6  by me first duly sworn to tell the whole truth;
7      That the testimony was transcribed by me
   to the best of my ability and is a true record of
8  the testimony of the witness; that the right to
   read and sign was reserved.
9
     That the cost of the original has been
10 charged to the party who noticed the deposition,
   and that all parties who ordered copies have been
11 charged at the same rate for such copies;
12     That I am not a relative or employee or
   attorney or counsel of any of the parties, or
13 relative or employee of such attorney or counsel;
14     That I am not financially interested in
   the action and have no contract with the parties,
15 attorneys, or persons with an interest in the
   action that affects or has a substantial tendency
16 to affect my impartiality.
17
     WITNESS MY HAND AND SEAL THIS 19th of
18 August, 2022.
19
20
21
22
23     *Nancy G. Gisch*
       Nancy G. Gisch, RMR, CRR, CLR, CRC
24     Notary Public, State of Wisconsin
       My commission expires on 11/13/24
25

Page 41

1          Veritext Legal Solutions
               1100 Superior Ave
2                 Suite 1820
             Cleveland, Ohio 44114
3            Phone: 216-523-1313
4
   August 29, 2022
5
   To: Mr. Kaylor
6
   Case Name: Deutsch, Brandon Et Al. v. My Pillow, Inc.
7
   Veritext Reference Number: 5368270
8
   Witness:  Thomas Arth      Deposition Date:  8/15/2022
9
10 Dear Sir/Madam:
11
   Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

11 (Pages 38 - 41)

Page 42

```
 1         DEPOSITION REVIEW
           CERTIFICATION OF WITNESS
 2
       ASSIGNMENT REFERENCE NO: 5368270
 3     CASE NAME: Deutsch, Brandon Et Al. v. My Pillow, Inc.
       DATE OF DEPOSITION: 8/15/2022
 4     WITNESS' NAME: Thomas Arth
 5     In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
 6     my testimony or it has been read to me.
 7     I have made no changes to the testimony
       as transcribed by the court reporter.
 8
       _____   _____
 9     Date            Thomas Arth
10     Sworn to and subscribed before me, a
       Notary Public in and for the State and County,
11     the referenced witness did personally appear
       and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
              Statement; and
14     Their execution of this Statement is of
              their free act and deed.
15
       I have affixed my name and official seal
16
       this _____ day of_____, 20____.
17
              _____
18            Notary Public
19            _____
              Commission Expiration Date
20
21
22
23
24
25
```

Page 43

```
 1         DEPOSITION REVIEW
           CERTIFICATION OF WITNESS
 2
       ASSIGNMENT REFERENCE NO: 5368270
 3     CASE NAME: Deutsch, Brandon Et Al. v. My Pillow, Inc.
       DATE OF DEPOSITION: 8/15/2022
 4     WITNESS' NAME: Thomas Arth
 5     In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
 6     my testimony or it has been read to me.
 7     I have listed my changes on the attached
       Errata Sheet, listing page and line numbers as
 8     well as the reason(s) for the change(s).
 9     I request that these changes be entered
       as part of the record of my testimony.
10
       I have executed the Errata Sheet, as well
11     as this Certificate, and request and authorize
       that both be appended to the transcript of my
12     testimony and be incorporated therein.
13     _____   _____
       Date            Thomas Arth
14
       Sworn to and subscribed before me, a
15     Notary Public in and for the State and County,
       the referenced witness did personally appear
16     and acknowledge that:
17     They have read the transcript;
       They have listed all of their corrections
18           in the appended Errata Sheet;
       They signed the foregoing Sworn
19           Statement; and
       Their execution of this Statement is of
20           their free act and deed.
21     I have affixed my name and official seal
22     this _____ day of_____, 20____.
23     _____
       Notary Public
24
25     _____
       Commission Expiration Date
```

Page 44

```
 1         ERRATA SHEET
           VERITEXT LEGAL SOLUTIONS MIDWEST
 2     ASSIGNMENT NO: 5368270
 3     PAGE/LINE(S) /    CHANGE    /REASON
 4     _____
 5     _____
 6     _____
 7     _____
 8     _____
 9     _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19
       _____   _____
20     Date             Thomas Arth
21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22     DAY OF _____, 20_____ .
23     _____
              Notary Public
24
       _____
25     Commission Expiration Date
```