## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Brandon Deutsch, individually and on behalf of all others similarly situated, | Case No. 20-cv-00318 (SRN/ECW) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| My Pillow, Inc. | |
| Defendant. | |

Jacob R. Rusch, Timothy J. Becker, and Zackary S. Kaylor, Johnson Becker PLLC, 444 Cedar Street, Suite 1800, St. Paul, MN 55101; and Jennell K. Shannon, Ballard Spahr LLP, 80 South 8th Street, Suite 2000, Minneapolis, MN 55402, for Plaintiff.

Alec J. Beck, Andrew D. Parker, and Lori A. Johnson, Parker Daniels Kibort LLC, 123 N. Third Street, Suite 888, Minneapolis, MN 55401, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 121], Defendant My Pillow's Motion for Summary Judgment [Doc. No. 140], Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel [Doc. No. 128], and My Pillow's Motion to Exclude Expert Testimony [Doc. No. 134].[1] For the reasons set forth below, the Court: (1) denies Plaintiffs' Motion for Summary Judgment; (2) grants in part and denies in part My Pillow's Motion for

---

[1] My Pillow's Motion to Exclude will be handled in a separate order.

1

Summary Judgment; and (3) grants Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel.

## I.   BACKGROUND

### A.   Procedural History

Named Plaintiff Brandon Deutsch filed the original Complaint on January 24, 2020, on behalf of himself and a putative class of similarly situated call center employees, alleging violations of: (1) the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, for failure to pay overtime wages; (2) the Minnesota Payment of Wages Act ("MPWA"), Minn. Stat. §§ 181 *et seq.*, for failure to timely pay straight time wages; and (3) the Minnesota Fair Labor Standards Act ("MFLSA"), Minn. Stat. § 117.30, for failure to keep accurate records. (Compl. [Doc. No. 1] ¶ 51–74.) In addition, Mr. Deutsch asserted a claim for civil penalties on behalf of the Minnesota Commissioner of Labor & Industry for the alleged violations of the MFLSA and MPWA, Count IV. (Compl. ¶ 75–81.) Shortly after filing, Shandrea Jenkins and Craig Lyons joined the action as opt-in plaintiffs by filing Consents to Sue. [Doc. Nos. 5, 30.]

After several motions to extend the deadline to file an answer, [Doc. Nos. 11, 14, 17, 22, 25], Mr. Deutsch filed an Amended Complaint on June 17, 2020, which My Pillow answered on July 1, 2020. (Am. Compl. [Doc. No. 31]; Answer [Doc. No. 33].) The Amended Complaint added allegations that My Pillow did not pay call center employees for post-break boot up and log in time. (Am. Compl. ¶ 31–40.)

The Court conditionally certified Plaintiffs' FLSA claim as a collective action on December 15, 2020 and approved a 90-day notice period. (Order Granting Motion to

Certify Conditional Class [Doc. No. 55] at 32–33.) During the notice period, nine additional employees filed a Consent to Sue; five of these opt-in plaintiffs have since withdrawn their consent. [Doc. Nos. 56–65, 103–107.] A total of seven Plaintiffs remain: named Plaintiff Mr. Deutsch and opt-in Plaintiffs Shandrea Jenkins, Craig Lyons, Susan Dols, Kelsie Mendez Zepeta, Thomas Arth, and Kenneth Gaustad.[2] (Pls.' Mem. [Doc. No. 123] at 6–9; First Miles Decl. ¶ 8–14 [Doc. No. 145].)

In September 2022, Plaintiffs stipulated to the dismissal of their allegations relating to post-break time as well as to the dismissal of their claim under the MFLSA for failure to keep adequate records, Count III. [Doc. Nos. 108, 111, 113, 116.]

## B.   Factual History

My Pillow is a pillow manufacturing company known for its eponymous patented pillow. (First Miles Decl. ¶ 2.) Plaintiffs are current and former My Pillow employees who performed customer service and sales at My Pillow's Chaska, Minnesota[3] call center from approximately 2017 to 2020. (Am. Compl. ¶ 15–16; First Sokolowski Decl. [Doc. No. 142], Ex. 8 (Miles Dep.) at 12:22–24.) My Pillow classified both customer service representatives and sales representatives as "call center representatives" ("CCRs"). (Miles Dep. at 13:14–14:11, 16:5–21; First Miles Decl. ¶ 1.) The call center operated 24/7, with

---

[2] Jodell Gaustad filed the Consent to Sue on behalf of Kenneth Gaustad, who is now deceased. [Doc. No. 62.]

[3] My Pillow moved its call center in November 2021. (Miles Dep. at 12:24–13:9.) All events relevant to this litigation took place at the Chaska call center. (*See* Pls.' Mem. at 1, 5.)

CCRs typically working eight-hour days, five days a week, for a total of 40 hours per week. (Miles Dep. at 28:10–29:9.)]

### 1.    Plaintiffs' Employment with My Pillow

Sherry Miles, My Pillow's Analytical Manager, attested to the employment history for each Plaintiff. (First Miles Decl. ¶ 1, 8–14.) Plaintiffs also submitted the offer letters they each received from My Pillow stating their title, wage, and approximate hours. (First Sokolowski Decl., Exs. 6, 7, 9, 11, 13, 14, 16.)

Ms. Dols began her employment with My Pillow on December 9, 2015 and remains an employee. (First Miles Decl. ¶ 8.) Ms. Dols worked "40 hours or more in 8 of her 237 weeks of employment[.]" (*Id.*)

Ms. Mendez Zepeta worked for My Pillow from May 11 to July 20, 2020. (*Id.* ¶ 9.) Ms. Mendez Zepeta "worked 40 hours or more in 1 of her 11 weeks of employment during the relevant time frame." (*Id.*) My Pillow terminated Ms. Mendez Zepeta for taking her first phone call too long after clocking in. (First Sokolowski Decl., Ex. 16.)

Mr. Lyons worked for My Pillow from February 12, 2018 to September 26, 2019. (First Miles Decl. ¶ 10.) He worked "40 hours or more in 8 of his 86 weeks of employment." (*Id.*)

Mr. Deutsch worked for My Pillow from December 16, 2017 to September 27, 2019. (*Id.* ¶ 11.) He worked "40 hours or more in 5 of his 95 weeks of employment." (*Id.*) My Pillow terminated Mr. Deutsch for tardiness and for not reporting for his shifts. (Deutsch Dep. at 56:10–57:16.)

4

Ms. Jenkins worked for My Pillow from January 4, 2019 to September 26, 2019. (First Miles Decl. ¶ 12.) Ms. Jenkins worked "40 hours or more in 5 of her 38 weeks of employment." (*Id.*)

Mr. Gaustad worked for My Pillow from March 1, 2016 to October 31, 2019. (*Id.* ¶ 13.) He worked "40 hours or more in 79 of his 88 weeks of employment during the relevant period." (*Id.*)

Mr. Arth worked for My Pillow from February 1, 2016 to November 23, 2020. (*Id.* ¶ 14.) He worked "40 hours or more in 37 of his 147 weeks of employment during the relevant time frame." (*Id.*)

## 2.     Call Center Computer Technology

Computers are central to CCRs' work. CCRs take incoming calls from customers using Annaware, a computer software. (Miles Dep. at 13:18–20, 14:10–11; First Miles Decl. ¶ 6; First Sokolowski Decl., Ex. 9 (Hagaman Dep.) at 14:6–15:3.) "Annaware is accessed through the [CCR's] computer and every telephone call between a customer and a [CCR] occurs through Annaware." (First Miles Decl. ¶ 6; *see also* Hagaman Decl. [Doc. No. 148] ¶ 7.) My Pillow admits that CCRs cannot perform their job duties without a computer. (First Kaylor Decl., Ex. 3 (Def.'s Resps. to Pls.' First Reqs. for Admissions) at 4; First Kaylor Decl. Ex. 4 (Def.'s Resps. to Pls.' Second Reqs. for Admissions) at 4.)

In July 2016, My Pillow purchased thirty T3500 computer workstations for its call center. (Hagaman Dep. at 20:9–21:11; First Kaylor Decl. [Doc. No. 124], Ex. 19 (Computer Receipts) at MYPILLOW000052_0001; Hagaman Decl. ¶ 8.) These computers used Windows 7 Pro as the operating system, although Windows 10 was available at that

time. (Hagaman Dep. at 24:2–18.) Mr. Hagaman testified that the computers using Windows 7 were upgraded to Windows 10, but he could not recall when precisely the update occurred. (*Id.* at 37:14–38:15; Hagaman Decl. ¶ 8.) Microsoft stopped providing support and updates for Windows 7 in early 2020. (Hagaman Dep. at 36:13–20.) In September 2019, My Pillow purchased new Dell computers to replace the T3500 workstations. (*Id.* at 13:2–20, 39:12–16; Computer Receipts at MYPILLOW000052_0002–0004.) The record does not detail exactly when the Dell computers replaced the T3500 workstations.

CCRs' computers receive updates on a weekly basis, typically pushed to the computer on Tuesday or Wednesday. (Hagaman Dep. at 24:19–25:9; Hagaman Decl. ¶ 4.) They also receive monthly security updates. (Hagaman Dep. at 25:7–9; Hagaman Decl. ¶ 4.) Updates automatically install if the computer is on; if the computer is off at the time of the update, the update will install once the machine is powered on. (Hagaman Dep. at 26:9–27:24; Hagaman Decl. ¶ 4.) Mr. Hagaman estimated that updates could take thirty seconds to one minute to install. (Hagaman Dep. at 28:1–6.)

### 3.    The Call Ready Process

To prepare to take their first call of the day, CCRs must "log in to their computer, they log in to [timekeeping software program] ADP, punch in, open Outlook, open up Annaware, check their emails, get in and up and ready to take phone calls." (Miles Dep. at 92:14–17; Def.'s Resps. to Pls.' First Reqs. for Admissions at 4 (admitting that My Pillow knew Plaintiffs spent time booting up computers and logging into programs at the beginning of their shifts); Def.'s Resps. to Pls.' Second Reqs. for Admissions at 6 (same).)

Some employees must also power their computer on prior to performing these steps. *See infra* Section I.B.2.a.i.

On their first day, My Pillow gives each CCR personal log in information for ADP, a timekeeping software accessed via web browser. (Miles Dep. at 20:9–25.) CCRs would start getting paid for their shift once they opened their browser, logged in to ADP, and clicked "clock in." (*Id.* at 24:22–24.) CCRs could not clock in without their computer. (*Id.* at 24:25–25:4.)

The heart of this dispute is the length of time that CCRs spent at their computers before they could click "clock in" on ADP. My Pillow did not record or otherwise keep track of the time it took CCRs to boot up and log in to their computers. (Def.'s Resps. to Pls.' First Reqs. for Admissions at 4; Def.'s Resps. to Pls.' Second Reqs. for Admissions at 5.)

### a.       Length of Time to Complete Boot Up and Log in Process

### i.       Deposition Testimony

Mr. Arth gave a "rough guess" that the log in process "averaged five to eight minutes a day." (First Sokolowski Decl., Ex. 1 (Arth Dep.) at 14:3–9.) He recalled experiencing delays "10 to 15 percent of the time" and characterized the total amount of uncompensated time he is owed as "fairly substantial." (*Id.* at 14:9, 21:16–21.)

Mr. Deutsch provided several estimates. On days when he had to turn on his computer, the boot up process took "10 to 15 minutes sometimes, or on a good day like 8 minutes[.]" (First Sokolowski Decl., Ex. 2 (Deutsch Dep.) at 15:21–23.) He testified that he arrived 15 minutes early to work to account for these delays. (*Id.* at 15:2–7.) Once Mr.

7

Deutsch began to leave his computer on at the end of his shift, the process shortened to "5 to 8 minutes usually. On a good day, maybe 4 or 5 minutes[.]" (*Id.* at 16:24–17:2.) He stated that boot up and log in times were inconsistent across computers, but that "it seemed like everyone – it would take at least like 5 minutes, or 3 to 5 minutes, on the quickest best time you could." (*Id.* at 21:19–22; *see also id.* at 89:17–18 ("Q: And it could also take less than 3 minutes? A: I would disagree with that.").) In addition, Mr. Deutsch recalled an instance in which the boot up and log in process took his computer 30 minutes; on that occasion, he used another employee's computer to log in after 15 minutes had passed. (*Id.* at 47:24–48:4.)

Ms. Gaustad testified that her husband told her that "it took longer" to log in to his work computer. (First Sokolowski Decl., Ex. 4 (Gaustad Dep.) at 7:13–9:10.) She testified that he never estimated or told her a precise amount of time that it took him to log in, although she recalled that Mr. Gaustad stated that he believed My Pillow owed him overtime pay for the process. (*Id.*)

Ms. Jenkins estimated that the boot up and log in process took about five minutes. (First Sokolowski Decl., Ex. 5 (Jenkins Dep.) at 47:19–24.) Once she started to leave her computer on at the end of her shift, Ms. Jenkins estimated that the process would take one to two minutes if there were no updates. (*Id.* at 36:14–47:3.) She could not estimate the total amount of uncompensated time that My Pillow owes her. (*Id.* at 45:12–16.)

Mr. Lyons estimated that when he had to power his computer on before logging in, described as a "cold start," the clock in process took about six to seven minutes. (First Sokolowski Decl., Ex. 6 (Lyons Dep.) at 113:19–23.) He also stated that five to ten minutes

would be a "normal" boot up time. (*Id.* at 141:4–6.) At another point, Mr. Lyons reiterated that the process regularly took between five and ten minutes with an average of eight minutes. (*Id.* at 143:15–18.) In addition, he testified that when his computer had updates to complete, the process could take ten to fifteen minutes. (*Id.* at 60:5–11.)

Ms. Mendez Zepeta testified that during her training period, it was "impossible to do [the boot up and log in process] in less than five minutes." (First Sokolowski Decl., Ex. 7 (Mendez Zepeta Dep.) at 12:10–15.) After training, the process took three to five minutes from a cold start. (*Id.* at 12:17–20.) If she left her computer on at the end of the previous shift, logging into her desktop and clocking into ADP took "about a minute." (*Id.* at 59:21–60:1.)

Ms. Dols testified that it took her "several minutes just to get [her] computer going." (First Sokolowski Decl., Ex. 3 (Dols Dep.) at 9:19–20.) At various times in her deposition, she estimated that it took her "five or ten minutes;" "sometimes several minutes or ten to fifteen minutes, maybe, to log in;" close to an average of seven minutes; and never less than five minutes. (*Id.* at 10:8–9, 32:6–33:24.) She recalled that a few times it took as long as twenty minutes to complete the log in process, and that it took longer than ten minutes more than thirty times. (*Id.* at 34:2–6, 35:22–36:7.) However, Ms. Dols testified that because of the adjustments she requested, she believes that My Pillow compensated her for the delays greater than ten minutes that she experienced. (*Id.* at 40:11–41:6.)

Plaintiffs attributed their lengthy boot up and log in processes in part to the age of the computers. (*See, e.g.*, Mendez Zepeta Dep. at 14:18 ("We didn't have the best computers"); Lyons Dep. at 55:4–7, 84:21–25 ("It seemed like if we were going to get

anything done, the whole computer set up would have to be – like, we'd have to get a whole new setup, because it was just the computer being old."); Dols Dep. at 31:17–32:15 (stating that since My Pillow purchased new computers in 2021, there have not been delays during the boot up and log in process).)

### ii.       Video Evidence

In addition to Plaintiffs' testimony, Mr. Lyons recorded two videos at the call center capturing the boot up and log in process. (First Kaylor Decl., Exs. 23 (First Video), 25 (Second Video).) He decided to record these videos "to have that [as] evidence" to show to managers who wanted to discipline him for tardiness. (Lyons Dep. at 89:6–18.)

In the First Video, taken on August 7, 2019, Mr. Lyons walks into the call center and to his workstation, where the computer is off. (First Video at 00:39; Lyons Dep. at 90:12–14.) He turns his computer on. (First Video at 00:40.) From the moment Mr. Lyons presses the power button to when he reaches the screen to enter his Windows credentials, about one minutes elapses. (*Id.* at 00:40–01:44.) Mr. Lyons faces the camera away from his computer while he enters his credentials. (*Id.* at 01:44–02:00.) The computer screen then displays "Welcome" with a spinning wheel for three minutes and twenty-one seconds before Mr. Lyons' desktop appears. (*Id.* at 02:00–05:21.) Once at Mr. Lyons' desktop, which has a customized background, Windows Outlook and a small calendar open automatically and begin to load. (*Id.* at 05:41.) Icons for a videogame, City of Heroes, and for two portable game launchers are also visible on the desktop. (*Id.*; Lyons Dep. at 95:16–96:8.) Mr. Lyons then clicks Google Chrome, (First Video at 06:08–09), which takes a little more than a minute to finish opening. (*Id.* at 07:14.) After it opens, pop-up

notifications appear from Youtube and Facebook. (*Id.* at 07:17; Lyons Dep. at 100:6–19.) Mr. Lyons closes these. (First Video at 07:22–23.) Personal bookmarks saved in Google Chrome's bookmarks bar are visible. (*Id.*; Lyons Dep. at 102:24–03:13.) Mr. Lyons proceeds to the ADP website, enters his credentials, states "This is pretty quick this time," and clocks in at 11:03 p.m. (First Video at 07:25–08:01; Lyons Dep. at 104:8–13.) In total, the process of booting up, logging in, and clocking into ADP took Mr. Lyons approximately seven minutes and twenty-one seconds.

