## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Brandon Deutsch, individually and on behalf of all similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>My Pillow, Inc.,<br><br>Defendant. | Case No. 20-cv-0318 (SRN/ECW)<br><br>**ORDER ON DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY OF BRIAN C. GRIESER** |

Jacob Robert Rusch, Timothy J. Becker, and Zackary S. Kaylor, Johnson Becker PLLC, 444 Cedar St., Ste. 1800 St. Paul, MN 55105, for Plaintiff

Alec J. Beck, Andrew D. Parker, and Lori A. Johnson, Parker Daniels Kibort, LLC, 123 3rd St. N., Ste. 888, Minneapolis, MN 55401, for Defendant

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant My Pillow, Inc.'s ("My Pillow's") Motion to Exclude Expert Testimony of Plaintiffs' Expert Brian C. Grieser [Doc. No. 134]. Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court denies the motion.

## I.   BACKGROUND

The Court incorporates by reference its discussion of the background of this litigation in its April 26, 2023 order (the "Summary Judgment Order") [Doc. No. 169] that addressed the parties' cross motions for summary judgment and plaintiffs' class certification motion.  In brief, Defendant My Pillow is a Minnesota corporation that

manufacturers pillows and other products.  (Am. Compl. [Doc. No. 31] ¶ 2.)  Plaintiffs are a group of current and former My Pillow employees who worked as customer service representatives and sales representatives, known as "call center representatives," or "CCRs," at My Pillow's Chaska, Minnesota call center between 2017 and 2020.[1]  (*Id*. ¶ 14.)  My Pillow provided computers with software, including a program called Annaware, from which CCRs answered customers' phone inquiries.  (Miles Summ. J. Decl. [Doc. No. 145] ¶ 6; *see also* Hagaman Decl. [Doc. No. 148] ¶ 7.)  In November 2021, My Pillow moved its call center.  (First Kaylor Decl. [Doc. No. 124], Ex. 2 (Miles Dep.) at 12:3–9).)  At that time, My Pillow updated its technology.  (*Id*.; Kaylor Decl., Ex. 18 (Hagaman Dep.) at 43:16–24).)

### A.    Employee Log-In Times

In this lawsuit, Plaintiffs seek compensation for unpaid time spent booting up and logging into My Pillow's computers prior to clocking into My Pillow's electronic timekeeping system, ADP.  My Pillow did not record or keep track of this time.  (*See* Summ. J. Order at 31.)  Plaintiffs allege that by failing to pay them for this time, My Pillow violated various labor laws, including the Fair Labor Standards Act ("FLSA") and the Minnesota Payment of Wages Act.

Prior to taking their first calls of the day, CCRs were required to complete the "call-ready process," which consisted of logging into their computers, logging into ADP,

---

[1] Plaintiffs currently include Brandon Deutsch, Shandrea Jenkins, Craig Lyons, Susan Dols, Kelsie Mendez Zepeta, and Thomas Arth.

punching in, opening Outlook, opening Annaware, and checking their email. (Miles Dep. at 92:14–17.) If an employee's computer was powered down, prior to taking any of these steps, the employee had to first turn on their computer. My Pillow would begin to compensate CCRs after they opened their browser, logged into ADP, and clicked "clock in." (*Id*. at 24:25–25:4.)

In their deposition testimony, Plaintiffs generally estimated the log-in process took five to eight minutes per day. (Sokolowski Summ. J. Decl. [Doc. No. 140], Ex. 1 (Arth Dep.) at 14:3–9, 21:16–21 (five to eight minutes, on average); *id*., Ex. 2 (Deutsch Dep.) at 15:21–23 (eight minutes on a good day); *id*., Ex. 5 (Jenkins Dep.) at 47:19–24 (approximately five minutes); *id*., Ex. 6 (Lyons Dep.) at 113:19–23, 141:4–6, 143:5–18 (five to ten minutes); *id*., Ex. 7 (Mendez Zepeta Dep.) at 12:10–15 (no less than five minutes during training period); *id*., Ex. 3 (Dols Dep.) at 10:8–9, 32:6–33:24 (close to an average of seven minutes).) Deutsch testified that on days when he had to power-on his computer from a cold start, the boot-up process sometimes took 10 to 15 minutes, and at best, eight minutes. (Deutsch Dep. at 15:21–23.) He noted that log-in times were inconsistent across computers, and testified that the boot-up and log-in process once took 30 minutes on his assigned computer. (*Id*. at 47:24–48:4.) Jenkins testified that after she began leaving her computer powered on at the end of shift, the log-in process took approximately one to two minutes, assuming no computer updates were necessary. (Jenkins Dep. at 36:14–47:3; *see also* Mendez Zepeta Dep. at 59:21–60:1.) If there were computer updates, Lyons estimated that the log-in process could take 10 to 15 minutes. (Lyons Dep. at 60:5–11.)