Although Mr. Deutsch and Ms. Jenkins were present during the filming of the First Video, it does not contain any footage of their computers. (*See generally* First Video; Lyons Dep. at 90:23–91:1; Deutsch Dep. at 42:8–45:15.) My Pillow provided Mr. Deutsch and Ms. Jenkins' timesheets from August 7, 2019, which reflect clock in times of 10:58 p.m. and 10:57 p.m., respectively. (Second Miles Decl. [Doc. No. 155] at MYPILLOW000003_0171, MYPILLOW000011_0062.)

Mr. Lyons recorded the Second Video on August 19, 2019. (*See* Second Video at 01:31 (desktop displaying date).) Mr. Lyons could not recall whether he filmed this video at the beginning of his shift or after a break. (Lyons Dep. at 108:3–09:16.) The video starts by displaying Mr. Lyons' black computer screen and does not show whether he pressed the power button. (Second Video at 00:00.) When the computer display turns on, the message "This might take several minutes" appears. (*Id.* at 00:25.) Mr. Lyons' desktop appears after about another minute and displays a generic Windows background. (*Id.* at 01:25.) Mr. Lyons opens Google Chrome and reaches the ADP log-in website after another two minutes; while Google Chrome loads, pop-ups appear from Facebook and news

outlets. (*Id.* at 01:27–03:26.) Mr. Lyons clocks in at 11:02 p.m. (*Id.* at 03:57.) The entire process thus lasts three minutes and fifty-seven seconds.

**b.    Frequency of Delays**

Plaintiffs' testimony again varied as to the frequency of delays experienced during the boot up process.

Mr. Arth testified that "a lot of people had short delays. I mean, every day, I mean, it was something. We just kind of took it, thought it was normal." (Arth Dep. at 9:8–10.)

Mr. Deutsch testified that he experienced delays logging into Windows daily and that everyone experienced delays of three to five minutes. (Deutsch Dep. at 20:18–22, 69:8–10.)

Ms. Dols had difficulty estimating whether less than half or less than a third of the time it took fewer than five minutes to complete the log in process, and reiterated that "a better estimate" would be between five and ten minutes "almost daily." (Dols Dep. at 36:24–37:20.) She stated that "every day was different." (*Id.* at 33:4–5.) As noted above, she also described experiencing delays of more than ten minutes over thirty times. (*Id.* at 35:22–36:7.)

Mr. Lyons stated that delays "weren't all the time." (Lyons Dep. at 63:3–7.) He estimated that delays of between five and ten minutes, such that he would use a different computer to clock into ADP, occurred "[n]ot very often, but I'd say once a month." (*Id.* at 139:24–40:3.)

Ms. Gaustad testified that her husband told her four or five times that he experienced delays. (Gaustad Dep. at 7:13–9:10.)

Finally, Ms. Mendez Zepeta testified to daily delays during her training period. (Mendez Zepeta Dep. at 12:10–15.) After completing her training, she stated that "98 percent of the time" it took longer than a minute to complete the log in process, even when her computer was already powered on at the beginning of her shift. (*Id.* at 60:19–21.)

### c.   Reporting Delays to Supervisors and Management

Every Plaintiff testified that they brought up the delays that they experienced to their supervisor.

Mr. Arth testified that he would verbally report delays of ten minutes or longer to his supervisor. (Arth Dep. at 7:22–8:8, 10:6–8.) While Mr. Arth did not formally report delays of less than ten minutes, he would still make comments such as, "Boy, this is kind of ridiculous" to the call center "happy helpers." (*Id.* at 14:10–15:2.)

Mr. Deutsch tried to complain about the clock-in system to Ms. Miles and to Traci Shrempp, My Pillow's Employee Relations Director, and suggested that CCRs should be able to use the physical clock-in machine that he had observed on the wall of the call center. (Deutsch Dep. at 6:4–9:21, 26:12–27:21; Shrempp Decl. [Doc. No. 146] ¶ 1.) Mr. Deutsch recalled that he was unable to fully explain the problems with the boot up and log in process during these conversations because "they immediately dismissed me" and further recalled that Ms. Miles commented, "that's the way Mike wants it done." (*Id.* at 6:19–21, 8:6–8, 9:24.) Similarly, he described being dismissed by other supervisors: "[E]very time I would bring it up you would get dismissed right away . . . I didn't push the issue because every time I would say anything about the log-in process I would get dismissed. So what are you supposed to do?" (*Id.* at 25:8–18.)

13

Ms. Dols recalled that she reported log in delays to her supervisor Jaclyn Cooper "whenever it happened." (Dols Dep. at 35:11–21.) She also recalled that other supervisors on duty during her shift observed her waiting to log in. (*Id.* at 34:7–21.)

Ms. Gaustad testified that her husband "would have to get some help from the supervisor" when he experienced log in delays. (Gaustad Dep. at 11:17–18.)

Ms. Jenkins testified that she would report log in and updating delays to her supervisors "in case it was interrupting with my clock . . . [because] I would have to use someone else's computer." (Jenkins Dep. at 17:20–25, 37:3–9.) She believed that her supervisor contacted the IT department about these delays. (*Id.* at 20:18–20.) Any time she experienced problems with ADP, Ms. Jenkins would inform her supervisor. (*Id.* at 27:20–24, 28:15–23.) Ms. Jenkins also recalled that night shift employees questioned why they were unable to use the clock-in machine on the wall to clock in; during these conversations, she recalled that her supervisor would agree about "[t]he logging in, how we should be using the time clock machine [instead of the computers]" because of the delays. (*Id.* at 39:7–40:20.)

Mr. Lyons recalled that he would report especially long delays to his supervisor, who instructed him to clock into ADP using someone else's computer. (Lyons Dep. at 60:5–21.) He stated that he was motivated to report the delays in order to contest being disciplined for tardiness. (*Id.* at 82:10–83:24.) Mr. Lyons recalled his supervisor saying "that she would bring . . . up [the delays] to somebody." (*Id.* at 83:16–24.) Mr. Lyons also recalled hearing coworkers complain about the delays, making comments such as, "Dang, this is taking a long time to load up." (*Id.* at 87:6–12.)

14

Ms. Mendez Zepeta likewise testified to raising the issue of boot up and log in delays to her supervisor in response to discipline for tardiness. (Mendez Zepeta Dep. at 78:9–21.)

### 4.      My Pillow's Training and Policies

Ms. Miles testified on behalf of My Pillow about its training procedures and general policies. (*See generally* Miles Dep.) Kyle Hagaman, Systems Administrator/IT Coordinator, testified on behalf of My Pillow about its computer technology. (*See generally* Hagaman Dep.; Hagaman Decl.) In addition, My Pillow submitted declarations from Ms. Shrempp, Employee Relations Director, and Kelli LaTour, who trained Ms. Mendez Zepeta. (Schrempp Decl. ¶ 1; LaTour Decl. [Doc. No. 147] ¶ 1–2.)

Ms. Schrempp provides a one-on-one orientation to each new CCR on their first day. (Miles Dep. at 20:10–22; Schrempp Decl. ¶ 2.) She ensures that CCRs understand:

> a. how to track their time;
> b. how to create an ADP username and password;
> c. how to log in to ADP and clock in and out;
> d. what time should be tracked;
> e. My Pillow does not permit off-the-clock work;
> f. at the start of every shift, employees first log in to their computers and clock into ADP[;]
> g. employees must be clocked into ADP before performing any work.

(Schrempp Decl. ¶ 3.) Ms. Schrempp also ensures that CCRs understand that the first thing they do to start their workday is log in to their computer. (*Id.* ¶ 4.)

After orientation with Ms. Schrempp, Ms. Miles would briefly address My Pillow's policies with the new CCR. (Miles Dep. at 23:2–24:1.) Then, she would pair the new CCR with an experienced CCR to shadow for the next two weeks. (*Id.* at 21:5–16.) Ms. Miles could not recall if new CCRs were given a formal training packet. (*Id.* at 23:23–24:2.)

15

### a.   Leaving Computers On or Off

Ms. Miles testified that CCRs' computers should never be off, per My Pillow policy, but that she is unaware of any written document to that effect. (Miles Dep. at 92:20, 116:22–17:6.) Her declaration attests: "It is My Pillow policy to leave the call center computers on at the end of every employee's shift. Employees are trained on this policy, starting during their training period." (Miles Decl. ¶ 5.) Mr. Hagaman also declared: "My Pillow requires [CCRs] to leave their computers on at the end of their shift. Most importantly, this permits computer updates to install when the [CCR] is not working." (Hagaman Decl. ¶ 3.)

Plaintiffs' testimony varied as to whether they were trained to leave their computer on at the end of the day. Mr. Arth testified that Ms. Miles instructed him to shut down his computer at the end of the day, such that he would have to turn it on each day when he arrived at the call center to start his shift. (Arth Dep. at 18:2–20:20.) Mr. Deutsch testified that he was never told to leave his computer on at the end of his shift, but that he began to do so about a year into his employment to minimize the amount of time spent on the clock-in process. (Deutsch Dep. at 71:2–16.) Similarly, Ms. Jenkins testified that she was neither trained nor told to leave her computer on at the end of her shift, although she started leaving her computer on several months into her employment. (Jenkins Dep. at 7:15–8:7, 9:12–24, 11:15–18, 16:3–7.) Ms. Dols testified that she was told to leave her computer on, but not as part of training, and that when she trained other employees she told them to leave their computers on. (Dols Dep. at 26:1–21.)

Ms. Mendez Zepeta testified that she was trained to shut the computer down at the end of the day and that she observed her trainer, Ms. LaTour, shutting down her own computer at the end of each shift. (Mendez Zepeta Dep. at 7:5–14, 8:13–10:17.) Ms. LaTour disputed this, declaring: "When I train any employee, I always train them to leave their computer on at the end of their shift. I recall training Ms. Mendez Zepeta on this requirement." (LaTour Decl. ¶ 3.)

### b.    Reporting Technology Problems

Mr. Hagaman declared that CCRs are required to report technical problems with their computer to their supervisor or to the IT department. (Hagaman Decl. ¶ 6.) CCRs may do so in person, by email, or by submitting a "tech ticket." (*Id.*) IT services are available to CCRs at all times. (*Id.*)

Mr. Deutsch acknowledged that he understood that he should seek help from IT for computer issues, "but it didn't seem like there was trouble with the computer. That's just how it was. That's how it is. That's what I was told, that's how it is." (Deutsch Dep. at 24:8–11.) Other Plaintiffs likewise testified that they knew to report computer problems to IT, but that they did not submit tickets related to boot up and log in delays or their computers being slow in general. (*See* Arth Dep. at 27:10–28:11; Dols Dep. at 29:21–30:12; Jenkins Dep. at 37:19–38:17; Lyons Dep. at 27:12–29:17.)

### c.    Requesting a Time Adjustment

Plaintiffs' testimony varied on the subject of My Pillow's time adjustment policies.

Some Plaintiffs testified that they knew they could request an adjustment to their time card from their supervisors if ADP, the clock-in software, was not functioning when

they attempted to log in. (Deutsch Dep. at 92:12–93:4; Jenkins Dep. at 28:15–23, 29:21–24; Lyons Dep. at 75:14–18; Mendez Zepeta Dep. at 16:4–12.) They also stated that they could, and did, request a time change if they forgot to clock in or out of ADP. (Deutsch Dep. at 74:5–8; Lyons Dep. at 73:11–16, 75:14–18; Mendez Zepeta Dep. at 19:11–14, 20:24–25.)

Mr. Deutsch and Mr. Lyons stated that they were not aware they could request changes to reflect the amount of time they spent booting up their computers every day and that they did not do so. (Deutsch Dep. at 77:25–79:3; Lyons Dep. at 85:23–86:20.) Mr. Deutsch felt he would be dismissed for requesting such a change. (Deutsch Dep. at 77:5–79:22.) However, Mr. Deutsch, Mr. Lyons, and Ms. Jenkins also testified that they would ask for an adjustment if the boot up and log in delays exceeded a certain amount of time or if they had to clock into ADP on someone else's computer. (Deutsch Dep. at 79:23–80:23; Lyons Dep. at 139:14–16, 140:12–141:25 (stating he would only request a change if the process took longer than the "normal" time of five to ten minutes); Jenkins Dep. at 27:20–28:23.) Mr. Arth likewise testified that he only sought compensation for longer delays, not minor ones. (Arth Dep. at 26:11–16, 28:12–15.)

Five Plaintiffs testified that My Pillow never explicitly told them that they would be compensated for the time they spent booting up and logging into their computers. (*Id.* at 36:17–21, 37:8–10; Deutsch Dep. at 91:5–16, 93:5–8; Jenkins Dep. at 48:9–24; Lyons Dep. at 138:22–39:11; Mendez Zepeta Dep. at 77:4–7.) They also testified that My Pillow never instructed them to record the amount of time they spent doing so daily. (Mendez Zepeta Dep. at 77:8–12; Arth Dep. at 37:11–14; Deutsch Dep. at 92:7–11; Jenkins Dep. at 48:22–

18

49:3; Lyons Dep. at 139:7–11.) Ms. Dols, however, testified that she was told that she should ask for an adjustment for the time she spent booting up her computer, every day if necessary, and that she did. (Dols Dep. at 49:5–25.)

Generally, Plaintiffs agreed that their supervisors would grant their time adjustment requests without further inquiry. (Arth Dep. at 27:2–9; Dols Dep. at 29:3–5; Jenkins Dep. at 29:2–30:11; Lyons Dep. 74:25–75:2, 78:5–79:1.) Ms. Mendez Zepeta testified that when she requested a time adjustment, her supervisors would incorrectly clock her in from when she took her first call rather than when she reached her workstation. (Mendez Zepeta Dep. at 16:17–17:19, 18:6–9.) Ms. Mendez Zepeta testified that she disputed these inaccurate corrections to her supervisors. (*Id.* at 27:16–29:2, 33:15–40:17.) In addition, Mr. Deutsch testified that he only asked for an adjustment a few times because of his concerns about being dismissed by his supervisors. (Deutsch Dep. at 78:5–80:16.)

My Pillow submitted emails from Plaintiffs requesting time clock adjustments. (First Sokolowski Decl., Exs. 10–15.) According to these exhibits, Mr. Arth, Mr. Gaustad, Mr. Lyons, and Ms. Mendez Zepeta requested time adjustments twice. (First Sokolowski Decl., Exs. 10, 13–15.)

Mr. Deutsch requested time adjustments fourteen times; many of these requests occurred because Mr. Deutsch forgot to clock in or accidentally clocked out. (First Sokolowski Decl., Ex. 11 at MYPILLOW000106_0001, MYPILLOW000088_0001, MYPILLOW000138_0001, MYPILLOW000084_0001, MYPILLOW000042_0001, MYPILLOW000025_0001.) Except for once, the remainder of Mr. Deutsch's requests occurred when ADP was malfunctioning or before Mr. Deutsch understood the clock in

19

process. (*Id.* at MYPILLOW000063_0001, MYPILLOW000082_0001, MYPILLOW000064_0001, MYPILLOW000144_0001, MYPILLOW000126_0001, MYPILLOW000096_0001, MYPILLOW000118_0001.)

Ms. Dols requested time adjustments twenty times. (First Sokolowski Decl., Ex. 12 (Dols Adjustment Reqs.).) Like Mr. Deutsch, Ms. Dols made most of her requests when she forgot to clock in or out, when ADP malfunctioned, or when she accidentally selected clock out instead of clock in. (*Id.* at MYPILLOW000077_0001, MYPILLOW000092_0001, MYPILLOW000130_0001, MYPILLOW000065_0001, MYPILLOW000121_0001, MYPILLOW000150_0001, MYPILLOW000105_0001, MYPILLOW000074_0001, MYPILLOW000104_0001, MYPILLOW000132_0001, MYPILLOW000135_0001, MYPILLOW000098_0001, MYPILLOW000125_0001, MYPILLOW000107_0001, MYPILLOW000110_0001, MYPILLOW000067_0001, MYPILLOW000089_0001.)