While working at My Pillow, Lyons recorded two videos showing the boot-up and log-in process. (First Kaylor Decl., Exs. 23 (First Video) & 25 (Second Video).) In the first video, recorded on August 7, 2019, he powered on his computer from a cold start. (First Video at 7:25–08:01; Lyons Dep. at 104:8–13.) The process of booting up and logging in took him approximately seven minutes and 21 seconds. (First Video at 7:25–08:01; Lyons Dep. at 104:8–13.) In the second video, recorded on August 19, 2019, it is unclear whether Lyons powered on his computer, but the process of logging in took three minutes and 57 seconds. (Second Video at 03:57.)

In its defense, My Pillow asserts that it provided training to CCRs on timekeeping practices, maintained a procedure in which employees could request time adjustments, required CCRs to report technology problems, and instructed that its computers should not be turned off at the end of a CCR's shift. (*See* Summ. J. Order at 15–20.) Because these facts are not directly at issue in the instant motion, the Court does not address them further.

### B.    Expert Opinions

Plaintiffs retained Brian C. Grieser as an expert witness to perform an elemental time study at My Pillow's new call center location. (Sokolowski Decl. [Doc. No. 137], Ex. 1 (Grieser Report) at 1.) Mr. Grieser is a Senior Consultant and Director of Technology and Instrumentation at Applied Safety and Ergonomics, Inc. ("ASE") in Ann Arbor, Michigan. (*Id*. at 2.) He holds master's and bachelor's degrees from the University of Michigan College of Engineering. (*Id*.) Mr. Grieser has over 28 years of experience in conducting research, consulting, and lecturing in the following areas: human factors/ergonomics, time study, statistics, design of experiments, and product,

occupational, and premises safety management.  (*Id*.)  Mr. Grieser leads the time and motion study work at ASE, which has conducted multiple time studies in a variety of workplace settings.  (*Id*.)  In particular, ASE has specialized experience in the analysis and timing of donning/doffing, sanitizing of protective clothing/PPE, COVID-19 screening, and other off-the-clock and overtime work.  (*Id*.)

During Mr. Grieser's July 21, 2022 live study of first and second shift My Pillow CCR employees, he studied the amount of time reasonably required for CCRs "to open and log into various programs prior to taking the first call of the day."  (*Id*.)  Based on his study, he opines that My Pillow employees spend an average of 24 seconds opening and logging into Windows, 12 seconds opening Outlook, 43 seconds opening the My Pillow Order Tracker, and 33 seconds opening and logging into the web-based ADP timekeeping software, for a total of approximately 112 seconds.  (Grieser Report at 1.)

Mr. Grieser also reviewed at least one of the 2019 Lyons videos, and found that Lyons spent approximately 62 seconds booting up the computer, 226 seconds logging into Windows, 39 seconds opening Outlook, and 111 seconds opening the ADP software, for a total of approximately 438 seconds.  (*Id*. at 1–2.)