## II.  DISCUSSION

### A.  Motions for Summary Judgment

Plaintiffs seek summary judgment only with respect to My Pillow's liability for their FLSA claim. (*See generally* Pls.' Mem.; Pls.' Reply [Doc. No. 164].) They argue that the boot up and log in process is compensable under the FLSA; that they are entitled to liquidated damages; and that the jury should decide My Pillow's willfulness. (*Id.*)

My Pillow seeks summary judgment on all claims. (*See generally* Def.'s Mem. [Doc. No. 143]; Def.'s Reply [Doc. No. 160].) My Pillow argues that the call ready process is not compensable under the FLSA and that the amount of time at issue is de minimis.

20

(Def.'s Mem. at 20–34.) It further contends that, procedurally, Plaintiffs' claims under the MPWA are limited to those arising after the 2019 amendment of the statute, and that, on the merits, the call ready process is not compensable under the MPWA. (*Id.* at 34–39.) Finally, My Pillow asserts that Plaintiffs cannot seek Commissioner's remedies under the MFLSA for the alleged violation of the MPWA. (*Id.* at 39–42.)

### 1.     Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). And a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the moving party bears the burden of establishing the lack of a genuine issue of fact, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, summary judgment is properly entered "against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

### 2. Fair Labor Standards Act – Count I

Plaintiffs allege that by failing to compensate CCRs for the boot up and log in process prior to clocking in, My Pillow has failed to compensate them for overtime hours in violation of the FLSA. (Am. Compl. ¶ 61–74.)

### a. Compensability

The FLSA requires employers to pay employees one and one-half times their regular pay for any time worked in excess of forty hours per week. 29 U.S.C. § 207. In order to prevail on their FLSA claim, Plaintiffs must "present evidence that they worked above their scheduled hours without compensation" and that My Pillow "knew or should have known that they were working overtime." *Hertz v. Woodbury Cnty., Iowa*, 566 F.3d 775, 781 (8th Cir. 2009).

### i. Integral and Indispensable Activity

My Pillow first argues that the call ready process is not compensable "work" under the FLSA. (Def.'s Mem. at 20–24.) It argues that booting up and logging in to the computer are preliminary activities analogous to "the historically non-compensable time of waiting to clock in at a physical timeclock—it is simply the 'electronic equivalent.'" (*Id.* at 23 (quoting *Cadena v. Customer Connexx LLC*, No. 2:18-cv-00233 (APG/DJA), 2021 WL 3112446, at *7 (D. Nev. July 21, 2021)).) Plaintiffs counter that the call ready process is

an integral and indispensable activity compensable as "work." (Pls.' Mem. at 26–33; Pls.' Reply at 11–12.)

Because the FLSA does not define "work," the Supreme Court initially determined that "the statutory workweek includes all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 690–91 (1946). This definition included preliminary activities like "walking to work on the employer's premises" and "turning on switches for lights and machinery." *Id.* at 691–93.

Congress subsequently passed the Portal-to-Portal Act, 29 U.S.C. §§ 251–62, in response to the "unexpected liabilities" created by the Supreme Court's expansive interpretation of the workweek "in disregard of long-established customs, practices, and contracts between employers and employees." 29 U.S.C. § 251(a). Thus, the Portal-to-Portal Act carves out an exclusion from the FLSA for time performing "activities which are preliminary to or postliminary to [the employee's] principal activity or activities." 29 U.S.C. § 254(a)(2).

"Principal activity or activities" includes "all activities that are an 'integral and indispensable' part of the principal activities." *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 33 (2014) (quoting *IBP, Inc. v. Alvarez*, 546 U.S. 21, 29–30 (2005)); *Lopez v. Tyson Foods*, 690 F.3d 869, 874 (8th Cir. 2012) ("Activities performed either before or after the regular work shift, on or off the production line, are compensable . . . if those activities are an integral and indispensable part of the principal activities for which covered

23

workmen are employed."). Furthermore, "any activity that is integral and indispensable to a principal activity is itself a principal activity." *Lopez*, 690 F.3d at 874.

An activity is "integral and indispensable . . . if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Busk*, 574 U.S. at 33. This inquiry is not governed by whether the employer requires the activity or whether the activity benefits the employer. *Id*. Rather, the analysis is "tied to the productive work that the employee is *employed to perform*." *Id.* (emphasis in original). Courts must perform this analysis on a case-by-case basis. *Id.* at 36.

No Eighth Circuit court has yet considered whether the boot up and log in process performed by call center employees may be compensable under the FLSA.[4] However, courts in other circuits have addressed the question with increasing frequency in recent years. The Tenth Circuit became the first appeals court to hold that the time call center employees spend booting up and launching software prior to clocking in is compensable. *Peterson v. Nelnet Diversified Sols., LLC*, 15 F.4th 1033, 1041–42 (10th Cir. 2021). Then, shortly after the parties in this case completed briefing on the instant motions, the Ninth Circuit reached the same conclusion. *Cadena v. Customer Connexx LLC*, 51 F.4th 831, 840 (9th Cir. 2022).

---

[4] This Court has twice previously adjudicated cases involving the call ready process for call center centers employees. *See Burch v. Qwest Commc'ns Int'l, Inc.*, 500 F. Supp. 2d 1181 (D. Minn. 2007); *Shoots v. iQor Holdings US Inc.*, No. 15-cv-563 (SRN/SER), 2015 WL 6150862 (D. Minn. Oct. 19, 2015). Neither of those cases squarely addressed whether that time is compensable under the FLSA for the reasons argued here.

In *Peterson*, call center representatives employed by a student loan servicer, Nelnet, brought a collective action seeking compensation for the call ready process. 15 F.4th at 1036. Before they could clock in, the CCRs had to wake up their computer, insert their security badge, and enter their credentials; this process automatically launched a specialized desktop program. *Id.* Once loaded, the desktop program opened the employer's Intranet system. *Id.* The Intranet system contained a link to the timekeeping system—the employee clicked the link, opened the timekeeping system, and then could clock in to begin receiving payment. *Id.* The district court found these activities integral and indispensable but nevertheless de minimis, and therefore noncompensable. *Id.*

On appeal, Nelnet compared this process to commuting to work or waiting in line to punch a time clock, activities which are generally not compensable under the FLSA. *Id.* at 1040. The Tenth Circuit rejected this argument: "turning on a computer, entering passwords, and launching software is not analogous to waiting in line to punch a clock, particularly when—very much unlike a time clock—the computer itself is an integral tool for the work the individual is employed to perform." *Id.* It continued:

> Critically, nothing in Nelnet's analogies and arguments adequately refutes the obvious connection between the computers and software programs and the work the CCRs are employed to perform. As the district court put it, "the CCR[s] make[ ] regular use of the prepared electronic tools in performing their substantive tasks. Therefore, the necessary preliminary work is intertwined with the substantive performance of the principal tasks which renders such preliminary work integral and indispensable." App. vol. 2, 508. Indeed, Nelnet effectively concedes indispensability, noting "the *necessity* of booting up and logging in to access job-related programs." Aplee. Br. 36 (emphasis added). As for the integral prong, there is a clear connection between the computers and software programs and the work the CCRs are employed to perform—the CCRs make consistent use of the

25

computer and its programs to perform their work. So preparing those tools is integral to the CCRs' work. . . .

In sum, we reach the same conclusion that the district court did: The preshift activities of booting up a computer and launching software are integral and indispensable to the CCRs' principal duties of servicing student loans by communicating with borrowers over the phone and by email. . . . Booting up a computer and launching software is "an intrinsic element of" servicing student loans and communicating with borrowers because the data and tools necessary to those principal duties exist on the computer. *Busk*, 574 U.S. at 35, 135 S. Ct. 513. Likewise, Nelnet could not have eliminated these activities "without impairing the employees' ability to complete their work." *Id.* Such integral and indispensable activities are compensable under the FLSA.

*Id.* at 1041–42 (some citations omitted).

Similarly, in *Cadena*, call center representatives provided customer service for an appliance recycling business over a "'soft phone,' operated only through their employer-provided computer." 51 F.4th at 834. To access the timekeeping system, CCRs had to turn on their computers, log in with a username and password, open the timekeeping system, and clock in. *Id*. Only after clocking in would CCRs open the software necessary to answer phone calls. *Id.* CCRs testified that this process could take anywhere from one to twenty minutes "depending on the age of the computer and whether the computer was off or in sleep mode." *Id.* The district court concluded that this process was not integral and indispensable to the CCRs' duties and granted summary judgment for defendants. *Id.* at 835.

The Ninth Circuit reversed, criticizing the district court's focus on whether "'engaging with a computer and loading a time keeping program to clock in' is integral to the employees' duties." *Id*. at 839. Instead, the Ninth Circuit "evaluate[d] the importance of booting up the computer to the employees' primary duties of answering calls . . . rather

26

than their need to clock in using the electronic timekeeping system." *Id.* With the proper framing, it explained:

> All of the employees' principal duties require the use of a functional computer, so turning on or waking up their computers at the beginning of their shifts is integral and indispensable to their principal activities. Because clocking in to the timekeeping program occurs after booting up the computer—the first principal activity of the day—it is compensable. *See IBP*, 546 U.S. at 37, 126 S. Ct. 514.
>
> We recognize that not all activities an employer requires as a part of an employee's duties are compensable. *See Integrity Staffing Sols.*, 574 U.S. at 36, 135 S. Ct. 513 (warning that treating all employer-required activities as integral and indispensable is overbroad). But when, as here, the required activity bears such a close relationship to the employees' principal duties that employees cannot eliminate the required activity and still perform their principal duties, the activity is compensable. Unlike in *Integrity Staffing Solutions*, where the employer could do away with security screening without impairing the warehouse employees' ability to retrieve and package products, Connexx call center employees cannot perform their principal duties without first booting up their computers.

*Id.*

The Court agrees with the reasoning employed in these cases. Like the CCRs in both *Peterson* and *Cadena*, My Pillow's CCRs could only reach the timekeeping software to clock in after completing a series of steps: turning the computer on, entering their Windows credentials, loading their desktop, opening the internet, accessing ADP, and clicking "clock in." (Miles Dep. at 92:14–17.) They similarly used a software available only on their computer to answer phone calls—their principal duty as employees. (*Id.* at 13:18–20, 14:10–11; First Miles Decl. ¶ 6 ("Annaware is accessed through the [CCR's] computer and every telephone call between a customer and a [CCR] occurs through Annaware."); *see also* Hagaman Decl. ¶ 7.) My Pillow could not have "eliminated the [boot up and log in] work altogether without impairing the employees' ability to complete their work." *Busk*,

574 U.S. at 35. The boot up and log in process is thus integral and indispensable to CCRs' principal activity of providing customer service and sales over the phone and is compensable under the FLSA.

In so holding, the Court joins the growing chorus of district courts that have similarly held that the boot up and log in process is compensable under the FLSA. *See Wilson v. Peckham, Inc.*, No. 1:20-cv-565, 2021 WL 3168616, at \*5 (W.D. Mich. July 26, 2021) (slip copy) ("[C]all center agents cannot avoid booting up and logging into their computers if they are to perform the work for which they were hired. . . . That process is akin to preparing a tool that the employee must use throughout the work day[.]"); *Garcia v. Vertical Screen, Inc.*, 580 F. Supp. 3d 79, 87 (E.D. Pa. 2022) ("Plaintiffs' 'consistent use of the computer and its programs to perform their work' means that booting up their computers and the systems that they used to both complete their work and receive compensation for it can be compensable under the FLSA." (quoting *Peterson*, 15 F.4th at 1041–42)); *Droesch v. Wells Fargo Bank, N.A.*, No. 20-cv-06751 (JSC), 2022 WL 17669713 (N.D. Cal. Dec. 14, 2022) (slip copy); *see also Jackson v. ThinkDirect Mktg. Grp., Inc.*, No. 1:16-cv-03749, 2019 WL 8277236, at \*4 (N.D. Ga. Dec. 19, 2019) (holding that the time remote workers spent logging into their VPN is compensable under the FLSA).[5]

---

[5] The Court notes that the U.S. Department of Labor has considered these activities compensable since at least 2008. (Am. Compl., Ex. B (U.S. Department of Labor, Wage and Hour Division, *Fact Sheet #64: Call Centers under the Fair Labor Standards Act (FLSA)* (July 2008)). The Department specifies: "An example of the first principal activity of the day for agents/specialists/representatives working in call centers includes starting the computer to download work instructions, computer applications, and work-related

28

The Court finds that because the boot up and log in process is integral and indispensable to CCRs' principal activity of providing customer service and sales over the phone, Plaintiffs prevail under the first part of the compensability analysis.

### ii.      Existence, Amount, and Extent of Work

Next, Plaintiffs argue that they have presented sufficient evidence of their uncompensated overtime work performing the call ready process. (Pls.' Mem. at 24–25; Pls.' Reply at 4.) My Pillow responds that Plaintiffs' evidence of overtime work is too speculative to meet their burden and that, regardless, no overtime remains uncompensated because My Pillow adjusted Plaintiffs' time cards upon request. (Def.'s Opp'n at 11–22.)

"An employee who sues for unpaid overtime has the burden of proving that he performed work for which he was not properly compensated." *Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1059 (8th Cir. 2014) (quotation omitted). Employers are required to keep records of the wages and hours of employees subject to the FLSA. *Id.* But where an employer fails to keep accurate records, employees are not denied recovery "simply because they cannot prove the precise extent of their uncompensated work." *Id.* Here, My Pillow admits that it did not keep records of the time CCRs spent performing boot up and log in work. (Def.'s Resps. to Pls.' First Reqs. for Admissions at 4; Def.'s Resps. to Pls.' Second Reqs. for Admissions at 5.)

In such situations, the court applies the "relaxed" evidentiary standard outlined by the Supreme Court in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. at 686–88. *Id.* Thus,

---

emails." (*Id.* at 2.) While not binding, this Factsheet further persuades the Court that the boot up and log in process is compensable.

"once the employee has shown work performed for which the employee was not compensated, and 'sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference,' the burden then shifts to the employer to produce evidence to dispute the reasonableness of the inference." *Carmody v. Kan. City Bd. of Police Comm'rs*, 713 F.3d 401, 406 (8th Cir. 2013). The goal is to award compensation "based on the most accurate basis possible." *Holaway*, 771 F.3d at 1059 (quoting *Dole v. Tony & Susan Alamo Found.*, 915 F.2d 429, 351 (8th Cir. 1990)).

Notably, the *Anderson* framework applies after an employee has met their initial burden to prove that they performed uncompensated overtime work—that is, the burden of proof relaxes where actual damages are certain. *Carmody*, 713 F.3d at 406–07 ("Even though *Anderson* relaxes the burden of proof, the officers must still prove the existence of damages."); *Viet v. Le*, 951 F.3d 818, 822 (6th Cir. 2020). To satisfy their initial burden on summary judgment, employees "need not recall their schedules with perfect accuracy . . . They must only coherently describe their day-to-day work schedules or the time it takes to complete their duties so that a rational jury could find that they worked more than 40 hours in the weeks claimed." *Viet*, 951 F.3d at 826.

### 1.    Existence of Uncompensated Overtime Work

My Pillow argues that Plaintiffs cannot meet the initial burden because their testimony and video evidence fails to show that "(1) in a week in which they worked overtime (2) they experienced a log in delay (3) that went uncompensated[.]" (Def.'s Reply at 13.)

The Court disagrees. First, Plaintiffs need not demonstrate they experienced a delay during a week in which they worked overtime. The Court understands Plaintiffs' claim as alleging that the boot up and log in process repeatedly pushed their workweek over the 40-hour FLSA threshold.

Second, My Pillow makes two admissions fatal to its position. It admits that it did not record the boot up and log in process as compensable time in Plaintiffs' time cards. (Def.'s Resps. to Pls.' First Reqs. for Admissions at 4; Def.'s Resps. to Pls.' Second Reqs. for Admissions at 5.) And it admits that Plaintiffs completed the call ready process every shift. (Def.'s Resps. to Pls.' First Reqs. for Admissions at 4 (admitting My Pillow "knew Plaintiff and Opt-ins spent time booting up computers and logging into programs at the beginning of their shifts."); Def.'s Resps. to Pls.' Second Reqs. for Admissions at 6 (same).) As explained above in *Peterson* and *Cadena*, the FLSA requires compensation for this time. Whether or not Plaintiffs experienced a delay on a particular shift, they performed the log in process every day that they worked.