My Pillow retained Dr. Robert G. Radwin to rebut Mr. Grieser's opinion. (Sokolowski Decl., Ex. 2 (Radwin Report) at 1.)  Dr. Radwin personally observed Mr. Grieser's time study and reviewed his report and findings.  (*Id*. at 3.)  In general, he opines that Plaintiffs' time study:  (1) does not help the jury understand the total time that My Pillow employees spent logging into their computer and clocking into the time clock; (2) is not based on sufficient facts or data; (3) is not the product of reliable principles and

methods; and (4) does not reliably apply the principles and methods to the facts of the case. (*Id*. at 6.)  Dr. Radwin performed his own calculations and opines that "the average time to launch Windows was 23.63 seconds, and the average time taken for the online ADP time tracking software to load for a CCR to log in was 32.68 seconds," for a total time of 56.31 seconds.  (*Id*. at 4.)

Mr. Grieser produced a rebuttal report in response to Dr. Radwin's criticisms, which the Court discusses in greater detail below.  (Miles Decl. [Doc. No. 155], Ex. 3 (Grieser Rebuttal Report at 1–2.)

## II.   DISCUSSION

My Pillow moves to exclude Mr. Grieser's opinion in its entirety, arguing that it is not helpful to the finder of fact, is not the product of reliable principles and methods, and that his commentary on the Lyons video does not constitute expert testimony.  (Def.'s Mem. [Doc. No. 136] at 8–12; Def.'s Reply [Doc. No. 163] at 2–9.)  Thus, My Pillow contends that his opinion fails to meet the requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579 (1993).

Plaintiffs oppose the motion, arguing that Mr. Grieser's opinion sufficiently meets the requirements of Rule 702 and *Daubert* and should not be excluded.

### A.   Standard of Review

Federal Rule of Evidence 702 governs the admissibility of expert testimony.[2] Under the rule, proposed expert testimony must satisfy three prerequisites to be admitted.

---

[2] Rule 702 provides:

*Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).  "First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact."  *Id.*  (citation omitted). "Second, the proposed witness must be qualified to assist the finder of fact."  *Id.*  (citation omitted).  "Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires."  *Id.* (citation omitted) (internal quotation marks omitted).

These requirements reflect the Supreme Court's analysis in *Daubert*, in which the Court emphasized the district court's gatekeeping obligation to make certain that all testimony admitted under Rule 702 "is not only relevant, but reliable."  509 U.S. at 589; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (extending *Daubert* to technical and other specialized expert testimony).  Under *Daubert*, the cornerstone for

---

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

admissibility is assistance to the trier of fact. *See Larson v. Kempker*, 414 F.3d 936, 940–41 (8th Cir. 2005).

Under this standard, proponents must demonstrate by a preponderance of evidence that the expert's opinion is reliable. Courts generally support "an attempt to liberalize the rules governing the admission of expert testimony," and favor admissibility over exclusion. *See Lauzon*, 270 F.3d at 686 (citation omitted) (internal quotation marks omitted); *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Doubts regarding the usefulness of an expert's testimony should be resolved in favor of admissibility, *United States v. Finch*, 630 F.3d 1057, 1062 (8th Cir. 2011), and gaps in an expert witness's qualifications or knowledge generally go to the weight of the testimony and not its admissibility, *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (citing 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure: Evidence* § 6265 (1997)).

### B.    Helpful to the Trier of Fact

My Pillow argues that Mr. Grieser's opinion is not helpful to the trier of fact and should be excluded because (1) the length of time it takes a CCR to become call-ready is not at issue in this litigation; (2) the length of time it currently takes a CCR to perform the log-in process is not relevant; and (3) Mr. Grieser's calculations related to Outlook and Annaware are improperly tabulated and misleading. (Def.'s Mem. at 8–12.)

### 1.      Length of Time to Clock In

In his Report, Mr. Grieser states that he considered the time it took CCRs "to open and log into various programs prior to taking their first call of the day." (Grieser Report at 3.) My Pillow argues that Mr. Grieser's opinion must be excluded because "[t]he time it takes to open any programs once a CCR is clocked in, but prior to taking their first call, is of no consequence here." (Def.'s Mem. at 8.)