Third, Plaintiffs all testified that they spent some amount of time booting up and logging into their computers prior to clocking into ADP. In addition, Mr. Lyons provided video evidence demonstrating this process. (*See generally* First Video; Second Video.) True, Plaintiffs agreed that My Pillow would compensate them when they requested an adjustment to their ADP clock-in time. (Arth Dep. at 27:2–9; Dols Dep. at 29:3–5; Jenkins Dep. at 29:2–30:11; Lyons Dep. 74:25–75:2, 78:5–79:1.) But Plaintiffs also testified, with the exception of Ms. Dols, that My Pillow never told them that they would be compensated for booting up and logging into their computers. (Arth Dep. at 36:17–21, 37:8–10; Deutsch

Dep. at 91:5–16, 93:5–8; Jenkins Dep. at 48:9–24; Lyons Dep. at 138:22–39:11; Mendez Zepeta Dep. at 77:4–7.) Notably, Ms. Mendez Zepeta disputes that her time adjustment requests were properly implemented. (Mendez Zepeta Dep. at 16:17–17:19, 18:6–9, 27:16–29:2, 33:15–40:17.)

Moreover, Plaintiffs testified that they would only request time adjustments under particular circumstances: if the call ready process exceeded a certain length of time, if ADP itself was down, or if they forgot to clock in altogether. (Deutsch Dep. at 79:23–80:23; Lyons Dep. at 139:14–16, 141:4–11; Jenkins Dep. at 27:20–28:23; Arth Dep. at 26:11–16, 28:12–15.) Mr. Arth, for example, stated that delays in the process occurred every day but that employees "just kind of took it, thought it was normal." (Arth Dep. at 9:8–10.) Plaintiffs' time adjustment requests generally corroborate this. (*See* First Sokolowski Decl., Exs. 10–15.) Contrary to My Pillow's position, neither Plaintiffs' testimony nor their time adjustment requests establish that My Pillow compensated them for every minute spent completing the boot up and log in process.

My Pillow takes particular issue with Ms. Dols' and Mr. Gaustad's evidence of uncompensated overtime work. (Def.'s Opp'n at 13–14.) It points to two exchanges during Ms. Dols' deposition: in one, Ms. Dols stated that she believed she was compensated for delays longer than ten minutes, (Dols. Dep. at 38:10–41:6), and in another, she stated that she knew she "could have" requested a time adjustment for any length of log in delay. (*Id.* at 49:17–50:6.) The former statement only addresses delays longer than ten minutes and the latter is not supported by Ms. Dols' time adjustment requests. My Pillow provided Ms. Dols' time adjustment requests for twenty days between February 2017 and March 2022.

(*See* Dols Adjustment Reqs.) These records show that Ms. Dols mainly requested adjustments when she forgot to clock in or out, when ADP was down, or when she selected clock out instead of clock in. (*Id*. at MYPILLOW000077_0001, MYPILLOW000092_0001, MYPILLOW000130_0001, MYPILLOW000065_0001, MYPILLOW000121_0001, MYPILLOW000150_0001, MYPILLOW000105_0001, MYPILLOW000074_0001, MYPILLOW000104_0001, MYPILLOW000132_0001, MYPILLOW000135_0001, MYPILLOW000098_0001, MYPILLOW000125_0001, MYPILLOW000107_0001, MYPILLOW000110_0001, MYPILLOW000067_0001, MYPILLOW000089_0001.) They do not discuss delays in log in times. (*Id*.) Given that she completed the call ready process daily and the record only contains twenty adjustment requests over a five-year period of employment, these records do not prove that My Pillow compensated Ms. Dols for all time spent on the call ready process.

As for Mr. Gaustad, Ms. Gaustad's testimony cannot establish the existence of unpaid overtime. Ms. Gaustad testified that Mr. Gaustad told her four or five times that "it took longer" to complete the call ready process and that he believed he was owed compensation for that time. (Gaustad Dep. at 7:13–9:10.) This vague testimony is inadmissible hearsay. Fed. R. Evid. 801. While Plaintiffs assert that Mr. Gaustad's uncompensated overtime may be proven using the representative evidence of the other CCRs, Plaintiffs "agree[d] that this case will not be presented through representative evidence." (May 5, 2021 Joint Disc. Plan [Doc. No. 66] at 1.) Allowing Plaintiffs to renege on this agreement would be unfairly prejudicial to My Pillow.

In light of My Pillow's admissions and Plaintiffs' testimony and video evidence, the Court finds that all Plaintiffs except for Mr. Gaustad have proven the existence of uncompensated overtime work. My Pillow is therefore entitled to summary judgment as to Mr. Gaustad's claim. The Court will proceed with its analysis as to the remaining Plaintiffs.

### 2.    Amount of Uncompensated Overtime Work

With the certainty that some amount of damages exists, Plaintiffs must still produce sufficient evidence to allow the jury to determine the amount and extent of overtime work as a matter of just and reasonable inference. *Carmody*, 713 F.3d at 406.

My Pillow argues that Plaintiffs do not provide evidence of overtime work "in an amount and to an extent that is determinable." (Def.'s Opp'n at 13.) It contends that Plaintiffs' estimates of the amount of time they spent on the call ready process are "unsupported speculation" from which it is unreasonable to make inferences. (*Id.* at 18.)

In response, Plaintiffs argue that their testimony and the video evidence is sufficiently definite to establish the amount of time that they worked through just and reasonable inference. (Pls.' Reply at 4–6.) However, they do not seek summary judgment on this issue and instead contend that the amount and extent of uncompensated work should be reserved for the jury as a question of damages. (*Id.* at 5.)

Even under the relaxed evidentiary standard of *Mt. Clemens*, the jury cannot make an inference where the evidence is vague and inconsistent. *Holaway*, 771 F.3d at 1059–60; *Rapp v. Network of Cmty. Options, Inc.*, 3 F.4th 1084, 1087–88 (8th Cir. 2021). For example, in *Holaway v. Stratasys Inc.*, the plaintiff failed to provide any evidence of the amount and extent of overtime worked:

Holaway has, instead, put forth contradictory and bare assertions of his overtime hours worked. At various times, Holaway has estimated his work hours as between forty-five and seventy hours a week, yet has failed to specifically account for the hours worked. In fact, Holaway failed to put forth any evidence regarding specific weeks where he worked beyond forty hours. Holaway has also failed to provide a meaningful explanation of how he arrived at his final estimate of sixty hours a week, every week, of his employment. Holaway provided only vague testimony and failed to reference specific days and hours worked. This failure includes a failure by Holaway to check his hours worked against any business records kept by Stratasys. In his calculations regarding his typical hours worked, Holaway also failed to take into account any paid holidays, any paid vacation, or any days he was on duty at home yet never was called out to install or service a printer.

Even taking the evidence in the light most favorable to Holaway, the evidence is inconsistent and provides no details which would allow a jury to determine Holaway worked beyond forty hours in any specific week of his employment.

771 F.3d at 1059–60. The Eighth Circuit affirmed summary judgment for the employer.

Recently, the Eighth Circuit again affirmed summary judgment for an employer where the plaintiffs provided insufficient details of the alleged overtime worked. *Rapp*, 3 F.4th at 1088. The court chastised the plaintiffs for failing to produce evidence "indicating [overtime or straight time] hours worked or amount paid in any given week. Nor d[id] they offer any testimony identifying specific hours worked or tasks completed." *Id.* The court found that the plaintiffs' "conjectural, counsel-created spreadsheets" purporting to show hours worked and overtime owed were insufficient because they were not based on evidence in the record. *Id.* It further held that one plaintiff's statement that he was on duty "24/7, 365" could not overcome these deficiencies to create a genuine issue of disputed material fact about unpaid overtime. *Id.*

Plaintiffs' evidence here distinguishes their overtime claims from those in *Holaway* and *Rapp*. The nature of their overtime makes a meaningful difference: Plaintiffs testified,

35

and My Pillow admitted, that CCRs performed the boot up and log in process every single day. (Def.'s Resps. to Pls.' First Reqs. for Admissions at 4; Def.'s Resps. to Pls.' Second Reqs. for Admissions at 6; Arth Dep. at 14:3–9; Deutsch Dep. at 15:21–23; Jenkins Dep. at 47:19–24; Lyons Dep. at 141:4–6; Mendez Zepeta Dep. at 12:10–20; Dols Dep. at 10:8–9, 32:6–33:24.) The jury need not speculate about when the overtime occurred during Plaintiffs' employment: it occurred at the beginning of each shift. The consistency and regularity of the CCRs' extra work contrasts with the failure to identify the hours worked in particular weeks or the tasks performed in *Holaway* and *Rapp*.

Moreover, Plaintiffs produced video evidence to support their estimations of their daily overtime. (*See generally* First Video; Second Video.) This concrete demonstration of delays during the boot up and log in process provides an anchor from which jurors can infer the total amount of overtime.

My Pillow asserts that the First Video does not credibly represent the call ready process because Mr. Lyons' computer contained customizations not made to other CCRs' computers—namely widgets, pop-up notifications, a picture folder, a personal background, personal bookmarks, and a video game and game launcher. (Def.'s Mem. at 11–12.) Mr. Hagaman declared that these modifications "would have caused significant delays to a computer and directly impacted the time taken to complete the log-in process[.]" (Hagaman Decl. ¶ 10.)

However, Mr. Lyons testified that he did not install the widgets on his computer, (Lyons Dep. at 94:20–95:4), and disputed that the video game and video game launcher would slow down his computer. (*Id.* at 97:15–98: 23.) Additionally, at his deposition (taken

36

prior to his declaration), Mr. Hagaman testified that he did not know whether it was outside the realm of possibility that turning on the computer alone could take five minutes, as shown in the video. (Hagaman Dep. at 33:13–34:7.) Furthermore, other Plaintiffs testified to experiencing delays greater than five minutes despite making no modifications to their computers. (Arth Dep. at 14:3–9; Deutsch Dep. at 15:21–23, 47:24–48:4; Dols Dep. at 34:2–6, 35:22–36:7; Mendez Zepeta Dep. at 12:10–15.) In light of this evidence, the Court finds Mr. Hagaman's lay testimony insufficient to "dispute the reasonableness of the inference" possible from the videos and Plaintiffs' testimony as a matter of law. *Carmody*, 713 F.3d at 406.

My Pillow also argues that the First Video shows Mr. Deutsch completing the boot up and log in process within two minutes, undermining any assertion of significant delays. (Def.'s Opp'n at 17.) It notes that Mr. Deutsch's clock in time from the day of the video reveals a log in process shorter than any estimate given by Mr. Deutsch, undermining his credibility. (*Id.*) In *Musticchi v. City of Little Rock, Ark.*, the court found no genuine issue of material fact on the time it took police officers to assemble and disassemble their vests because video evidence "blatantly contradicted" their testimony. 734 F. Supp. 2d 621, 634 (E.D. Ark. 2010). The officers asserted that it took them more than ten minutes, while the video showed the task taking less than two minutes. *Id.* The video thus "so discredited" the officers' testimony that no jury would believe them. *Id.*

Here, Mr. Deutsch estimated the shortest time for the call ready process as three minutes. (Deutsch Dep. at 88:19–89:18.) While the video does not show Mr. Deutsch's computer, Mr. Deutsch's clock in records from August 7, 2019 reflect that he clocked in at

10:58 p.m. that night, five minutes earlier than Mr. Lyons. (*See generally* First Video; Second Miles Decl. at MYPILLOW000003_0171.) Subtracting these five minutes from Mr. Lyons' boot up and log in process that day results in an approximately two minute and twenty-one second process for Mr. Deutsch. (*See* First Video.) The Court is not convinced that a thirty-nine second discrepancy between an estimate from Mr. Deutsch's memory and an estimate constructed from a video that does not show his computer constitutes a "blatant[] contradict[ion]." *Musticchi*, 734 F. Supp. 2d at 634. Because credibility is normally an issue for the factfinder, and because the video does not show Mr. Deutsch's boot up and log in process, the Court finds the use of Mr. Deutsch's deposition estimates proper.

The Court acknowledges that Plaintiffs' estimates vary as to how long the call ready process took and how frequently significant delays occurred. In addition, Plaintiffs failed to provide a total estimate of the uncompensated time that they are owed, which is less evidence than the counsel-created spreadsheets submitted by the plaintiffs in *Rapp. Rapp*, 3 F.4th at 1088.

However, Plaintiffs explained the variation in their estimates by pointing to whether the computers were on or off at the start of the process, whether the computer had to install updates, and the age of the computers. (*See, e.g.*, Jenkins Dep. at 36:14–47:3; Lyons Dep. at 54:22–55:7, 84:17–85:10.) And Mr. Hagaman confirmed that updates could install during the log in process if CCRs' computers had been off prior to their shift, which would increase the duration of boot up and log in. (Hagaman Dep. at 27:11–28:6.) Assessing the credibility and consistency of this testimony poses no insurmountable task for the jury,

38

especially in conjunction with the video evidence. The Court finds that there is sufficient evidence from which to infer an average amount of time spent on the boot up and log in process.

Lastly, My Pillow argues throughout its briefing that any time spent powering the computer on should not count towards the alleged uncompensated overtime because My Pillow required CCRs to leave their computers on at the end of each shift. (*See, e.g.*, Def.'s Mem. at 6 ("Trainers reinforce My Pillow's policies and practices, including leaving their computers on at the end of each shift[.]"); *id.* at 21 n.12.) While Ms. Miles, Mr. Hagaman, and Ms. LaTour attested to such a policy, (Miles Dep. at 92:20; Miles Decl. ¶ 5; Hagaman Decl. ¶ 2; LaTour Decl. ¶ 3), multiple Plaintiffs testified either that My Pillow never informed them of this policy or that they were instructed to do just the opposite. (Arth Dep. at 18:2–20:20; Deutsch Dep. at 71:2–16; Jenkins Dep. at 7:15–8:7; Mendez Zepeta Dep at 7:5–14, 8:13–10:17.)[6] The Court finds that this conflicting testimony creates a question of disputed material fact as to whether My Pillow had an established policy, disseminated to its employees, requiring CCRs to leave their computers on. The Court will therefore consider the time spent turning computers on as part of the compensable call ready process for the remainder of this opinion.

Although Plaintiffs' evidence may include minor inconsistencies, in the absence of accurate record-keeping by My Pillow damages must be determined "based on the most

---

[6] Notably, My Pillow admitted that it knew CCRs' "spent time booting up computers . . . at the beginning of the shift." (Def.'s Resps. to Pls.' Second Reqs. for Admissions at 6.) This admission belies My Pillow's assertion of a call center-wide policy prohibiting turning computers off at the end of the shift.

accurate basis possible." *Holaway*, 771 F.3d at 1059. Because Plaintiffs performed the call ready process every day, explained the variations in their estimates, and provided videos demonstrating some amount of time to perform the process, the Court finds that Plaintiffs have provided enough evidence to allow the jury to estimate the amount and extent of overtime work performed as a matter of just and reasonable inference.

### ii.      My Pillow's Knowledge

My Pillow next argues that it did not have the knowledge of unpaid overtime required for FLSA liability. (Def.'s Mem. at 32–34.) It contends that because it had a reasonable process for reporting overtime and requesting time adjustments, it cannot be held liable for overtime that Plaintiffs failed to report. (*Id.*)

Plaintiffs respond that My Pillow admits it required CCRs to perform the call ready process and that Plaintiffs reported delays to their supervisors. (Pls.' Reply at 2–11.) Plaintiffs also assert that My Pillow cannot prove an established policy requiring employees to daily request a time adjustment for the call ready process. (*Id.*)

Under the FLSA, "[a]n employer is obligated to compensate employees for work it knows the employees are performing." 29 C.F.R. § 785.11. "The mere promulgation of a rule against overtime work is not enough." *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011) (citing 29 C.F.R. § 785.13). "[An employer] cannot accept the benefits [of overtime work] without including the extra hours in the employee's weekly total for the purposes of overtime compensation. If the employer has the power and desire to prevent such work, he or she must make every effort to do so." *Reich v. Stewart*, 121 F.3d 400, 407 (8th Cir. 1997) (quoting *Mumbower v. Callicott*, 526 F.2d 1183, 1188 (8th Cir. 1975)).

Constructive knowledge of overtime is sufficient to establish liability under the FLSA. *Hertz*, 566 F.3d at 781. An employer is thus liable where it should have acquired knowledge of overtime work "through reasonable diligence." *Id.* Reasonableness has its limits. For example, the Eighth Circuit has declined to require employers to "weed through" non-payroll records to discover employee overtime where the employer had an "established procedure for overtime claims that Plaintiffs regularly used." *Id.* at 782; *see also Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 389 (6th Cir. 2016) ("[R]easonable diligence is not an expectation of omniscience.").