Plaintiffs assert that My Pillow misinterprets Mr. Grieser's opinion, noting that he "identified, timed, and reported the mean times for four activities that [CCRs] were observed performing prior to clocking in: Windows log-in, opening Outlook, opening My Pillow Order Tracker, and opening and logging into the ADP time-keeping application." (Pls.' Opp'n [Doc. No. 150] at 6) (quoting Grieser Report at Attachment A). As Mr. Grieser clarifies in his Rebuttal Report, the end point for his elemental time calculations was when CCRs logged into ADP. (Grieser Rebuttal at 2.) As it appears that Mr. Greiser did not include in his calculation any activities that occurred after CCRs logged into ADP, the Court finds his opinion helpful to the factfinder. To the extent that My Pillow questions whether the opening of certain programs prior to the ADP log-in should be included in the study's calculations, My Pillow will have a full opportunity to cross examine Mr. Grieser at trial and to present its own expert's testimony in this regard.

### 2.      Testing of Current Clock-In Process

My Pillow also argues that Mr. Grieser's opinion regarding the length of time it *currently* takes CCRs to perform the log-in process is not helpful to the factfinder, as the

9

relevant timeframe is from 2017 to 2020.[3]   (Def.'s Mem. at 8.)   Furthermore, it contends that Mr. Grieser improperly extrapolates a conclusion about a different group of CCRs, at a different location, using different equipment.   (*Id*. at 10 n.4 (citing *Buffalo Wild Wings, Inc. v. Buffalo Wings & rings*, No. 09-cv-1426 (JRT/SER), 2012 WL 13128107, at *2 (D. Minn. Feb. 14, 2012) (excluding expert who relied on two franchise locations to average expenses across all locations).)   My Pillow further points to the testimony of Plaintiff Dols, asserting that she testified that she has experienced no delays in the log-in process since 2021.   (Def.'s Mem. at 10.)

Plaintiffs agree that their claims are limited to the 2017–2020 time period, and that My Pillow's CCRs presently work in a different location, using newer computers.   (Pls.' Opp'n at 6.)   Moreover, they concede that Mr. Grieser's calculations do not represent the amount of time it took Plaintiffs to complete the boot-up and call-ready processes between 2017 and 2020.   (*Id*.)   However, they seek to offer Mr. Grieser's time study as evidence that unpaid boot-up work exists, and as evidence of no administrative difficulties in calculating such time.   (*Id*. at 1.) They also assert that My Pillow misrepresents Ms. Dols' testimony, asserting that she reported spending one to two minutes booting up her computer in 2022.   (*Id*. at 7 (citing Dols Dep. at 23:10–25:19).)

---

[3] My Pillow also argues that Mr. Grieser lacks foundation to testify about the boot-up procedure at My Pillow for the 2017 to 2020 period.  (Def.'s Reply at 3.)  The Court declines to exclude his testimony at this time on this basis, subject to any pretrial rulings, and foundation and objections at trial.

While My Pillow argues that expert testimony is unnecessary to establish that unpaid boot-up work exists, (Def.'s Reply at 2–3), the Court finds that Mr. Grieser's analysis may be helpful to the factfinder on that question and as to whether and how such work can be quantified.   As such, his testimony may be relevant to a potential de minimis defense.   As noted in the Summary Judgment Order, under the de minimis doctrine, "[e]mployers are not required to pay employees for 'insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes[.]'" *Lyons v. Conagra Foods Packaged Foods LLC*, 899 F.3d 567, 584 (8th Cir. 2018) (quoting 29 C.F.R. § 785.47).   To determine whether uncompensated overtime is de minimis, courts consider:   "[1] the amount of time spent on the extra work, [2] the practical administrative difficulties of recording additional time, [3] the regularity with which the additional work is performed, and [4] the aggregate amount of compensable time."   *Id.* (quoting *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 176 (7th Cir. 2011)).   Plaintiffs maintain that Mr. Grieser's opinion is relevant to the second factor.   (Pls.' Opp'n at 1.)   However, My Pillow argues that the administrative difficulties of recording additional time is a legal conclusion that Mr. Grieser may not offer.   (Def.'s Reply at 4.)