Other Circuits agree that no constructive knowledge may be found where an employer has a well-established policy for reporting overtime that employees fail to follow. *See, e.g.*, *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 876 (6th Cir. 2012) ("When the employee fails to follow reasonable time reporting procedures [they] prevent[] the employer from knowing its obligation to compensate the employee and thwart[] the employer's ability to comply with the FLSA."); *Allen v. City of Chicago*, 865 F.3d 936, 938–39 (7th Cir. 2017); *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 965 (5th Cir. 2016). This rule does not apply, however, if the employer discourages accurate reporting of overtime or if the employer is otherwise on notice that overtime is being under-reported or needs closer monitoring. *Hertz*, 566 F.3d at 782; *Allen*, 865 F.3d at 939 (noting that "[s]uch employer misbehavior might be overt . . . or more subtle."); *Bell v. Westside Dialysis Unit, LLC*, No. 4:21-cv-00748 (BRW), 2023 WL 2350598, at *3 (E.D. Ark. Jan. 23, 2023) (slip copy).

41

The record demonstrates that My Pillow had actual and constructive knowledge that Plaintiffs completed uncompensated work before clocking in. My Pillow's Analytical Manager, Sherry Miles, testified that at the start of every shift, CCRs must "log in to their computer, they log in to ADP, [and] punch in." (Miles Dep. at 92:14–17.) As discussed above, My Pillow admitted that CCRs perform this work every day. (*See* Def.'s Resps. to Pls.' First Reqs. for Admissions at 4; Def.'s Resps. to Pls.' Second Reqs. for Admissions at 6.) This evidence establishes actual knowledge of the boot up and log in process.

As for My Pillow's knowledge that CCRs experienced delays during this process, Plaintiffs testified that they complained to their supervisors. (Arth Dep. at 7:22–8:8, 10:6–8, 14:10–15:2; Deutsch Dep. at 6:4–9:21, 25:8–27:21; Dols Dep. at 35:11–21; Jenkins Dep. at 17:20–25, 27:20–24, 28:15–23, 37:3–9; Lyons Dep. at 60:5–21; Mendez Zepeta Dep. at 78:9–21.) And Ms. Jenkins testified that her supervisor stated that she would pass the message along to management. (Jenkins Dep. at 20:18–20.) Plaintiffs' testimony creates a question of disputed material fact as to My Pillow's constructive knowledge of delays during the call ready process.

My Pillow argues that Plaintiffs availed themselves of its time adjustment policy when they experienced problems during this process. (Def.'s Opp'n at 19–22.) While Plaintiffs testified that they requested time adjustments under certain circumstances, (Deutsch Dep. at 79:23–80:23; Lyons Dep. at 139:14–16, 141:4–11; Jenkins Dep. at 27:20–28:23; Arth Dep. at 26:11–16, 28:12–15), they also testified that My Pillow never told them that they would be compensated for the daily time spent booting up and logging into their computer. (Arth Dep. at 36:17–21, 37:8–10; Deutsch Dep. at 91:5–16, 93:5–8; Jenkins

Dep. at 48:9–24; Lyons Dep. at 138:22–39:11; Mendez Zepeta Dep. at 77:4–7.) And multiple Plaintiffs testified that they would only request a time adjustment for delays of a certain length. (Deutsch Dep. at 79:23–80:23; Lyons Dep. at 139:14–16, 141:4–11; Jenkins Dep. at 27:20–28:23; Arth Dep. at 26:11–16, 28:12–15.)

Although Ms. Dols testified to knowledge of a policy that she should request daily time adjustments, her testimony and time adjustment requests leave open to question that she actually did so. (Dols Dep. at 49:5–25.) My Pillow's evidence of time adjustment requests by the other Plaintiffs, (First Sokolowski Decl., Exs. 10–15), provides several instances of adjustments but does not substantiate that Plaintiffs knew that they could or should request an adjustment for each and every minute of their daily call ready process.

Moreover, Mr. Deutsch testified that management dismissed his attempts to complain about delays during the call ready process. (Deutsch Dep. at 6:4–9:21, 25:8–27:21, 77:5–79:22.) This testimony raises the possibility that My Pillow discouraged accurate reporting. At a minimum, there is a fact question as to whether CCRs "fail[ed] to follow reasonable time reporting procedures" for booting up and logging into their computers. *White*, 699 F.3d at 876.

The Court finds that because My Pillow conceded that the boot up and log in process exists and takes some amount of time, it is not entitled to summary judgment on its knowledge of uncompensated work. However, the Court also finds that there are questions of disputed material fact about My Pillow's knowledge of the amount and extent of any delays Plaintiffs experienced and whether My Pillow had a reasonable time adjustment

policy which Plaintiffs failed to follow. The Court therefore finds that Plaintiffs are not entitled to summary judgment on My Pillow's constructive knowledge of delays.

### b.    De Minimis Doctrine

Finally, My Pillow argues that the amount of time that the CCRs spent on the call ready process is de minimis as a matter of law and therefore not compensable under the FLSA. (Def.'s Mem. at 25–31; Def.'s Reply at 4–10; Def.'s Opp'n at 26–31.) Plaintiffs disagree. (Pls.' Opp'n at 37–47.)

Under the de minimis doctrine, employers are not required to pay employees for otherwise compensable work when the amount of time at issue is insubstantial. *Lyons v. Conagra Foods Packaged Foods, LLC*, 899 F.3d 567, 584 (8th Cir. 2018). The doctrine originates from the Supreme Court's commentary in *Anderson*:

> When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved.

*Anderson*, 328 U.S. at 692. These principles are now codified in a Department of Labor regulation. 29 U.S.C. § 785.47.[7] Thus, "[e]mployers are not required to pay employees for 'insubstantial or insignificant periods of time beyond the scheduled working hours, which

---

[7] More recently, the Supreme Court has questioned the application of the de minimis doctrine to the FLSA without explicitly rejecting it. *See Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 234 (2014) ("A *de minimis* doctrine does not fit comfortably within the statute at issue here, which it can fairly be said, is *all about* trifles[.]") (emphasis in original).

44

cannot as a practical administrative matter be precisely recorded for payroll purposes[.]'" *Lyons*, 899 F.3d at 584 (quoting 29 C.F.R. § 785.47).

To determine whether uncompensated overtime is de minimis, courts consider: "[1] the amount of time spent on the extra work, [2] the practical administrative difficulties of recording additional time, [3] the regularity with which the additional work is performed, and [4] the aggregate amount of compensable time." *Id.* (quoting *Kellar*, 664 F.3d at 176) (alterations in original). These factors "are analyzed in concert and balanced; they are not independent preconditions to a de minimis finding." *Helmert v. Butterball, LLC*, No. 4:08-cv-00342 (JLH), 2010 WL 3397373, at *3 (E.D. Ark. Aug. 25, 2010) (quoting *Scott v. City of N.Y.*, 592 F. Supp. 2d 386, 402 (S.D.N.Y. 2008)). The employer "bears the burden to show that the de minimis doctrine applies." *Kellar*, 664 F.3d at 176; *Peterson*, 15 F.4th at 1046.

Here, the analysis hinges on the first factor. My Pillow argues that the Court should focus on the minimum estimate provided to complete the call ready process. (Def.'s Mem. at 27.) Regardless of the minimum, it contends that all estimates provided by Plaintiffs fall within the amount of time normally considered de minimis. (*Id*. at 27–28.) Plaintiffs argue that "the daily boot-up and call-ready work regularly required of Plaintiffs took from 3 minutes up to 10 minutes." (Pls.' Opp'n at 39.)

"Although the amount of daily time spent on the additional work is an important factor in determining whether a claim is de minimis, no precisely calculated, rigid durational period applies, but most courts have found daily periods of approximately 10 minutes de minimis even though otherwise compensable." *Lyons*, 899 F.3d at 584

(quotation omitted). In *Lyons*, the Eighth Circuit found a duration of "two to five minutes" checking out tools and "no more than a few minutes" checking them in to be de minimis. *Id*. at 584–85.

My Pillow urges that *Lyons* establishes a clear ten-minute threshold compelling a finding that the CCRs' call ready process is de minimis. (Def.'s Mem. at 28.) However, the court's analysis in *Lyons* is limited to a single sentence: "Under the facts before us, we conclude that such time is de minimis in light of the short duration of th[e] [tool check out] process and the additional administrative burden necessary to compensate employees for that time." *Lyons*, 899 F.3d at 584. More recently, in *Peterson*, the Tenth Circuit declined to apply the de minimis doctrine to approximately two minutes spent on the call ready process in light of the other de minimis factors. *Peterson*, 15 F.4th at 1043–49.

The Court has already determined that a question of disputed material fact exists as to the duration of the boot up and log in work completed by CCRs. Despite Plaintiffs' estimate in their brief of a three-to-ten-minute duration, several Plaintiffs testified to at least occasional delays greater than ten minutes, with Ms. Dols testifying that she experienced delays longer than ten minutes more than thirty times. (Dols Dep. at 34:2–6, 35:22–36:7; Deutsch Dep. at 15:21–23; Lyons Dep. at 60:5–11.) This testimony exceeds the *Lyons* threshold. Even if delays greater than ten minutes occurred infrequently, a delay of that length is a significant amount of uncompensated time for an hourly employee.

This question of disputed material fact prevents the Court from applying the de minimis doctrine in favor of either party. *See, e.g.*, *Garcia*, 580 F. Supp. 3d at 89–90 ("Because there is a jury issue as to how much uncompensated time Plaintiffs spent logging

46

in, it follows that whether that time is *de minimis* must also go before a jury."); *Wilson*, 2021 WL 3168616, at *7 (denying summary judgment on the de minimis doctrine where the employees and the employer disagreed about the length of the call ready process). As a result, My Pillow has not met its burden to prove that the call ready process is de minimis as a matter of law.

*     *     *

In sum, the boot up and log in process qualifies as a compensable activity under the FLSA because it is integral and indispensable to CCRs' principal activities. Plaintiffs have proven the existence of some amount of uncompensated time of which My Pillow had actual knowledge. However, questions of disputed material fact remain about the amount and extent of the time spent on the process as well as My Pillow's constructive knowledge of any delays. These factual issues prevent resolution of the ultimate question of My Pillow's liability under the FLSA for allegedly failing to compensate Plaintiffs for overtime work. For these reasons, the Court denies summary judgment to both parties on My Pillow's liability under the FLSA.

**c.     Liquidated Damages & Willfulness**

Plaintiffs assert that they are entitled to an award of liquidated damages for My Pillow's FLSA violation. (Pls.' Mem. at 39–42.) They also argue that the question of My Pillow's willfulness is a fact question best left to the jury. (Pls.' Mem. at 42–43.)

The FLSA provides for the award of liquidated damages where an employer is found liable for unpaid overtime work. 29 U.S.C. § 216(b). However, because questions of disputed material fact preclude a finding that My Pillow violated the FLSA as a matter of

47

law, the Court denies summary judgment to Plaintiffs on the issue of liquidated damages. As for willfulness, Plaintiffs have not requested summary judgment and the Court expresses no view on this issue.

### 3.      Minnesota Payment of Wages Act – Count II

My Pillow moves for summary judgment on Count II, Plaintiffs' claim for violations of the Minnesota Payment of Wages Act, Minn. Stat. § 181.101. (Def.'s Mem. at 34–39; Def.'s Reply at 12–16.) My Pillow argues that Plaintiffs have no private right of action to bring MPWA claims arising before the Act's amendment. (Def.'s Mem. at 34–36.) Next, My Pillow asserts that the MPWA claims must be dismissed because it did not fail to pay "wages" as defined under the MPWA. (*Id.* at 36–39.)

In response, Plaintiffs counter that offer letters from My Pillow stating their title and hourly wage establish an "independent, substantive legal right" sufficient to support an action for claims arising prior to July 2019. (Pls.' Opp'n at 50–52.) Plaintiffs also contend that the boot up and log in process constitutes compensable work under the MPWA. (*Id.* at 52–54.)

The MPWA provides: "[E]very employer must pay all wages, including salary, earnings, and gratuities earned by an employee at least once every 31 days[.]" Minn. Stat. § 181.101(a) (2022). "[W]ages are earned on the day an employee works." *Id.*

Prior to 2019, this provision merely dictated the timing for payment of wages, with violations enforceable solely by the Minnesota Commissioner of Labor and Industry. Minn. Stat. § 181.101(a) (2018); *Caldas v. Affordable Granite & Stone Inc.*, 820 N.W.2d 826, 837 (Minn. 2012) ("[T]he Payment of Wages Act does not create a substantive right to the

48

recovery of a particular wage."); *Milner v. Farmers Ins. Exch.*, 748 N.W.2d 608, 617 (Minn. 2008) ("[T]he PWA addresses how often wages must be paid and establishes penalties for wages that are paid late."). In 2019, the legislature amended Section 181.101(a), adding: "This section provides a substantive right for employees to the payment of wages . . . in addition to the right to be paid at certain times." Minn. Stat. § 181.101(a) (2022).

The presumption against retroactivity is "deeply rooted in our jurisprudence because considerations of fairness demand that individuals should have an opportunity to know what the law is before they act[.]" *Ubel v. State*, 547 N.W.2d 366, 370 (Minn. 1996). "Only if Congress or the [state] legislature clearly proscribes retroactive application will a statute be permitted to operate retroactively." *Id.* at 369. Here, Plaintiffs do not argue that the amendment to the MPWA applies retroactively and the Court finds no language in the statute demonstrating the legislature's intent that it should. The Court therefore declines to apply the statute retroactively and finds that Minn. Stat. § 181.101(a) does not grant a substantive right of action for claims arising prior to July 1, 2019.[8]

---

[8] The parties cite different effective dates for the 2019 statutory amendment. (*See* Def.'s Mem. at 34–35 (effective date of August 2019); Pls.' Opp'n at 50, 50 n.10 (effective date of July 2019)). All statutory enactments take effect on August 1, except for appropriations bills and where the enactment specifies a different date. Minn. Stat. § 645.02 (2022). The session law enacting the relevant amendment to Minn. Stat. § 181.101 made appropriations and thus took effect on July 1, 2019. H.F. No. 2, 91st Leg., 1st Special Sess. (Minn. 2019).

### a.     Claims Arising Prior to the 2019 Amendment

Despite the statute's lack of retroactive application, Plaintiffs nevertheless assert that they may maintain a cause of action for violations of Section 181.101(a) for claims arising prior to 2019 if they can prove an "independent, substantive legal right" to the wages. (Pls.' Opp'n at 50–51 (citing *Shoots v. iQor Holdings US Inc.*, No. 15-cv-563 (SRN/SER), 2015 WL 6150862 (D. Minn. Oct. 19, 2015) and *Cruz v. TMI Hosp., Inc.*, No. 14-cv-1128 (SRN/FLN), 2015 WL 6671334 (D. Minn. Oct. 30, 2015)).) Plaintiffs contend that the offer letters they received from My Pillow stating their title and hourly wage establish such a substantive right. (*Id.* at 51–52.)

The Court declines to recognize claims arising prior to July 1, 2019 on this basis. Plaintiffs' Amended Complaint omits any explanation of the statutory amendment or its impact on their MPWA claim. (Am. Compl. ¶ 75–80.) Nor does the Amended Complaint mention Plaintiffs' offer letters. (*See generally* Am. Compl.) In fact, Plaintiffs only raised this theory in their opposition to My Pillow's Motion for Summary Judgment. (Pls.' Opp'n at 50–52.) Allowing Plaintiffs to maintain these pre-amendment claims without affirmatively alleging them would circumvent the Federal Rules' notice pleading standard.

Moreover, the cases that Plaintiffs cite for support involved additional causes of action, not present here, that supported an independent right to maintain an action under Section 181.101(a). First, the plaintiffs in *Cruz*, a group of housekeepers, alleged a breach of contract claim alongside their claim for failure to timely pay wages under Section 181.101(a). *Cruz v. TMI Hosp., Inc.*, No. 14-cv-1128 (SRN/FLN), 2015 WL 5996383, at *12–13, *21–22 (D. Minn. Oct. 14, 2015). The plaintiffs argued that their employers had

verbally offered to pay them a certain wage for all hours worked and that by going to work the plaintiffs had accepted this offer, forming a unilateral contract. *Id.* at *13. The plaintiffs further asserted that their employers told them to work off the clock, which their employers denied. *Id.* Because the question of whether an employer made a statement at all is a question of fact for the jury, the court denied summary judgment on the breach of contract claim. *Id.*

Addressing the plaintiffs' claims under Section 181.101(a) later in the opinion, the court agreed with defendants that as a timing statute, Section 181.101(a) "does not create a substantive right to the recovery of a particular wage." *Id.* at *21 (citing *Caldas*, 820 N.W.2d at 837). "Rather, an employee must establish an independent, substantive legal right, separate and distinct from the timing provision to the particular wage claimed. However, if the employee establishes this right, then the employee also may maintain a cause of action for a violation of the timing statute." *Id.* (citation omitted).