"Under the Federal Rules of Evidence, opinion testimony is not inadmissible solely because it embraces an ultimate issue to be decided by the trier of fact."   *Kostelecky v. NL Acme Tool/NL Indus., Inc.*, 837 F.2d 828, 830 (8th Cir. 1988) (citing Fed. R. Evid. 704(a)) ("An opinion is not objectionable just because it embraces an ultimate issue.").   However, while expert testimony must be helpful to the trier of fact "to understand the evidence or

to determine a fact in issue," Fed. R. Evid. 702, "evidence that merely tells the jury what result to reach is not sufficiently helpful to the trier of fact to be admissible." *Kostelecky*, 837 F.2d at 830 (citing *Hogan v. Am. Tel. & Tel. Co.*, 812 F.2d 409, 411–12 (8th Cir. 1987)).   In addition, "[l]egal conclusions do not qualify as expert opinions."   *Estes v. Moore*, 993 F.2d 161, 163–64 (8th Cir. 1993).   An expert witness may not give an opinion regarding the law's meaning because "[m]atters of law are for the trial judge, and it is the judge's role to instruct the jury on them."   *S. Pine Helicopters, Inc. v. Phoenix Aviation Mgrs., Inc.*, 320 F.3d 838, 841 (8th Cir. 2003).   He "may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied."   *Hoekman v. Educ. Minn.*, 335 F.R.D. 219, 239 (D. Minn. 2020) (quoting *Walsh v. Principal Life Ins. Co.*, 266 F.R.D. 232, 238 (S.D. Iowa 2010)).

Indeed, Mr. Grieser may not offer the legal opinion or conclusion that it would not have been administratively difficult for My Pillow to measure the additional time that CCRs spent booting up and logging into their computers prior to clocking in.   However, it does not appear that Plaintiffs seek to offer an improper legal opinion.   Rather, Plaintiffs seek to present Mr. Grieser's testimony regarding his time study "only as evidence that boot-up work exists and that it is possible to calculate how much time it took to complete the work at issue across a collective group of CCRs."   (Pls.' Opp'n at 1.)   If My Pillow presents a defense that the additional time was de minimis, it will be up to the jury to determine whether the facts demonstrate that it would have been administratively difficult to account for the additional time.   In this regard, Mr. Grieser's opinion is distinguishable

from the opinion of the excluded expert in *Buffalo Wild Wings*, who compared revenues of restaurant locations to opine on a jury question—whether the defendant had been unjustly enriched—and to opine about the costs associated with franchise revenues.  2012 WL 13128107, at *1.

While the determination of whether the de minimis doctrine applies is typically a legal question for the court, *see, e.g.*, *Lyons*, 899 F.3d at 584, where there is a fact dispute about the amount of uncompensated time, some courts have held that the determination  is a question for the jury.  *Garcia v. Vertical Screen, Inc.*, 580 F. Supp. 3d 79, 89–90 (E.D. Penn. 2022); *Walsh v. E. Penn Mfg. Co., Inc.*, 555 F. Supp. 3d 89, 124 (E.D. Penn. 2021). Regardless of whether it is a legal or factual question, the current record contains disputed issues of material fact regarding how much time Plaintiffs expended prior to clocking in. (*See* Summ. J. Order at 44–47.)  In addition, it is unknown whether My Pillow will present a de minimis defense at trial, as well as whether they will present evidence or counter evidence regarding the administrative difficulties in measuring additional time.  Given all these unknowns, the Court will not exclude Mr. Grieser's testimony on this basis, at this time.

Finally, My Pillow asserts that Mr. Grieser's time study calculations should be excluded as irrelevant and prejudicial to the jury.  (Def.'s Reply at 4–5.)  The Court declines to exclude his testimony on this basis, at this time, however, the Court will assess how the proposed expert testimony is offered in context, subject to any pretrial evidentiary rulings and objections at trial.

### 3.      Calculations Regarding Outlook and Annaware

Additionally, My Pillow contends that Mr. Grieser's time measurements related to Outlook and Annaware were improperly calculated and are misleading. (Def.'s Mem. at 10.) My Pillow argues that although Mr. Grieser acknowledges that only a small fraction of employees launch Outlook and/or Annaware, it is unclear whether these actions were performed on or off the clock. (*Id.*) Even assuming that employees performed these tasks prior to clocking in, My Pillow argues that Mr. Grieser improperly calculated and wrongly included the average time spent loading Outlook and Annaware in his total time calculation for all observed CCRs, thereby inflating the average time for the log-in process by almost 33%. (*Id.* at 10–11.)