> In other words, should it be determined that Plaintiffs were entitled under, for example, *an employment agreement*, to payment for their alleged off-the-clock work, then Plaintiffs also will be entitled to pursue a statutory penalty to the extent that those payments did not comply with the timing requirements in § 181.101. Therefore, because there is an issue of fact regarding whether Plaintiffs are owed unpaid wages [under a contract] for off-the-clock work, there is also an issue of fact as to whether Plaintiffs were paid all wages earned in a timely manner.

*Id.* at *22 (emphasis added). The court denied summary judgment to the employers. *Id.* In a subsequent opinion addressing class certification, the court again stated that the plaintiffs' claim under Section 181.101(a) depended upon the jury's determination of their breach of contract claim. *Cruz*, 2015 WL 6671334, at *9, *9 n.3.

Next, in *Shoots v. iQor Holdings US Inc.*, the plaintiff alleged violations of Section 181.101(a) as well as two other provisions of the MPWA, Sections 181.13 and 181.14. 2015 WL 6150862, at *7. As in *Cruz*, the court stated that Section 181.101(a) "does not create a substantive right to the recovery of a particular wage." *Id.* (citing *Caldas*, 820 N.W.2d at 837). Then, the court noted that Sections 181.13 and 181.14 entitled employees to payment of wages "earned and unpaid" upon discharge. *Id.* These sections provided: "Wages are actually earned and unpaid if the employee was not paid for all time worked at the employee's regular rate of pay or *at the rate required by law*, including any applicable statute, regulation, rule, ordinance, government resolution or policy, *contract*, or other legal authority[.]" *Id.* (quoting Minn. Stat. § 181.13 and citing identical language in Minn. Stat. § 181.14) (emphasis added).

The court held that the plaintiff could maintain a cause under Sections 181.13 and 181.14 by proving that one of the sources of law identified in that definition entitled him to payment at a particular rate. *Id.* The plaintiff satisfied this requirement by "alleging that Defendant was required by the parties' agreement to pay for all hours worked," because the "Employment Agreement sent to [plaintiff] identified his hourly wage as $12 per hour." *Id.* The court therefore declined to dismiss the MPWA claims. *Id.*

By contrast, Plaintiffs here did not allege breach of contract or violations of Sections 181.13 and 181.14 to support their Section 181.101(a) claim. (*See generally* Am. Compl.) By citing these cases, Plaintiffs seem to be arguing that My Pillow's offer letters constituted an offer for a unilateral contract. To be clear, neither party has provided any authority addressing unilateral contracts. However, even entertaining such a liberal construction of

Plaintiffs' theories, the offer letters do not demonstrate the existence of a unilateral contract.

Where the relevant facts are undisputed, whether a contract exists is a question of law for the court. *TNT Props., Ltd. v. Tri-Star Devs. LLC*, 677 N.W.2d 94, 101 (Minn. Ct. App. 2004). To establish a unilateral contract based on an employee handbook, four conditions must be met: "(1) the terms are definite in form; (2) the terms are communicated to the employee; (3) the offer is accepted by the employee; and (4) consideration is given." *Feges v. Perkins Rests., Inc.*, 483 N.W.2d 701, 707 (Minn. 1992). Courts apply these same criteria to offer letters. *See Schwarzrock v. Remote Techs., Inc.*, No. A10-473, 2011 WL 68262, at *4–5 (Minn. Ct. App. Jan. 11, 2011); *LaForce v. Schubert Indus. Inc.*, No. CX-89-146, 1989 WL 58111, at *2 (Minn. Ct. App. June 6, 1989); *Huffman v. Premis Corp.*, No. C9-97-2239, 1998 WL 373065, at *2 (Minn. Ct. App. July 7, 1998).

In this case, the lack of sufficiently definite terms in My Pillow's offer letters prevents the formation of a unilateral contract with Plaintiffs. On this prong, courts ask: "is the language in a[n offer letter] sufficiently definite for a court to discern with specificity what the provision requires of the employer so that it can be determined if there has been a breach?" *Hall v. City of Plainview*, 954 N.W.2d 254, 261 (Minn. 2021) (cleaned up).

*Rios v. Jennie-O Turkey Store, Inc.* is instructive. 793 N.W.2d 309 (Minn. Ct. App. 2011). There, production-line employees at defendant Jennie-O's turkey processing plant alleged that Jennie-O violated their contracts and the MFLSA by failing to pay them for the time spent donning and doffing personal protective equipment pre- and post-shift. *Id.* at 312. The district court determined that the employees' original contracts did not contain

a term providing compensation for donning and doffing and found no subsequent unilateral offer to compensate for donning and doffing. *Id.* at 315.

> The Court of Appeals affirmed both holdings:

> Minnesota courts apply an objective standard of contract formation. Here, the record is devoid of any evidence that Jennie–O offered to pay appellants for time spent donning and doffing. To the contrary, appellants have either conceded that they never discussed with respondents whether they could be paid for donning and doffing or admitted that they cannot recall any such discussions. Appellants attempt to rely on provisions in employee handbooks as reflecting an agreement to pay for donning and doffing, but fail to cite any language identifying such a promise. Appellants assert that the dearth of evidence demonstrates the existence of a genuine issue of material fact to be decided by the jury. But we conclude that, on this record, no reasonable jury could find that the parties reached an agreement that appellants would be paid for donning and doffing.

*Id.* at 315–316 (citation omitted).

Likewise here, My Pillow's offer letters to do not contain "any language identifying such a promise [to pay for the call ready process]." *Id.* The spare letters only mention Plaintiffs' titles, hourly compensation, and the general schedule of the position. (*See* First Sokolowski Decl., Exs. 6, 7, 9, 11, 13, 14, 16.) In fact, the offer letters do not describe any of the tasks for which Plaintiffs would be compensated. (*Id.*) Without this specificity, the letters cannot constitute unilateral offers to compensate Plaintiffs for the time spent booting up and logging into their computers.

Plaintiffs failed to plead a pre-amendment basis for their MPWA Section 181.101(a) claim, cite distinguishable authority, and offer insufficient evidence of a unilateral contract. For all of these reasons, the Court holds that Plaintiffs cannot maintain a substantive cause

54

of action for the payment of wages under MPWA Section 181.101(a) for claims arising prior to July 1, 2019.

### b.      Compensability under the MPWA

On the merits, My Pillow argues that because the MPWA does not define "wages," the Court should define the term by referencing the MFLSA. (Def.'s Mem. at 36–38.) It contends that the boot up and log in process is not compensable under the MFLSA because the statute must be construed more narrowly than the FLSA. (*Id.* at 37–38; Def.'s Reply at 15–16.) As such, My Pillow asserts that Plaintiffs' failure to establish a FLSA claim is fatal to their MPWA claim as well. (Def.'s Mem. at 38; Def.'s Reply at 15–16.) My Pillow also argues that Plaintiffs' MPWA claim fails because they cannot establish the amount of unpaid work time and the time is de minimis regardless. (Def.'s Mem. at 38–39; Def.'s Reply at 16.)

Plaintiffs do not dispute My Pillow's resort to the MFLSA for interpretive guidance. Instead, Plaintiffs argue that the MFLSA must be interpreted more broadly than the "integral and indispensable" test applied to FLSA claims. (Pls.' Opp'n at 52–53.) They further contend that Minnesota law does not recognize the de minimis doctrine and that their testimony and video evidence are sufficient to establish the amount of uncompensated work they performed. (*Id.* at 53–54.)

Despite providing that "every employer must pay all wages . . . earned by an employee," Minn. Stat. § 181.101(a), the MPWA does not define "wages" or delineate the work activities that entitle an employee to "wages." *See generally* Minn. Stat. § 181.01–181.1721 (2022). Absent plain language defining "wages," Minnesota courts look to

related statutes for guidance. *Milner*, 748 N.W.2d at 617. Because the MPWA and the MFLSA "provide a comprehensive statutory scheme for wages and payment in Minnesota . . . [they] should be interpreted in light of each other." *Id.* In addition, the Court strictly construes the MPWA because it provides for civil penalties. See *Brekke v. THM Biomed., Inc.*, 683 N.W.2d 771, 774 (Minn. 2004).

The MFLSA defines "wages" as "compensation due to an employee by reason of employment." Minn. Stat. § 177.23, subp. 4 (2022). Furthermore, a Minnesota Department of Labor and Industry regulation provides that:

> Hours worked include training time, call time, cleaning time, waiting time, or any other time when the employee must be either on the premises of the employer or involved in the performance of duties in connection with his or her employment or must remain on the premises until work is prepared or available.

Minn. R. 5200.0210, subp. 1 (2022).

While they agree that this rule informs the compensability analysis, the parties dispute its proper interpretation. My Pillow argues that it is stricter than the FLSA because "it requires the employee to be engaged in the performance of a duty connected to the employment, not just performing an 'activity.'" (Def.'s Reply at 15.) Plaintiffs counter that the rule only requires a "connection" to the employment, which is less demanding than the FLSA's requirement that an activity be "integral and indispensable" to an employee's principal duties. (Pls.' Opp'n at 53.)

When interpreting the MFLSA, the Minnesota Supreme Court has "declined to look to the federal FLSA [for guidance], as it is structured differently from the MFLSA." *Milner*, 748 N.W.2d at 617; *see also Erdman v. Life Time Fitness Inc.*, 771 N.W.2d 58, 64 (Minn.

Ct. App. 2009) (declining to rely on the FLSA for guidance interpreting the MFLSA because of distinctions in the rules under each statute). The Court's finding of compensability under the FLSA is thus not dispositive as to compensability under the MPWA.

The court may turn to dictionary definitions to discern a statute or regulation's plain meaning. *Hagen v. Steven Scott Mgmt., Inc.*, 963 N.W.2d 164, 173 (Minn. 2021). Although both parties argue that the plain language of the Minn. R. 5200.0210, subp. 1 compels their preferred reading, neither party offers a dictionary definition to support their interpretation.[9] (*See* Def.'s Mem. at 38; Pls.' Opp'n at 53; Def.'s Reply at 15–16.)

Plaintiffs focus on "connection," arguing that this term is broad enough to encompass boot up and log in work. (Pls.' Mem. at 53.) The Oxford English Dictionary defines "connection" as: "The condition of being related to something else by a bond of interdependence, causality, logical sequence, coherence, or the like; relation between things one of which is bound up with, or involved in, another." *Connection*, *Oxford English Dictionary Online*, https://www.oed.com/view/Entry/39356?redirectedFrom=connection#eid (last visited Mar. 26, 2023). According to this definition, the boot up and log in process is performed "in connection with [Plaintiffs'] employment" because they receive all incoming calls through the computer software, Annaware. My Pillow admits this. (First Miles Decl. ¶ 6; Hagaman Decl. ¶ 7.)

---

[9] Neither party argues that Minn. R. 5200.0210, subp. 1 is ambiguous. (*See* Def.'s Mem. at 38; Pls.' Opp'n at 53; Def.'s Reply at 15–16.)

My Pillow's argument that CCRs did not perform a "duty" when booting up and logging into their computers is unavailing. Merriam-Webster defines "duty" as: "obligatory tasks, conduct, service, or functions enjoined by order or usage according to rank, occupation, or profession." *Duty*, *Merriam-Webster's Dictionary Online*, https://unabridged.merriam-webster.com/unabridged/duty (last visited Mar. 26, 2023); *see also Oxford English Dictionary Online* (defining "duty" as "[t]he action which one's position or station directly requires; business, office, function."). Powering on and logging into their computer is an "obligatory task" for CCRs because they cannot receive a call without doing so. (*See* Def.'s Resps. to Pls.' Second Reqs. for Admission at 4 (admitting that CCRs "could not perform their job duties without a computer").)

Moreover, Minn. R. 5200.1200 defines "off duty" as: "Periods when the employee is completely relieved of duty and free to leave the premises for a definite period of time, and the period is long enough for the employee to use for the employee's own purposes, are not hours worked." Minn. R. 5200.1200, subp. 3 (2022). When CCRs boot up and log into their computers, they remain at their workstation and they cannot leave the premises. Although the parties dispute the length of the boot up and log in process, there is no evidence that CCRs use that time for their "own purposes." *Id.* Because the call ready process does not fall within the definition of "off duty" provided by the rule, it follows that performing the call ready process constitutes a "duty" under Minn. R. 5200.0120, subp. 1. The Court finds that the plain meaning of "hours worked" in Minn. R. 5200.0120 encompasses time spent booting up and logging into computers before clocking in to ADP.

My Pillow additionally argues that the time is not compensable under the MPWA because it is de minimis and because Plaintiffs cannot prove the hours worked. The former argument is without merit. No Minnesota court has applied the de minimis doctrine in the context of a wage dispute. The child support case cited by My Pillow involved a sum totaling less than ten dollars per month. (*See* Def.'s Mem. at 38 (citing *Dvorak v. Judovsky*, No. C098-2507, 1999 WL 432602, at *2 (Minn. Ct. App. June 29, 1999)). Here, the disputed amount is potentially much greater. As for the latter argument, the Court's finding on the sufficiency of Plaintiffs' evidence to prove their hours worked applies equally here.

In the absence of a definition of compensable work in the MPWA itself, and based on the plain language of Minn. R. 5200.0120, subp. 1, the Court finds that the call ready process is compensable under the MPWA. Accordingly, the Court denies summary judgment to My Pillow on this issue.

### 4.      Commissioner's Remedies – Count IV

My Pillow lastly argues that it is entitled to summary judgment on Plaintiffs' Count IV, which requests Commissioner's remedies under Minn. Stat. § 177.27, subd. 8. (Def.'s Mem. at 39–42; Def.'s Reply at 16–18.) It contends that Subdivision 8 only allows private actions for violations of the MFLSA and that the Court has already dismissed Plaintiffs' cause of action under the MFLSA, Count III. (Def.'s Mem. at 42; Def.'s Reply at 16.)

Plaintiffs respond that Subdivision 8's private right of action encompasses Minn. Stat. § 177.27, subd. 7, which allows the Commissioner to seek penalties for violations of sections identified in Minn. Stat. § 177.27, subd. 4. (Pls.' Opp'n at 54–57.) Plaintiffs argue that because Subdivision 4 identifies Minn. Stat. § 181.101, the provision under which they

allege an MPWA violation, Subdivision 8 ultimately empowers them to maintain a private right of action for Commissioner's remedies for that MPWA violation. (*Id.*) In addition, Plaintiffs note that the MPWA and the MFLSA must be read in concert. (*Id.* at 57.)

The plain language and structure of MFLSA Section 177.27 demonstrate that Plaintiffs propose an unreasonable interpretation of Subdivision 8. The subdivisions discussing private rights of action repeatedly mention only MFLSA provisions. First, Subdivision 8 itself refers to "action[s] seeking redress for a violation or violations of sections 177.21 to 177.44." Minn. Stat. § 177.27, subd. 8. Next, in granting the district court jurisdiction over private actions under Subdivision 8, the statute identifies actions "wherein a violation or violations of sections 177.21 to 177.44 are alleged to have been committed." Minn. Stat. § 177.27, subd. 9. And attorney fees and costs are permissible in these actions where an employer "is found to have committed a violation or violations of sections 177.21 to 177.44." Minn. Stat. § 177.27, subd. 10. The consistent focus on these MFLSA provisions demonstrates that the scope of private actions under Subdivision 8 is limited to alleged violations of the MFLSA and does not include violations of the MPWA.

Plaintiffs focus on Subdivision 8's statement that "in an action under this subdivision the employee may seek damages and other appropriate relief provided by subdivision 7[.]" Minn. Stat. § 177.27, subd. 8. Subdivision 7 states that "[i]f an employer is found by the commissioner to have violated a section identified in subdivision 4," then the Commissioner may bring an enforcement action. Minn. Stat. § 177.27, subd. 7. Subdivision 4 does identify MPWA Section 181.101. Minn. Stat. § 177.27, subd. 7. But allowing employees to seek the same *remedies* as the Commissioner can under Subdivision

7 does not necessarily equate to allowing them to allege *violations* of provisions not identified in Subdivision 8. In other words, Subdivisions 8, 9, and 10 entitle employees to seek relief for violations of the MFLSA, Minn. Stat. § 177.21–177.44; Subdivision 8 merely provides that they may seek the types of relief identified in Subdivision 7 for those violations.

Further bolstering this conclusion, the Minnesota Supreme Court describes Subdivision 8 as providing a cause of action for violations of the MFLSA. *Burt v. Rackner, Inc.*, 902 N.W.2d 448, 455 (Minn. 2017) ("Minn. Stat. § 177.27, subd. 8, unambiguously allows an aggrieved employee to sue for *any* violation of the statute, which creates a broad, private right of action in favor of employees harmed by an employer's violation of the MFLSA.") (emphasis in original); *Milner*, 748 N.W.2d at 616 ("The Act allows employees to bring civil actions *to enforce the MFLSA*.") (emphasis added).