In his Rebuttal Report, Mr. Grieser clarifies that he only measured work that CCRs performed prior to clocking in. (Pls.' Opp'n at 7.) Although not every CCR opened Outlook and Annaware prior to clocking in, Plaintiffs assert that "it was work that some employees did, in fact, engage in prior to clocking in," making it relevant to the overall reported time. (*Id.*) Mr. Grieser offers no opinion on "whether that time is compensable or should be applied to the group as a whole." (*Id.*) Plaintiffs further note that Mr. Grieser provided total times for each individual element, e.g., Outlook or Annaware, alongside the average times for each element. (*Id.* at 8.)

The Court declines to exclude Mr. Grieser's opinion on this basis. As Plaintiffs note, he will not opine as to whether this time is compensable or should be applied to the group as a whole, and he provides separate calculations for the amount of time spent on each individual task, making it possible to take the Outlook or Annaware log-in time into

account or to disregard it.  My Pillow will have a full opportunity to cross examine Mr. Grieser and to present its own expert's testimony on this point.

In sum, the Court finds that Mr. Grieser has expertise in time studies that may be helpful to the finder of fact.

### C.     Reliable Principles and Methodologies

My Pillow also argues that Mr. Grieser's opinion should be excluded because his study fails to comply with generally accepted time-study standards and is based upon unreliable elements.  (Def.'s Mem. at 12.)

### 1.     Generally-Accepted Standards

My Pillow first argues that Mr. Grieser failed to provide a definite start point and end point to measure the time employees spent logging into Windows and the ADP timekeeping portal.  (*Id*.)  My Pillow's expert, Dr. Radwin, opines that one of the seven standard criteria for separating work into elements in an elemental time study is that the elements should be "easily detected and defined by a definite end point."  (Radwin Report at 4 (citing M.E. Mundel and D.L. Danner, *Motion and Time Study: Improving Productivity*, 419, 7th ed. (1998).)

While Mr. Grieser's initial Report may have only suggested the start and end times for opening and logging into software programs by describing the use of ASE's time-calculating application, (Grieser Report at 3–4), his Rebuttal Report clearly identifies the start and end times for booting up the computer, logging into Windows, logging into Outlook, logging into My Pillow Order Tracker, and logging into the ADP timekeeping system.  For example, with respect to booting up the computer, Grieser states that the

starting point was "when subject touches power button on computer, mouse button, or key on keyboard," and the ending point was "when Windows login screen appears." (Grieser Rebuttal Report, Attachment A.)  With respect to the ADP log-in, Grieser states that the starting point was "when subject clicks on browser icon or browser autoloads, or when subject clicks on ADP icon, bookmark," and the ending time was "when subject is clocked in on ADP website." (*Id.*)  Mr. Grieser also identifies the start and end times for the other software. (*Id.*)

The Court finds this information sufficiently conforms with accepted principles and methodologies for an elemental time study. (*See* Radwin Report at 4.)  Accordingly, the Court will not exclude Mr. Grieser's opinion on this basis.

## 2.   Separation of Hand Work from Machine Work

My Pillow also contends that Mr. Grieser failed to meet another criterion for elemental time studies by not separating hand work (i.e., keying and using a computer mouse) from machine work time (i.e., time for the computer to access applications from memory, obtain information from the computer network, and launch software). (Def.'s Mem. at 12–13; Radwin Report at 4 (opining that in an elemental time study, "hand work should be separated from machine work time.").)

Mr. Grieser responds to this criticism by explaining that many of the time-study criteria cited by Dr. Radwin are specific to an industrial context, which is not the context here. (Grieser Rebuttal at 2.)  For instance, Mr. Grieser opines, "hand work versus machine work and internal work versus external work are distinctions that matter when setting a performance rating or a time standard but are irrelevant and unnecessary in measuring how

long it takes workers to log into computers." (*Id*. at 2–3 (citing A. Frievalds & B. Niebel, *Niebel's Methods, Standards, and Work Design* (12th ed. 2009)).  In addition, Mr. Grieser opines that including distinctions between hand work and machine work "would unnecessarily complicate the study" and could run counter to other accepted time-study criteria.  (*Id*. at 3.)