While Plaintiffs assert that Subdivision 8 "is so broad that an employee could theoretically enforce Minn. Stat. § 177.21, the title section of the Act," the Minnesota Supreme Court has expressly rejected such an expansive interpretation:

> Although every section of the MFLSA . . . falls within the literal scope of actionable violations under section 177.27, the legislature clearly did not contemplate that an employer could be civilly liable for misciting the Act, violating the purpose of the Act, or improperly seeking an appeal of an administrative rule.
> Therefore, in determining the scope of actionable violations, we focus on whether *a section of the MFLSA* is capable of being violated by an employer.

*Milner*, 748 N.W.2d at 614 (emphasis added). Considering this skepticism towards overbroad readings of Subdivision 8 with respect to the actual MFLSA provisions listed,

the Minnesota Supreme Court would not likely interpret Subdivision 8 to allow employees to seek Commissioner's remedies for violating an unlisted provision from a separate statute.

Moreover, in determining when the court may enter civil penalties in a private action under the MFLSA, the *Milner* Court referenced and distinguished the civil penalties scheme of the MPWA. *Id.* at 615–18. Preliminarily, the Court determined that employees could in fact seek injunctive relief and civil penalties for violations of the MFLSA. *Id.* at 616. However, the Court clarified that: "this conclusion does not mean that private parties have all the powers of the Commissioner; rather, the statute grants private parties the right to *seek the remedies* available to the Commissioner under subdivision 7." *Id.* at 616 (emphasis added).

Next, the Court determined that civil penalties under the MFLSA are payable only to the state by comparing Subdivision 7's language to language in the MPWA:

> Under the PWA, penalties are paid to the individual employee, even when the Commissioner collects the money. *See, e.g.*, Minn. Stat. § 181.101 ("Money collected by the commissioner must be paid to the employee concerned."). The PWA also specifically provides that an employer found to have violated the PWA "is liable to the aggrieved party" for civil penalties. Minn. Stat. § 181.171, subd. 1.
>
> If the legislature had intended the same result under the MFLSA, the legislature would have used similar language and explicitly provided for civil penalties to be paid to the individual employees. For example, in enforcement actions brought by the Commissioner under the MFLSA, the legislature specifically provides for the employer to pay "to the aggrieved parties" back pay and compensatory damages, as well as liquidated damages. Minn. Stat. § 177.27, subd. 7. The legislature did not include civil penalties within this particular provision. *See id.* (stating that an employer found to have repeatedly or willfully violated the MFLSA "shall be subject to a civil penalty"). And the legislature did not specify a different result for civil actions brought by employees. *See Id.*, subd. 8. Therefore, we hold that civil

penalties are payable to the state under the MFLSA, regardless of whether
the penalties are assessed by the Commissioner or the district court.

*Id.* at 617–18. This analysis confirms that the Minnesota Supreme Court contemplates
distinct private civil enforcement schemes under the MFLSA and the MPWA.[10]

Finally, if the plain language of the statute and the state caselaw left any room for
doubt, this Court has previously recognized that only the Commissioner can enforce
penalties for violating Minn. Stat. § 181.101(a). *Hull v. ConvergeOne, Inc.*, 570 F. Supp.
3d 681, 695 (D. Minn. 2021) ("[T]he ability to enforce a penalty [under Minn. Stat.
§ 181.101(a)] is limited to the DLI [Commissioner], with any collected funds going to the
employee[.]"). The Court therefore finds that Subdivision 8's private right of action for
violations of the MFLSA does not cover violations of MPWA Section 181.101(a).

Here, the Court dismissed Plaintiffs' sole cause of action alleging a violation of the
MFLSA, Count III, pursuant to the parties' stipulations. [Doc. No. 116.] Plaintiffs'
remaining substantive counts only allege violations of the FLSA and the MPWA. Because

---

[10] Plaintiffs additionally cite *Schroeder v. Kubes*, No. A12-0357, 2013 WL
1285476, at \*4 (Minn. Ct. App. Apr. 1, 2013), for the proposition that Subdivision 8 allows
them to seek civil penalties for violations of MPWA Section 181.101(a). (Pls.' Opp'n at
55–56.) There, the court stated in one line of dicta that: "Encompassed by subdivision 7
are violations involving record-keeping (Minn. Stat. § 177.30) and the earning statement
the employer must provide to the employee (Minn. Stat. § 181.032), as well as civil
penalties for repeated and willful violations." *Schroeder*, 2013 WL 1285476, at \*4.
However, the question before the court was whether the plaintiff could receive additional
statutory penalties under the MFLSA when the court had already awarded penalties under
the MPWA. *Id.* at \*3–4. The court did not directly analyze whether Subdivision 8 allows
Plaintiffs to seek Commissioner's remedies for violations of the MPWA. *Id.*
   Considering the Minnesota Supreme Court's more recent statement that Subdivision
8 creates a cause of action for "employees harmed by an employer's violation of the
MFLSA," *Burt*, 902 N.W.2d at 455, the Court does not find *Schroeder* persuasive.

MFLSA Section 177.27, Subdivision 8 does not allow employees to seek Commissioner's remedies for violations of the MPWA, the dismissal of Count III is fatal to their request for Commissioner's remedies under Count IV. Consequently, the Court grants summary judgment to My Pillow on Count IV.

### B.    Motion for Class Certification

Plaintiffs move for class certification on their claim for unpaid straight time under the MPWA. (*See* Pls.' Rule 23 Mem. [Doc. No. 130]; Pls.' Rule 23 Reply [Doc. No. 162].) They also move for the appointment of Mr. Deutsch and Mr. Lyons as class representatives and their counsel as class counsel. (Pls.' Rule 23 Mem. at 1.) Plaintiffs assert that their proposed class meets each of the requirements under Federal Rule of Civil Procedure 23(a) as well as those under Rule 23(b). (*See generally* Pls.' Rule 23 Mem.)

My Pillow argues that Plaintiffs' proposed class definition impermissibly expands upon the definition contained within the Amended Complaint. (Def.'s Rule 23 Opp'n [Doc. No. 153] at 20–23.) It also asserts that Plaintiffs cannot establish that the proposed class meets the requirements of Rule 23(a) and 23(b). (*Id.* at 23–37.)

### 1.    Standard of Review

The Court has broad discretion in determining whether class certification is appropriate, and "[t]his discretion extends to defining the scope of the class." *Shapiro v. Midwest Rubber Reclaiming Co.*, 626 F.2d 63, 71 (8th Cir. 1980) (citations omitted). Likewise, "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). "To be certified as a class, plaintiffs must meet all of the requirements of Rule 23(a) [of the Federal Rules of Civil

Procedure] and must satisfy one of three subsections of Rule 23(b)." *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005) (citations omitted). In this case, Plaintiffs argue that each of the Rule 23(a) requirements, as well as Rule 23(b)(3), is satisfied. (Pls.' Rule 23 Mem. at 13–27.)

Under Rule 23(a):

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). A trial court must engage in a "rigorous analysis" to ensure that these prerequisites are met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Under Rule 23(b)(3), a class action is proper if:

the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
(A) the class members' interests in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

### 2.    Request to Modify the Class Definition

The original Complaint proposed a class composed of:

> All current and former Customer Service Agents, Telephone Sales Agents, or other job titles performing similar job duties employed by My Pillow, Inc., at any time during the last three years who worked forty (40) or more hours per week and were not paid for off-the-clock work.

(Compl. ¶ 41.)

Plaintiffs updated the definition in the Amended Complaint, which defines the proposed class as:

> All current and former Customer Service Agents, Telephone Sales Agents, or other job titles performing similar job duties employed by My Pillow, Inc., at any time from May 6, 2017 until the conclusion of this litigation who worked forty (40) or more hours per week and were not paid for off-the-clock work.

(Am. Compl. ¶ 51.) Now, Plaintiffs request certification of the following class:

> All former Call Center Representatives, or other job titles performing similar job duties, employed by My Pillow, Inc., at any time from January 24, 2017 to December 31, 2020, who were not paid for all hours worked.

(Pls.' Rule 23 Mem. at 8.) Plaintiffs' new definition thus delineates a time period beginning three months earlier than the operative definition and includes employees not paid for "all hours" worked as opposed to only employees who "worked forty (40) or more hours per week." (*Compare id.*, *with* Am. Compl. ¶ 51.)

My Pillow objects to these changes, arguing that the proposed definition expands the class by extending the relevant time period three months earlier and by adding new categories of employees (all part-time CCRs and full-time CCRs who did not work 40 or more hours) never before contemplated by the class definition. (Def.'s Rule 23 Opp'n at 20.) It contends that incorporating these individuals would be unduly prejudicial at the dispositive motion stage. (*Id.* at 20–23.)

66

The Court has significant discretion to modify the class definition, even at the certification stage. *See, e.g.*, *In re Select Comfort Corp. Secs. Litig.*, 202 F.R.D. 598, 606 (D. Minn. 2001) ("The court has broad authority to define and redefine classes and subclasses until final judgment is entered pursuant to the Fed. R. Civ. P. 23(c)(1)."); *Shapiro*, 626 F.2d at 71 (stating that the court's discretion extends to "defining the scope of the class"). However, "[c]ourts have different views on whether a plaintiff may seek to certify a class that is broader than the class defined in the complaint." *Delcavo v. Tour Res. Consultants LLC*, No. 21-cv-2137 (JWL/ADM), 2022 WL 594484 (D. Kan. Feb. 28, 2022) (slip copy) (comparing cases). Many courts require plaintiffs to amend their complaint before considering certification of an expanded class. *See, e.g.*, *Hays v. Nissan N. Am.*, No. 4:17-cv-00353 (BCW), 2019 WL 13102324, at *1–2 (W.D. Mo. Sept. 16, 2019) (slip copy).

While expansion at the certification stage may be a rare occurrence, it is not unheard of. *See, e.g.*, *In re Select Comfort Corp.*, 202 F.R.D. at 606 (expanding the class definition, without amending the complaint, where a plain reading of the complaint made "absolutely clear" that plaintiffs alleged claims on behalf of "all persons and entities" who acquired defendants' stock in the relevant time period); *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 211 (S.D.N.Y. 2018) ("[E]xpansion of the class definition beyond that which was proposed in the complaint is not categorically improper [at the certification stage]."). "Ultimately, the Court has discretion to certify appropriate classes that meet the requirements of Rule 23, even if those classes do not necessarily conform to

the operative complaint." *Baker v. City of Florissant*, No. 4:16-cv-1693 (NAB), 2023 WL 1434261, at *8 (E.D. Mo. Feb. 1, 2023) (slip copy).

Courts typically decline to expand the class at the certification stage if the parties would require additional discovery or if the changes would deprive the defendant of fair notice. *See, e.g., Vincent v. Money Store*, 304 F.R.D. 446, 453 (S.D.N.Y. 2015) (refusing to expand relevant class period backwards in time because additional discovery would be required and because it would unfairly include individuals whose claims had not been tolled after the complaint was filed); *Johansson v. Nelnet*, No. 4:20-cv-3069, 2022 WL 6232089, at *5 (D. Neb. July 21, 2022) (slip copy) ("While a Plaintiff is not prevented from redefining a putative class to meet the needs of the case, the putative class definition must nonetheless align with and cannot expand beyond the foreseeable claims arising from the operative complaint itself."); *In re Homaidan*, 640 B.R. 810, 868 (E.D.N.Y. 2022) ("[T]he Court's discretion [to certify a class different from the one set forth in the complaint] should be exercised in the right context, based on the appropriate record, and with adequate notice and an opportunity for [both parties] to be heard.").

For example, in *Smith v. Seeco, Inc.*, the plaintiffs' proposed modification of the class definition added new plaintiffs and theories of recovery not pled in the complaint. No. 4:15-cv-00147 (BSM), 2016 WL 3541412, at *3 (E.D. Ark. Mar. 11, 2016). Permitting the changes would have added four to five months of new discovery, including taking additional depositions and updating expert reports. *Id.* The court refused to permit the expansion at the certification stage because it "would be unduly prejudicial to the

68

defendants after months of discovery has been conducted and expert disclosures have been submitted." *Id.*

The court also refused to allow the plaintiffs to file a motion to amend the complaint because the litigation among the parties spanned "three cases, four years, and eight complaints." *Id.* at *4. Under such circumstances, "justice is best served by expeditiously getting th[e] case resolved, not by continuing to drag it around until plaintiffs find a theory or a class definition that will stick." *Id.*

This case lacks the discovery, notice, and efficiency concerns that prevented expansion of the class in *Seeco*. First, the Court's summary judgment ruling on the scope of Plaintiffs' MPWA claim eliminates My Pillow's concerns about extending the class time frame earlier. Plaintiffs may maintain their MPWA from July 1, 2019 through December 31, 2020.

Second, My Pillow has not requested additional discovery. Indeed, in the hearing before Magistrate Judge Wright on this issue, My Pillow represented that it would not serve additional discovery if the Court permitted Plaintiffs to amend the class definition. (July 14, 2022 Hr'g Tr. [Doc. No. 102] at 38:11–15 ("We believe that we can obtain all the information we need through the depositions that we have noticed.").) That the evidence is fixed greatly reduces the potential prejudice to My Pillow from allowing the new definition. *Baker*, 2023 WL 1434261, at *8 (permitting evaluation of an expanded class under Rule 23 where the defendant had not identified what additional discovery would be necessary under the expanded definition).

69

Third, the Court finds that the supposedly new class members fairly fall within the scope of the Amended Complaint. The first paragraph of the Amended Complaint states that Mr. Deutsch brings the action on behalf of "all similarly situated current and/or former employees of Defendant" for My Pillow's alleged violation of the MPWA. (Am. Compl. ¶ 1.) Later, it alleges that Mr. Deutsch's claims are typical of the class because the same question drives his legal theory as drives theirs: "whether all Class members were employed by Defendant on an hourly basis without receiving compensation for 'off-the-clock' wages owed for that work." (*Id.* ¶ 54.) And the MPWA does not limit recovery only to overtime hours. Minn. Stat. § 181.101(a) (2022).

As for My Pillow's argument that Plaintiffs should have modified the definition earlier in the litigation, Plaintiffs attempted to amend their Amended Complaint in June 2022. (*See* Pls.' Motion to Amend Class Definition [Doc. No. 87].) Magistrate Judge Wright denied their Motion from the bench based on Rule 16's diligence requirement without evaluating the potential impact on My Pillow. (July 14, 2022 Hr'g Tr. at 47:21–48:16.) Judge Wright ruled without prejudice "to any argument that a party may make regarding the class definition at class certification."[11] (*Id.* at 48:3–5.) My Pillow received

---

[11] For the same reason, the Court is not bound by Judge Schiltz's comments in *Nerland v. Caribou Coffee Co., Inc.*, as My Pillow asserts. (Def.'s Rule 23 Opp'n at 21–22.) There, Judge Schiltz refused to modify the class definition at the certification stage because the plaintiffs had never previously expressed a desire to expand the class definition. *Nerland*, 564 F. Supp. 2d 1010, 1033 n.12 (D. Minn. 2007). Plaintiffs here did in fact attempt to amend the class definition. Again, when Magistrate Judge Wright denied their Motion, she explicitly made "no finding that the amendment of the complaint was or was not required for the purposes of making those arguments regarding the class definition at the certification stage." (July 14, 2022 Hr'g Tr. at 48:6–8.)

warning well in advance of the present motions that Plaintiffs wished to amend the class definition.

In short, the Court elects in its discretion to evaluate the following class on Plaintiffs' Motion for Certification:

> All former Call Center Representatives, or other job titles performing similar job duties, employed by My Pillow, Inc., at any time from July 1, 2019 to December 31, 2020, who were not paid for all hours worked.

With that preliminary matter resolved, the Court turns to the requirements of Rule 23(a) and 23(b).

### 3.    Numerosity

The first requirement of Rule 23(a) requires the class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs argue that numerosity is easily met because the class consists of approximately 200 CCRs. (Pls.' Rule 23 Mem. at 13–14.) My Pillow contends that although it employed 198 CCRs from January 2017 to December 2020, more than half of these individuals must be excluded from the class, defeating numerosity. (Def.'s Rule 23 Opp'n at 23–24.)