The Court finds that Mr. Grieser has sufficiently explained his methodology and his reasons for not separating hand work from machine work in his time study.  The Court therefore declines to exclude Mr. Grieser's testimony on this basis.  My Pillow will have a full opportunity to question Mr. Grieser regarding hand work versus machine work and to present the testimony of its expert, Dr. Radwin, at trial.

### 3.   Separation of Simultaneous Activities

Additionally, My Pillow argues that Mr. Grieser's time study is unreliable because he did not separate the times of simultaneous activities, such as when employees logged into one program while waiting for another to load.  (Def.'s Mem. at 13.)  Rather, My Pillow asserts that Mr. Grieser stopped his measurement for the first activity and started his measurement of the second activity.  (*Id*.)  By not separating the time for the different activities, My Pillow argues that Grieser is unable to identify which activity began first, how long the first activity truly took, or how the first activity impacted the second.  (*Id*.)  My Pillow contends that such separation is another standard criterion in elemental time studies and Mr. Grieser's opinion should be excluded for failing to account for it.  (*Id*.)

In his Rebuttal Report, Mr. Grieser clarifies that "only one timer was running for one activity for one subject at a time."  (Grieser Rebuttal at 5.)

Because Mr. Grieser measured one activity at a time, the Court will not exclude his opinion as unreliable or inconsistent with standard principles and methodologies for elemental time studies.

### D.      Sufficient Data

My Pillow also moves to exclude Mr. Grieser's opinion, arguing that under generally accepted time-study principles, the 24 observations included in the time study are insufficient.  (Def.'s Mem. at 14.)  In particular, My Pillow states that the margin of error for the elements of the time study exceeded 13%, with an error margin as great as 111%, while a generally accepted margin of error for such studies is 5–10%.  (*Id*.)  In addition, My Pillow contends that Mr. Grieser's time study failed to observe employees on more than one occasion and failed to take into account the irregularity of Plaintiffs' experiences with delays in clocking in.  (*Id*.)

In response, Mr. Grieser draws a distinction between a study that uses a sampling methodology, in which an adequate number of subjects must be included so the sample represents the whole population, versus a census methodology, in which the entire population is studied.  (Grieser Rebuttal at 5.)  Mr. Grieser states that the study here was a census study of the population of CCRs, not a representative sampling study.  (*Id*.)  He further opines:

> To the extent that Dr. Radwin suggests [Mr. Grieser's employer, ASE,]
> needed more data, it is important to note that 1) the population at the location
> was limited, and it is unlikely that enough unique subjects would be available
> to meet the statistical thresholds he opines were necessary; 2) studying the
> same subjects multiple times introduces other statistical problems, such as
> covariance; and 3) ASE was limited in its observations:  defense counsel
> wanted to end our study early for a personal matter before seven subjects

were scheduled to arrive at 11:00 p.m.  In return, he stipulated that our sample size would not be criticized. . . .  Additional elemental data gathered from these seven potential subjects would have affected the percent error that Dr. Radwin reported in Table 1 of his report.

(*Id*.)  Plaintiffs argue that Dr. Radwin's error rate calculations and criticism of the sample size is based on the incorrect "assumption that there was, in fact, a larger population to study." (Pls.' Opp'n at 12.)  Moreover, they contend that the amount of time Plaintiffs and the proposed class spent booting up their computers and completing call-ready work "is not relevant to Grieser's time study." (*Id*. at 13.)  Rather, Plaintiffs again maintain that Mr. Grieser's opinions are offered to show that boot-up work exists and that it is administratively possible to calculate the amount of unpaid preliminary computer work that CCRs perform.  (*Id*.)

The Court finds that Mr. Grieser's elemental time study relied on generally accepted principles and methodologies for a census study.  Again, My Pillow can explore the bases for Mr. Grieser's opinions on cross examination and through its own evidence.  My Pillow's motion to exclude Mr. Grieser's testimony on this basis is therefore denied.