When assessing numerosity, the "most obvious" factor is the number of persons in the proposed class. *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559 (8th Cir. 1986). However, "[n]o arbitrary rules regarding the necessary size of classes have been established." *Id.* Thus, in addition to the number of persons, the court considers "the nature of the action, the size of the individual claims, the inconvenience of trying individual suits, and any other factor relevant to the practicability of joining all the putative class members." *Id.* "[A] class consisting of 40 or more individuals raises a presumption that joinder is

impracticable." *Cruz*, 2015 WL 6671334, at *6 (citing *Lockwood Motors, Inc. v. Gen. Motors Corp.*, 162 F.R.D. 569, 574 (D. Minn. 1995)). "[W]here the numerosity question is a close one, a balance should be struck in favor of a finding of numerosity, since the court has the option to decertify pursuant to Rule 23(c)(1)." *Cortez v. Nebraska Beef, Inc.*, 266 F.R.D. 275, 289 (D. Neb. 2010) (quoting *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983)).

The Court agrees with Plaintiffs that numerosity is satisfied in this case. My Pillow has identified 198 individuals employed as CCRs between January 2017 and December 2020, the timeframe identified in Plaintiffs' proposed class definition. The Court's modification of the relevant period to July 1, 2019 to December 31, 2020 significantly shortens the proposed time frame from about four years to about one and a half, rendering the size of the class somewhat unclear. However, Plaintiffs need not establish the precise size of the class at this stage. *Cortez*, 266 F.R.D. at 289; *Nerland*, 564 F. Supp. 2d at 1030 ("Plaintiffs need not prove the exact number of proposed class members to satisfy the numerosity requirement as long as they can reasonably estimate the size of the class.").

Reducing the number of CCRs proportionately results in a class size around 50, which is sufficient to demonstrate numerosity. *See, e.g.*, *Ark. Educ. Ass'n v. Bd. of Educ. of Portland, Ark. Sch. Dist.*, 446 F.2d 763, 765–66 (8th Cir. 1971) (affirming certification of a class with around 17 members); *Hoekman v. Educ. Minn.*, 335 F.R.D. 219, 256–57 (D. Minn. 2020) (certifying a class with 33 members).

My Pillow asserts that 117 of the potential class members must be excluded because they received notification of the FLSA conditional certification and chose not to opt-in.

(Def.'s Rule 23 Opp'n at 24.) It contends that there is no evidence that a fear of retaliation from My Pillow or a language barrier prevented these individuals from joining. (*Id.*) The Court declines to exclude these individuals from the class on this basis. Even a mere "possibility" that individuals did not join due to a fear of retaliation warrants their inclusion in the class. *Nerland*, 564 F. Supp. 2d at 1031. Aside from retaliation, these individuals may have simply desired to avoid the burdens of affirmatively joining the FLSA collective action—for example, the exposure of embarrassing personal information through invasive deposition questioning. Rule 23 class certification does not present these obstacles.

Assuming a class size around 50 and considering that all potential members worked at the same facility, the Court finds that Plaintiffs have demonstrated numerosity.

### 4.   **Commonality and Predominance**

The second criteria under Rule 23(a) requires Plaintiffs to demonstrate the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). However, because "[p]redominance [under Rule 23(b)] subsumes the commonality requirement," the Court analyzes them both through the lens of predominance. *Custom Hair Designs by Sandy v. Cent. Payment Co., LLC*, 984 F.3d 595, 601 (8th Cir. 2020). Predominance measures "the relation between common and individual questions in a case." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

> An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof. The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues. When one or

73

more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.

*Id.* (citations and quotations omitted).

"When determining 'whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings,' but that inquiry should be limited to determining whether, if the plaintiffs' 'general allegations are true, common evidence could suffice to make out a prima facie case for the class.'" *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011) (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)). "If the liability issue is common to the class," common questions predominate over individual questions "despite individual differences in class members' damages." *Nerland*, 564 F. Supp. 2d at 1035.

Plaintiffs assert that common factual and legal questions predominate here: whether My Pillow failed to notify CCRs to report unpaid time; whether it had a widespread practice of not paying for boot up and log in work; and whether it knew that CCRs performed unpaid boot up and log in work. (Pls.' Rule 23 Mem. at 22.)

My Pillow counters that these commonalities will be overrun by individual factual inquiries into the amount of actual unpaid time owed to each class member. (Def.'s Rule 23 Opp'n at 26.) It asserts that differences in time adjustment requests, inconsistent adherence to company policies across individuals, variances in the length of the boot up and log in process, and the range of computer models used by CCRs prevent resolution via a common answer. (*Id.* at 27–30.)

74

The Court disagrees: common questions and common answers predominate here. First, all of the proposed class members were classified by My Pillow as CCRs and worked at the same location. All CCRs had to log in to their computers to access the software necessary to perform their job duties. Second, the allegations supporting the MPWA claims are that My Pillow "had a policy or practice that applied to all proposed class members and deprived them of their . . . statutory rights [to wages]." *Cruz*, 2015 WL 6671334, at *9. Plaintiffs' claims depend upon whether My Pillow had a practice of failing to compensate CCRs for boot up and log in work, a question that can be answered on a classwide basis.

Plaintiffs' case is analogous to *Burch v. Qwest Communications International, Inc.*, where call center employees sued their employer for failing to pay for boot up and log in work. 677 F. Supp. 2d 1101 (D. Minn. 2009). The Court found commonality and predominance satisfied because the defendant subjected the plaintiffs to the same boot up and log in process:

> Plaintiffs claim they were forced to work off the clock because of Qwest's general policy, monitoring systems, and reporting practices. They claim that Qwest's particular system of starting shift time based on being logged into the telephone and being ready to take calls, even though employees must boot up in order to be ready for the start of shift and must shut down after logging out of the telephone, creates widespread state law overtime violations.

*Id.* at 1125. Plaintiffs assert almost identical allegations here.

My Pillow's objections implicate individualized questions of damages, not liability. My Pillow relies heavily on its alleged policies of requiring CCRs to request a time adjustment for any boot up and log in work performed and requiring CCRs to leave their computers on at the end of their shift. As previously discussed, My Pillow has not

demonstrated the existence of these policies as a matter of law. These questions are susceptible to resolution on a class-wide basis through, for example, evidence of My Pillow's regular training procedures.

Regardless, variations in adherence to policy or in the length of the uncompensated work will not preclude certification:

> While it is true that there may be individual questions regarding the amount of time that a particular individual was required to work off the clock or how often the individual [requested a time adjustment] . . . those individual issues relate to damages. And, liability—not damages—is the focus of the commonality and predominance inquiries.

*Cruz*, 2015 WL 6671334, at *9; *Custom Hair Designs*, 984 F.3d at 602 ("Slight variation in actual damages does not defeat predominance if there are common legal questions and common facts."). Both parties have estimated the average amount of time spent on the boot up and log in process. As the Court determined above, there is sufficient evidence for the jury to infer the average length of this process.

The Court finds that Plaintiffs have demonstrated commonality and predominance. When faced with potentially individualized damages in the past, this Court has exercised its discretion to certify a liability-only class and addressed the issue of damages in a separate phase of litigation. *See, e.g.*, *Cruz*, 2015 WL 6671334, at *9. Here, the parties have not requested bifurcation of the MPWA claim nor expressed their views on the possibility of phased trials. The Court will accordingly reserve this issue for resolution closer to trial.

### 5.    Typicality

The third factor under Rule 23(a) requires the claims of the class representatives to be typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). Plaintiffs assert that the claims of Mr. Deutsch and Mr. Lyons, the proposed representatives, are typical because they held the same job, performed the same job duties, and completed the same uncompensated boot up and log in work as the members of the class. (Pls.' Rule 23 Mem. at 17–18; Pls.' Rule 23 Reply at 10–12.)

My Pillow argues that Mr. Lyons' computer modifications distinguish his claims from those of the class and will dominate in the litigation. (Def.'s Rule 23 Opp'n at 31–32.) As for Mr. Deutsch, My Pillow contends that his claims are atypical due to his habit of leaving his computer on, his decision to only seek time adjustments for delays great than 10 minutes, and his testimony about experiencing more updates than others. (*Id.* at 32.)

"[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (citation omitted)." The burden of demonstrating typicality is not "onerous," however the class representative must demonstrate that they are not "alone in [their] dissatisfaction with the employer's unlawful practices." *Paxton*, 688 F.2d at 562. As with commonality, factual variations in individual claims do not preclude certification "if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory. When typicality and commonality arguments overlap significantly, the analysis for commonality largely determines typicality." *Custom Hair Designs*, 984 F.3d at 604.

The Court finds that Mr. Deutsch and Mr. Lyons have grievances typical of the class. Both challenge My Pillow's failure to compensate CCRs for boot up and log in time under the same legal theory: failure to pay for all hours worked in violation of the MPWA. Because Mr. Deutsch and Mr. Lyons' claims "resemble the theories applicable to all class members, minor factual variations . . . do not defeat typicality." *Id.*

My Pillow asserts that Mr. Lyons is subject to unique defenses, due to his computer modifications, which will dominate the adjudication of his claims. (Def.'s Rule 23 Opp'n at 31–32.) It argues that this "separate and distinct course of conduct" renders him atypical of the class. (*Id.* (quoting *Nagel v. United Food & Com. Workers Union*, No. 18-cv-1053 (WMW/ECW), 2021 WL 347414, at *5 (D. Minn. Feb. 2, 2021)). But the *Nagel* court found no typicality because of the *defendant's* distinct course of conduct in dealing with other class members. *Nagel*, 2021 WL 347414, at *5. Here, My Pillow required all CCRs, including Mr. Lyons, to perform log-in work before clocking in to ADP.

And the Court is not convinced that the dispute over the computer modifications will consume the litigation. This is not the type of central defect that prevents certification. *See, e.g.*, *In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999) (denying certification because the sole remaining class representative had sold their business and ownership over the central antitrust claim in the case was unresolved). Moreover, as noted above, multiple Plaintiffs testified to experiencing boot up and log in times consistent with those displayed in the First Video.

My Pillow's objections to Mr. Deutsch's typicality are not persuasive. Mr. Deutsch's comment that he experienced frequent updates implicates the amount of

damages he is owed, not My Pillow's liability for its policy of requiring unpaid work. The same is true for the number of time adjustments he sought and whether he left his computer on at the end of his shift. *Custom Hair Designs*, 984 F.3d at 604 ("Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims."). The Court has already found a question of disputed material fact on My Pillow's time adjustment and computer boot up policies. The Court will not find Mr. Deutsch's behavior atypical in light of these open questions.

The Court therefore finds that Mr. Lyons and Mr. Deutsch satisfy Rule 23(a)(2)'s typicality requirement.

### 6. Adequacy

The final Rule 23(a) requirement demands that the class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

Plaintiffs argue that Mr. Deutsch and Mr. Lyons are adequate representatives because they have diligently participated in the litigation by sitting for depositions and by capturing the video evidence of the boot up and log in process. (Pls.' Rule 23 Mem. at 19–20.) They assert that Mr. Deutsch and Mr. Lyons share an identical desire with the class members—to recover for unpaid time. (Pls.' Rule 23 Reply at 13–14.)

My Pillow argues that Mr. Lyons cannot adequately represent the class because he is "motivated by personal animus" and has published statements about My Pillow and this litigation on his Facebook page. (Def.'s Rule 23 Opp'n at 33.) It further contends that Mr. Deutsch cannot adequately represent the class because he has not demonstrated a

79

willingness to participate in the litigation. (*Id.* at 34.) My Pillow does not challenge the adequacy of Plaintiffs' counsel. (*Id.* at 32.)

Adequacy is met where "the representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge." *City of Farmington Hills Emps. Ret. Sys. v. Wells Fargo Bank, N.A.*, 281 F.R.D. 347, 353 (D. Minn. 2012). The requirement of adequacy "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "'But perfect symmetry of interest is not required and not every discrepancy among the interests of class members renders a putative class action untenable. . . . [T]o forestall class certification the intra-class conflict must be so substantial as to overbalance the common interests of the class members as a whole.'" *Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 767 (8th Cir. 2020) (quoting *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 138 (1st Cir. 2012)).

Here, My Pillow has not identified an intra-class conflict substantial enough to defeat adequacy. Mr. Lyons' Facebook posts relating to his termination and this lawsuit, however ill-conceived, do not demonstrate that he "cannot be trusted to convey accurate information to the class about the lawsuit" or that personal animus will prevent him from "protect[ing] the rights of absent class members." (Def.'s Rule 23 Opp'n at 23.) Mr. Lyons admitted to posting on Facebook but denied that he wishes to punish My Pillow for terminating him. (Lyons Dep. at 130:12–14, 132:14–33:6.)

First, My Pillow's concerns are "entirely speculative and . . . insufficient to render class certification inappropriate because it relies on nothing more than conjecture" about

how Mr. Lyons will behave towards the other class members. *Vogt*, 963 F.3d at 767. Second, even assuming that Mr. Lyons feels personal animus towards My Pillow, this is not the type of divergent *legal* interest that would disadvantage other class members and prevent certification. *See id.* at 768 ("[E]ven if there are slightly divergent theories that maximize damages for certain members of the class, 'this slight divergence is greatly outweighed by shared interests in establishing [defendant's] liability.'") (quoting *DiFelice v. U.S. Airways, Inc.*, 235 F.R.D. 70, 79 (E.D. Va. 2006)).

Next, My Pillow points to Mr. Deutsch's testimony that he does not discuss this case with his girlfriend and that he does not care about the amount of recovery. (Def.'s Rule 23 Opp'n at 34.) Mr. Deutsch's private discussions are irrelevant to the adequacy inquiry, which focuses on the similarity of the representative's interests to the rest of the class. *City of Farmington*, 281 F.R.D. at 353. Regardless of Mr. Deutsch's feelings about his precise financial recovery, he maintains an identical interest to the other members of the class to demonstrate My Pillow's liability for unpaid boot up and log in work. That interest is the core of this litigation.

My Pillow has failed to raise an issue sufficient to contest Mr. Deutsch and Mr. Lyons' ability to fairly and adequately protect the interests of the proposed class. The Court finds that Mr. Deutsch and Mr. Lyons will adequately represent the class.

### 7.   **Superiority**

Finally, Rule 23(b)(3) requires that the class action form be superior to other methods of adjudication. The rule provides four nonexclusive factors for courts to assess:

81

    (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
    (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
    (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
    (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Considering these factors, the Court finds that a class action is the superior method of adjudicating this case. First, the class members likely have little interest in individually controlling separate actions. "Plaintiffs' individual claims are for tens or hundreds of dollars. Absent a class action, no plaintiff is likely to pursue their claim individually." *Custom Hair Designs*, 984 F.3d at 605. Second, the parties have presented no evidence of separate individual actions against My Pillow for these claims. Third, concentrating this action in this forum is desirable because all of the relevant conduct occurred at My Pillow's Chaska, Minnesota call center. Lastly, this case does not present any significant manageability concerns. Plaintiffs bring their class claim under a single state's law, for a single activity, performed at a single location by all members of the class. *Burch*, 677 F. Supp. 2d at 1128–29 ("By focusing only on the booting up and shutting down claims, the ultimate trial of this case will focus on two limited activities which are universally performed across the class.").

In conclusion, the Court finds that Plaintiffs have satisfied each requirement of Rule 23(a) and 23(b). Accordingly, the Court grants certification of Plaintiffs' MPWA class, appoints Mr. Deutsch and Mr. Lyons as class representatives, and appoints Plaintiffs' counsel as class counsel.

### III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion for Summary Judgment [Doc. No. 121] is **DENIED**;

2. Defendant's Motion for Summary Judgment [Doc. No. 140] is **GRANTED** in part and **DENIED** in part;

3. Plaintiffs' Motion to Certify Class and Appointment of Class Representatives and Class Counsel [Doc. No. 128] is **GRANTED**;

4. The Court certifies the following Rule 23 class:

   > All former Call Center Representatives, or other job titles performing similar job duties, employed by My Pillow, Inc., at any time from July 1, 2019 to December 31, 2020, who were not paid for all hours worked.

5. This class is certified with respect to Plaintiffs' claim for a violation of the Minnesota Payment of Wages Act, Minn. Stat. § 181.101(a);

6. Within seven (7) days of the date of this Order, the parties shall submit a joint proposed notice to the Court. If the parties are unable to agree on the content of the notice, the parties shall each submit a proposed notice, together with briefing not to exceed eight (8) pages per side, within fourteen (14) days of the date of this order.

7. Mr. Deutsch and Mr. Lyons are appointed as class representatives; and

8. Plaintiffs' counsel, Jacob R. Rusch, Timothy J. Becker, and Zackary S. Kaylor of Johnson Becker, PLLC, and Jennell K. Shannon of Ballard Spahr LLP, are appointed as class counsel.

Dated: April 27, 2023                    s/ Susan Richard Nelson
                                         SUSAN RICHARD NELSON
                                         United States District Judge