### D.    Lyons Video

Finally, My Pillow moves to exclude Mr. Grieser's opinion regarding the Lyons video.  It contends that Mr. Grieser's analysis of how long it took Lyons to perform the log-in process depicted in the video is not based on any specialized knowledge or skill and is unhelpful to the jury. (Def.'s Mem. at 15.)  My Pillow notes that the video's time stamps demonstrate the difference between the time that Lyons began to use the computer and when he clocked in, such that expert testimony is unnecessary. (*Id*.)  In addition, My Pillow

points to Lyons' deposition testimony in which he acknowledges that he clicked on the internet browser at the 6:09 mark, and his browser opened at the 6:25 mark, resulting in 14 seconds to open the browser, which My Pillow characterizes as "basic math." (*Id*.)

Also, My Pillow argues that Mr. Grieser's opinion regarding the Lyons video is unhelpful to the factfinder, asserting that Lyons' computer was "heavily modified" and unrepresentative of any other CSR's computer. (*Id*. at 15–16.)  Moreover, it contends that the expert's opinion is limited to Lyons' experience on a single day and fails to account for Lyons' testimony that his log-in times were inconsistent. (*Id*.)

Plaintiffs counter that Mr. Grieser's analysis of the Lyons' video is no different than his 2022 elemental time study of My Pillow CCRs, in that he identified the same elements and timed how long it took Lyons to complete each element. (Pls.' Opp'n at 13.)  Further, Plaintiffs argue that Grieser's analysis is more than a simple math calculation, as it demonstrates that in 2019, My Pillow could have observed and calculated the elements of the boot-up and call-ready process, just as Mr. Grieser did by viewing the video and performing the calculations. (*Id*. at 13–14.)

The Court agrees with Plaintiffs that Mr. Grieser's analysis consists of more than basic math as it may inform the question of whether it would have been administratively difficult for My Pillow to observe and calculate, in 2019, the amount of computer time CCRs expended prior to clocking in.  As with his testimony concerning the 2022 time study, Mr. Grieser's testimony regarding the Lyons video may be relevant to My Pillow's potential de minimis defense.  Moreover, as to the calculation of Lyons' clock-in time, Mr. Grieser's testimony need not be excluded simply because it constitutes basic math. *See*

*Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1086 (D. Minn. 2015) ("To the extent that portions of [the expert's] analysis constitutes basic addition or multiplication of the numbers he aggregated, the Court rejects Symantec's argument that such testimony would be inadmissible purely because it is a simple calculation.") (citing *WWP, Inc. v. Wounded Warriors Family Support Inc.*, 628 F.3d 1032, 1040 (8th Cir. 2011)).

In addition, as the Court discussed in its Order on Summary Judgment, there is conflicting evidence regarding whether the modifications to Lyons' computer—a video game and video game launcher—slowed down the log-in and clock-in processes such that it was an outlier among CCR's computers. (*See* Summ. J. Order at 36–37.) As to whether Lyons' log-in time is also unrepresentative because the video is limited to a single CCR, on a single day, Plaintiffs acknowledge these limitations. (Pls.' Opp'n at 13–14.) However, the video and Plaintiffs' testimony constitute evidence of the boot-up and clock-in times during a portion of relevant time period. (*Id*.) Again, My Pillow will have a full opportunity at trial to cross examine Mr. Grieser about the Lyons video and to present its own evidence.

Therefore, the Court denies My Pillow's motion to exclude Mr. Grieser's opinion and testimony regarding the Lyons video.

## III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendant My Pillow, Inc.'s ("My Pillow's") Motion to Exclude Expert Testimony of Plaintiff's Expert Brian C. Grieser [Doc. No. 134] is **DENIED**.

2.     This matter is set to be tried on Monday, July 31, 2023 in Courtroom 7B, Warren E. Burger Federal Building and U.S. Courthouse, 316 N. Robert St., St. Paul, MN 55101.  A trial order will be issued separately forthwith.

Dated: May 1, 2023                                     s/Susan Richard Nelson
                                                       SUSAN RICHARD NELSON
                                                       United States District Judge